# EXHIBIT B

**Mark Limback**
**12/07/2022**

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF MICHIGAN

3                    SOUTHERN DIVISION

4    UNIVERSAL TRUCKLOAD, INC.,

5                    Plaintiff,

6       -vs-                      No. 2:22-CV-10988

7                                 Hon. Bernard A. Friedman

8    JOSEPH BRIDGE,

9                    Defendant.

10   _____/

11   PAGE 1 TO 95

12

13        The deposition of MARK LIMBACK,

14        Taken at 22375 Haggerty Road,

15        Novi, Michigan,

16        Commencing at 1:32 p.m.,

17        Wednesday, December 7, 2022

18        Before Christina Raymond, CSR 7194.

19

20

21

22

23

24

25

**Mark Limback**
12/07/2022                                        **Page 2**

```
 1   APPEARANCES:

 2   MR. JOSEPH N. GROSS (OHIO BAR NO. 0056241)

 3   MR. THOMAS D. JACKSON (OHIO BAR NO. 0098911) VIA ZOOM

 4   Benesch, Friedlander, Coplan & Aronoff LLP

 5   200 Public Square, Suite 2300

 6   Cleveland, Ohio  44114

 7   Telephone:  216.363.4500

 8   jgross@beneschlaw.com

 9       Appearing on behalf of the Plaintiff.

10

11   MS. COURTNEY L. NICHOLS P75160

12   Plunkett Cooney

13   38305 Woodward Avenue, Suite 100

14   Bloomfield Hills, Michigan  48304

15   Telephone:  248.594.6360

16   cnichols@plunkettcooney.com

17       Appearing on behalf of the Defendant.

18

19   ALSO PRESENT:  Joseph Bridge (VIA ZOOM).

20

21

22

23

24

25
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Mark Limback**
**12/07/2022**                                    **Page 3**

1                    TABLE OF CONTENTS

2    Witness                                     Page

3    MARK LIMBACK

4     EXAMINATION BY MR. GROSS:                 5

5     EXAMINATION BY MS. NICHOLS:               92

6

7                    INDEX TO EXHIBITS

8

9    Exhibit                                     Page

10   (Exhibits attached to transcript)

11   (Exhibit D retained by Ms. Nichols)

12    DEPOSITION EXHIBIT A                      8

13    Notice

14    DEPOSITION EXHIBIT B                      28

15    Complaint

16    DEPOSITION EXHIBIT C                      31

17    Confirmation of Employment Offer

18    DEPOSITION EXHIBIT D                      39

19    March 11, 2016 Confidentiality and

20    Non-Solicitation Agreement

21    DEPOSITION EXHIBIT E                      46

22    Plaintiff's Answers to Defendant's First

23    Set of Interrogatories and Requests for

24    Production of Documents

25



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Mark Limback**
**12/07/2022**                                                **Page 4**

```
 1   (Exhibits continued)

 2   DEPOSITION EXHIBIT F                        51

 3   Email Thread

 4   DEPOSITION EXHIBIT G                        77

 5   September 29, 2021 Email

 6   DEPOSITION EXHIBIT H                        79

 7   October 13, 2021 Email

 8   DEPOSITION EXHIBIT I                        83

 9   July 20, 2021 Email

10   DEPOSITION EXHIBIT J                        86

11   Email

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1    Novi, Michigan

2    Wednesday, December 7, 2022

3    About 1:32 p.m.

4         COURT REPORTER:  Do you solemnly swear or

5    affirm that the testimony you are about to give will be

6    the truth, the whole truth and nothing but the truth?

7         MARK LIMBACK:  I do.

8              MARK LIMBACK,

9    having first been duly sworn, was examined and

10   testified on his oath as follows:

11   EXAMINATION BY MR. GROSS:

12   Q.   Mr. Limback, my name is Joe Gross.  We met sort of at

13        the deposition of Joe Bridge the other day.  I know you

14        were in attendance by Zoom or by phone, as were we.  So

15        we're here today to take your deposition as the

16        corporate representative of Universal Truckload, Inc.

17        So for the record can you say your name, spell your

18        last name, and give us your title at Universal

19        Truckload, Inc.?

20   A.   **My name is Mark Limback, L-I-M-B-A-C-K, and I'm the**

21        **president of what was formally Universal Truckload.**

22        **We've recently changed our name to UACL Logistics.**

23   Q.   Is that UACL Logistics, Inc., or --

24   A.   **LLC.**

25   Q.   LLC.  Well, this deposition is being transcribed by



```
 1        Christina Raymond, our court reporter.  At the end of
 2        the deposition you'll be given an opportunity to say
 3        whether or not you'll review the transcript, which is
 4        what we're both saying, and your attorney might be able
 5        to help you but that would be an option you have at the
 6        end to make sure that Christina is accurate.
 7                 Have you been deposed before?
 8   A.   Yes.
 9   Q.   When was the last time you were deposed?
10   A.   Oh, jeez.  In -- boy, it'd be pure speculation but --
11        my memory's slipping me here.  2019.
12   Q.   Okay.  And what kind of case was that?
13   A.   Liability case.
14   Q.   Truck accident?
15   A.   Yes.
16   Q.   Have you ever been deposed in a case involving an
17        employee's restrictive covenants?
18   A.   No, I have not.
19   Q.   Well, you saw at Joe Bridge's deposition that the
20        attorney will ask a question, then the deponent, which
21        today is you, has an opportunity to answer.  Anything
22        you say will be presumed to be the truth because you,
23        you know, when you raised your right hand you said
24        you'd tell the truth so we're going to presume anything
25        that you say will be the truth.  I'm not going to try
```



Mark Limback
12/07/2022                                          Page 16

1   Q.   I heard that.

**2   A.   And our shippers and consignees.**

3   Q.   What's a shipper?

**4   A.   A shipper is where we go to pick up a load to put on**

**5        our trailer.**

6   Q.   And what's a consignee?

**7   A.   Where we go to deliver a load.**

8   Q.   And who pays for your services?

**9   A.   Either the shipper or the consignee.**

10  Q.   But not the commissioned agent, right?

**11  A.   No, the commissioned agent does not pay us but they do**

**12       bring the revenue to us.**

13  Q.   Because they service the shippers, they get the

14       carriers, and they provide -- they service on behalf of

15       Universal Truckload, Inc., correct?

**16  A.   Correct.**

17  Q.   Does Universal -- I'm going to -- just because there's

18       too many subsidiaries of your company and too many

19       names I'm just going to call it Universal.  If you

20       don't understand which Universal company I'm talking

21       about just ask, but I'm usually going to be talking

22       about Universal Truckload, Inc., because that's the

23       plaintiff, which is now known as UACL Logistics, LLC,

24       is that fair?

**25  A.   Yes.**



1  Q.   Does Universal Truckload, Inc., have any exclusive

2       relationships with any of its shippers?

**3  A.   There's some.**

4  Q.   And I understand that the identity of who they are

5       might be confidential, is that how you would see it as

6       well?

**7  A.   Yes.**

8  Q.   Okay.  At this point I'm not going to ask you for any

9       confidential information so if you think information is

10      confidential to your employer just say it's

11      confidential and we'll -- we might ask a question later

12      when we have a suitable protective order, correct?

**13  A.   Yes.**

14  Q.   What about consignees, does Universal Truckload, Inc.,

15      have any exclusive relationships with consignees?

**16  A.   Yes.**

17  Q.   And does Universal Logistics have any exclusive

18      relationships with any commissioned agents?

**19  A.   Yes.**

20  Q.   As far as consignees, what percentage -- approximate

21      percentage of Universal Truckload's business is with

22      exclusive relationships with consignees?

**23  A.   I don't have that information off the top of my head.**

24  Q.   Approximate.  Is it half or more or less than half?

**25  A.   It's less than half.**



1  Q.   What about shippers?

2  **A.   I would say the same.**

3  Q.   What about commissioned agents?

4  **A.   That's about 60 percent.**

5  Q.   Who are -- well, in general who are the competitors of

6       Universal Truckload, Inc.?

7  **A.   Do you want me to list companies?**

8  Q.   Kind of companies?

9  **A.   Landstar, TII and their affiliates, Admiral Merchants,**

10      **Beemac.  There's quite a few.**

11 Q.   Most of the trucks that we see on the road might be

12      competitors?

13 **A.   Yes.**

14 Q.   Does Universal have any -- strike that.

15           Does Universal Truckload, Inc., have any

16      employee drivers?

17 **A.   Not in my division, no.  Let me correct that.  No, we**

18      **do not.**

19 Q.   Does Universal Truckload, Inc., operate with

20      owner-operators?

21 **A.   Yes.**

22 Q.   Independent contractor owner-operators?

23 **A.   Yes.**

24 Q.   Does Universal Truckload, Inc., provide brokerage

25      services?



Mark Limback
12/07/2022                                              Page 24

1           Logistics go to work there.

2    Q.     Have you ever sued any of the employees who went to

3           Transport Investments, Inc., before?

4    A.     No.

5    Q.     Have any of the employees who went to Transport

6           Investments, Inc., who you're aware of done anything

7           wrong by going to Transport Investments, Inc.?

8    A.     Can you rephrase that?

9    Q.     Okay.  That's fine.  Are you aware if any of the

10          employees who went to Transport Investments, Inc., from

11          Universal Truckload or one of its predecessors ever

12          violated any agreement they had with Universal

13          Truckload, Inc.?

14   A.     Yes.

15   Q.     Who?

16   A.     David Powell, and Gina Hubs, and Joe Bridge.

17   Q.     What did David Powell do to violate an agreement with

18          Universal Truckload, Inc.?

19   A.     He called on agents -- our agents and tried to get them

20          to go to work for TII or their subsidiaries.

21   Q.     Anything else?

22   A.     That's it.

23   Q.     And what did Universal Truckload, Inc., do about that?

24   A.     We sent him several letters.  Our in-house counsel sent

25          him several letters and -- in trying to stop the



Mark Limback
12/07/2022                               Page 25

1       interaction with our people.

2   Q.  Did that work?

3   A.  **Yes.**

4   Q.  And so to date does Universal Truckload, Inc., have any

5       issues with David Powell?

6   A.  **No, his 24 months on his non -- non-solicitation**

7       **agreement have expired.**

8   Q.  What about Gina Powell, what did she do to violate an

9       agreement with Universal Truckload?

10  A.  **Do you mean Gina Hubs?**

11  Q.  Gina -- yes.

12  A.  **She called on our agents as well and we had our**

13      **in-house counsel send her a letter and she stopped.**

14  Q.  And Joe Bridge, what did he do?

15  A.  **He called on existing customers and he called on an**

16      **individual that worked for one of our agents in**

17      **conjunction with our agent as well.**

18  Q.  Anything else?

19  A.  **And talked to several other agents as well.**

20  Q.  So talking to an agent is -- in your mind that's a

21      violation of the agreement that Joe Bridge had?

22  A.  **He shouldn't be talking or communicating with any**

23      **people that he worked in the past.**

24  Q.  So does Universal Truckload, Inc., and Transport

25      Investments, Inc., do they compete for the same



HANSON RENAISSANCE
COURT REPORTERS & VIDEO    hansonreporting.com
313.567.8100

Mark Limback
12/07/2022                                    Page 26

```
 1       shippers?

 2  A.   In some cases, yes.

 3  Q.   Do they compete for the same consignees?

 4  A.   I don't know that off the top of my head but in general

 5       practice, yes.

 6  Q.   Do they compete for the same agents?

 7  A.   They compete for agents.

 8  Q.   But no specific agent, just agents?

 9  A.   Agents.

10  Q.   Because the more agents a company has in your business

11       the better?

12  A.   Well, that's not necessarily true.  The more agents

13       generating revenue and bringing revenue to us the

14       better.

15  Q.   When did you first become aware of Joe Bridge?

16  A.   When he became an agent for Great American Lines.  That

17       would have been in 2007, I believe.

18  Q.   And Joe Bridge had a company at that time, right?

19  A.   Yes, he did.

20  Q.   Did you work with Joe Bridge in 2007 or soon thereafter

21       when he was an agent?

22  A.   No.

23  Q.   When was the first -- well, let me ask you this.

24            Did you ever work closely with Joe Bridge?

25  A.   Yes.
```



**Mark Limback**
12/07/2022                                              Page 27

1  Q.    When did that start?

2  **A.    I got to know Joe Bridge when he was the terminal**

3        **manager for Great American somewhere around 2013, and**

4        **then in 2016 Joe became a regional business development**

5        **guy that fell under my authority.**

6  Q.    So he reported directly to you in 2016 sometime?

7  **A.    On a dotted line per se.**

8  Q.    Who was his direct supervisor?

9  **A.    I believe at the time it was Mike Silverwood.**

10  Q.    Mike Silverwood was in what position at the time?

11  **A.    He was a VP at the time.  No, excuse me.  He was the**

12        **president of Mason Dixon and he handled the operations**

13        **in the south.**

14  Q.    Operations of what?

15  **A.    Of our -- he managed our employees that lived in the**

16        **south as well as the agent base in the south.**

17  Q.    And the employees of the south included Joe Bridge?

18  **A.    Yes.**

19                  (Mr. Jackson no longer present)

20  BY MR. GROSS:

21  Q.    Joe Bridge ever work in your headquarters in Michigan?

22  **A.    No.**

23  Q.    He was always remote, right?

24  **A.    Yes.  Well, remote is -- what would you mean by remote?**

25  Q.    Outside of Michigan?



**Mark Limback**
**12/07/2022**                                    **Page 28**

1  **A.     Yes.**

2  Q.     He had an office in North Carolina, right?

3  **A.     Correct.**

4              (Mr. Jackson now present)

5  BY MR. GROSS:

6  Q.     Did you have a role in promoting him to the VP

7         position?

8  **A.     Who are we talking about?**

9  Q.     Joe Bridge.

10 **A.     Joe Bridge was never a VP at our company.**

11 Q.     He was a director, right?

12 **A.     His highest title was senior director of business**

13 **         development.**

14 Q.     And -- well, let me start back.  In 2016 were you the

15        one who promoted him into his new role?

16 **A.     Yes.**

17 Q.     And when he became a senior director did you have a

18        role in that?

19 **A.     Yes.**

20 **         DEPOSITION EXHIBIT B**

21 **         Complaint**

22 **         WAS MARKED BY THE REPORTER**

23 **         FOR IDENTIFICATION**

24 BY MR. GROSS:

25 Q.     The court reporter just handed you a pretty thick



1      document labeled Exhibit B, which is the complaint in

2      this case.  You already said that you were familiar

3      with it, but is that what you recognize Exhibit B to

4      be?

5  **A.   Yes.**

6  Q.    If you go to page 14 of Exhibit B there's your name at

7      the top of the page.  Is that your signature?

8  **A.   Yes, it is.**

9  Q.    And did you sign this in front of the notary public on

10      April 28th?

11  **A.   Yes.**

12  Q.    Who is Raven Shefferly?

13  **A.   She is an employee of ours who's a notary.**

14  Q.    What did you do before signing the agreement or the

15      complaint?

16  **A.   I read it.**

17  Q.    And you believe that all the statements in that were

18      true, correct?

19  **A.   Correct.**

20  Q.    If you go to Exhibit 2 of Exhibit B, what is Exhibit 2

21      to Exhibit B?

22  **A.   It's an offer letter to Joe Bridge for the position of**

23  **   regional business development manager.**

24  Q.    And it was signed by the director of HR One, right?

25  **A.   Correct.**



**Mark Limback**
12/07/2022                                          Page 44

1        that, but I don't have any of those in my possession.

2   Q.   But either Mr. Monahan or somebody in the company would

3        have those documents, correct?

4   A.   **Correct.**

5   Q.   Mr. Monahan signs his letter on Exhibit 3 to the

6        complaint as VP Legal Universal Logistics Holdings,

7        Inc.  Is he the lawyer for Universal Logistics

8        Holdings, Inc.?

9   A.   **Yes.**

10  Q.   Is he the lawyer for UACL Logistics?

11  A.   **We use his services, yes.**

12  Q.   What about Universal Truckload, Inc., before Joe Bridge

13       left, was Mr. Monahan the lawyer for -- well, provide

14       services to Universal Truckload?

15  A.   **Yes.**

16  Q.   Who would have the receipt, the certified mail receipt,

17       for the letter that was sent to Joe Bridge on

18       November 5th, 2021, which is attached to the complaint

19       as Exhibit 3?

20  A.   **I don't know.**

21  Q.   So after the letter was sent on November 5th, 2021 did

22       your -- did company's issues with Joe Bridge stop?

23  A.   **No.**

24  Q.   When was the next time that Joe Bridge -- the actions

25       of Joe Bridge concerned you?



1  A.    I don't have the exact date, but in the spring of 2022

2        I had conversations with Tim Monahan about it.

3  Q.    Again, I don't want to know what you talked about.

4  A.    Oh, okay.

5  Q.    And in the spring what caused you to want to talk to

6        Mr. Monahan?

7  A.    We seen additional emails that -- Joe Bridge's

8        Universal Truckload email was forwarded to our agent

9        liaison head and he received emails that indicated that

10       Joe was doing business and still communicating with

11       customers that he dealt with with us, as well as a guy

12       that worked for one of our agents.

13 Q.    I want you to look at Exhibit D, which is the 2016

14       agreement.  Again, not the one attached to the

15       complaint that was talked about, Exhibit D.  What

16       provision in this agreement prevents Mr. Bridge from

17       talking to anyone?

18 A.    Paragraph 3.

19 Q.    What part of Exhibit 3 says that -- or not Exhibit 3.

20       What part of Section 3 provides that Joe Bridge cannot

21       talk to people?

22 A.    Can't solicit business, accept business from, divert

23       business from, or otherwise interfere with any company

24       relationship.

25 Q.    Anything else?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO        hansonreporting.com
313.567.8100

1   A.    I can continue to read the rest of it.

2   Q.    Well, what I'm looking for is -- you said that he's

3         talking to people.  You're more concerned with his

4         soliciting people rather than talking to people?

5   **A.    Well, the email -- I may have rephrased -- misphrased**

6         **the talking, but the emails clearly indicate that he is**

7         **doing business, diverting business that we would have**

8         **normally handled, and accepting freight from an**

9         **existing customer that he worked with for us under the**

10        **pretense of another individual that worked for an agent**

11        **of ours while Joe Bridge was here.**

12  Q.    Point you to Exhibit 4 in the complaint, a letter from

13        Ms. Nichols.  Did you see this letter before it went

14        out?

15  **A.    Yes.**

16  Q.    And you would agree with me that the 2013 agreement and

17        not the 2016 agreement was attached to Ms. Nichols'

18        letter?

19  **A.    Yes, I would.**

20  Q.    Are you aware that -- did you ever become aware that

21        Mr. Bridge received this letter?

22  **A.    Yes, based on Courtney saying that it was hand**

23        **delivered.  Courtney being our attorney.**

24        **DEPOSITION EXHIBIT E**

25        **Plaintiff's Answers to Defendant's First Set of**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1    Interrogatories and Requests for Production of

2    Documents

3    WAS MARKED BY THE REPORTER

4    FOR IDENTIFICATION

5  BY MR. GROSS:

6  Q.    As you may or may not know, I received supplemental

7        answers to Defendant's First Request For

8        Interrogatories and Request of Production of Documents,

9        I don't know, maybe an hour before today's deposition.

10       Haven't had a chance to look at them, although I did

11       print them out.  And I'm sure there's things in there

12       that are different than in the interrogatory answers

13       that you provided to me but I haven't had a chance to

14       review them yet.  And so I don't know what I'm going to

15       do about that yet, but I would like to ask you about

16       the former interrogatory answers that you provided on

17       behalf of the company.  Then I guess if there's

18       differences we'll address them later.  I've handed you

19       -- or the court reporter's handed you a document

20       labeled Exhibit E.  Do you recognize this?

21 A.    Yes.

22 Q.    You familiar with this document?

23 A.    Yes.

24 Q.    Do you believe the answers to the interrogatory -- that

25       is interrogatory numbers 1-16 to be true?



 1  A.    Yes.

 2  Q.    Did you review them before they were sent to us?

 3  A.    Yes.

 4  Q.    Let's go to interrogatory No. 1.  And the answer is,

 5        "Mark Limback and Brian Zimmerman provided information

 6        in documents relative to these answers and responses to

 7        requests for production of documents."  Do you believe

 8        that to be true?

 9  A.    Yes.

10  Q.    Anybody else provide information and documents relative

11        to these answers and responses to requests for

12        production of documents?

13  A.    No.

14  Q.    Who is Brian Zimmerman?

15  A.    He is the director of our agent services department.

16  Q.    Does he work for you?

17  A.    Yes.

18  Q.    And when you say "our" you mean UACL Logistics, LLC?

19  A.    Yes, sir.

20  Q.    And formally Universal Truckload, Inc.?

21  A.    Yes.

22  Q.    And does he, like you, have other responsibilities?

23  A.    He manages our agent services department and he handles

24        our RFPs, request for pricing, request for quoting,

25        with -- that come in through the company based on --



1        you know, based on former business, future business,

2        and so on.

3    Q.  But what company?  Does he get involved in the heavy

4        haul business too?

5    A.  No, he does not.

6    Q.  Just UACL Logistics, LLC, correct?

7    A.  That's correct.

8    Q.  When you prepared for this deposition did you work with

9        Brian Zimmerman to get prepared?

10   A.  No, I did not.

11   Q.  Go to interrogatory No. 6.  That's on Page 6 of what

12       we're calling Exhibit E.  This asked about customers of

13       Universal Truckload, Inc., who were complained by

14       Universal Truckload to have been solicited by Joe

15       Bridge and who Joe allegedly contacted to make a

16       solicitation, right?

17   A.  Correct.

18   Q.  And the answer was Robert Braunstein who's head of

19       transportation at West Marine because of three emails,

20       right?

21   A.  I don't know how many emails that are in there, but

22       that's what it says, yes.

23   Q.  Well, that's why we're here.  I'm trying to find out

24       what evidence that you, meaning your company, has

25       against my client.  So I'm aware of a July 12th, '21



1        email, an October 22nd, '21 email, and a November 1st,

2        2021 email.  My question to you is does the company

3        have any other evidence that Mr. Bridge and

4        Mr. Braunstein -- well, that Mr. Bridge solicited

5        Mr. Braunstein for business?

6    A.  **I believe there's additional emails.**

7    Q.  At the time that you responded and answered these

8        interrogatories were you aware of those additional

9        emails?

10   A.  **No.**

11   Q.  But since then you've found additional emails?

12   A.  **Correct.**

13   Q.  I suppose in this document that I received today there

14       might be some other emails, correct, or do you know?

15   A.  **Correct.**

16   Q.  When did you discover those additional emails?

17   A.  **The end of last week.**

18   Q.  What steps did you take to discover those additional

19       emails?

20   A.  **I had our IT department go back and search the -- Joe**

21       **Bridge's email address.**

22   Q.  Was that the first time that you've done that?

23   A.  **Yes.**

24   Q.  You didn't do that before we received the answers from

25       the company in September of 2022, correct?



**Mark Limback**
12/07/2022                                    Page 51

1  A.   No, I didn't.

2  Q.   Did your IT department give you a report just recently?

3  A.   **Not report, just the emails that were found.**

4  Q.   And did you give all those emails to your attorney?

5  A.   **All the ones that had to do with the people in**

6       **question, yes.**

7  Q.   Okay.  Well, I'm not going to take the time to look at

8       them now so I'll need to review them with my client.

9       Did the company do anything else since September 4th,

10      2022 to find out how Joe Bridge called on persons to

11      solicit business?

12 A.   **No, other than if emails had come in through his email**

13      **address but, no, we did not.**

14              MR. GROSS:  So do we need a break?

15              MS. NICHOLS:  Sure, we can take a break.

16              (A short recess was taken)

17      DEPOSITION EXHIBIT F

18      Email Thread

19      WAS MARKED BY THE REPORTER

20      FOR IDENTIFICATION

21 BY MR. GROSS:

22 Q.   Mr. Limback, we've taken a short break.  We're back on

23      the record.  And, again, your swearing in applies to

24      your statements now as it did before, you understand

25      that?



Mark Limback
12/07/2022                                          Page 52

1   A.   Yes.

2   Q.   The court reporter gave you a document that we've

3        identified as Exhibit F.  Do you recognize this

4        document?

5   A.   Yes.

6   Q.   What is this document?

7   A.   It's an email thread.  Appears to be between several

8        different people from West Marine and -- a number of

9        people on here from West Marine and then Joe Bridge is

10       on there.  And Brian Zimmerman had forwarded it to me

11       because Joe Bridge's Universal Truckload email address

12       has been forwarded to him.

13  Q.   So you've had an opportunity to review this document

14       before, right?

15  A.   Yes.

16  Q.   So what in Exhibit F indicates that there was an

17       ongoing business relationship between Joe Bridge and

18       Mr. Braunstein and West Marine?

19  A.   Are we talking about the exhibit in whole or the first

20       page or --

21  Q.   No, the exhibit in whole.

22  A.   Okay.  Yeah, it's clear that Robert Braunstein from

23       West Marine, who was a customer of ours as well, has

24       reached out to Joe Bridge asking questions in regards

25       to Erick La Torre's comments about specific loads and



```
 1          when loads would be ready, and it clearly shows that

 2          West Marine is offering loads to Transport Investments

 3          and looking for some answers in regards to Joe Bridge's

 4          involvement.  And he's obviously involved because why

 5          would the customer be reaching out to him asking

 6          questions?

 7   Q.     Where did the customer reach out to Joe Bridge to

 8          answer a question?

 9   A.     Robert -- on the third page Robert Braunstein sends an

10          email to Joe Bridge saying, "Not sure why he's pressing

11          us."

12   Q.     How does that indicate to you that Joe Bridge is

13          soliciting West Marine for business?

14   A.     Well, if the customer's reaching out to Joe Bridge, Joe

15          Bridge has some involvement and he feels comfortable

16          with asking him a question about loads that were

17          tendered to Transport Investments.  And Joe Bridge's

18          Transport Investment email is on some of these threads

19          as well so I wouldn't think the customer would include

20          him without him being involved.

21   Q.     Anything else?

22   A.     I mean, other than reading it page-by-page it's clear

23          that there's loads being tendered to Transport

24          Investments and with Joe Bridge's involvement to

25          monitor or understand what's happening.
```



1   Q.   Well, my question is what is in this exhibit that

2        indicates that Joe Bridge solicited West Marine for

3        business?

4             MS. NICHOLS:   Just going to object to the

5        form and the foundation.   Particularly the word

6        "solicit" to the extent it's calling for a legal

7        conclusion.

8   BY MR. GROSS:

9   Q.   You can answer.

10  **A.   Joe Bridge's involvement is clear with this customer or**

11      **otherwise why would that customer include Joe Bridge on**

12      **this email thread concerning that freight that is being**

13      **handled by Transport Investments, and freight that we**

14      **possibly could have been picking up as well.**

15  Q.   What in this Exhibit F indicates that Joe Bridge

16       solicited, however you want to say -- whatever -- well,

17       let me ask you this.

18            What does solicit mean to you?

19  **A.   It's involved in the business and a part of taking care**

20      **of that business and servicing that customer.**

21  Q.   Mr. Limback, I just picked up my telephone and said

22       give me the definition of "solicit."   It says on Google

23       solicit means to ask for or try to obtain something

24       from someone.   Do you think solicit in Joe Bridge's

25       2013 agreement or the 2016 agreement means something



Mark Limback
12/07/2022                                                    Page 55

1       else?

2   A.  I would say that the agreement -- what's in that

3       agreement speaks for itself and it's clearly typed out.

4   Q.  Must be a lawyer, or talked to one.  All right.  Have

5       you asked or know of anybody at Universal Truckload,

6       Inc., or UACL, anybody at West -- well, let me start

7       over.

8               Are you aware of anybody at Universal

9       Truckload, Inc., or its successors who have asked West

10      Marine for the business that Transport Investments,

11      Inc., apparently has?

12  A.  I don't directly know that myself, but that doesn't

13      mean people have or have not.

14  Q.  All right.

15  A.  Our business has declined substantially and it's

16      indicated based on these emails that they are handling

17      business that we would have handled in the past.

18  Q.  But you don't know that, do you?  You don't know that

19      the business that Transport Investments, Inc., had

20      would have been business that Universal Truckload,

21      Inc., had, right?

22  A.  We were hauling those same lanes.

23  Q.  The same lanes that is on Exhibit F?

24  A.  I don't know if that or the overall -- on some other

25      email that may be out there.  But the locations -- the



 1        two and from locations, we've handled those loads in

 2        the past, yes.

 3   Q.   Same products?

 4   A.   **I don't know what products are on the trucks.**

 5   Q.   Who handles the West Marine account for Universal

 6        Truckload, Inc., or its successors?

 7   A.   **Right now it's through our agent Tony and Ron, and**

 8        **there's some other agents that are doing business with**

 9        **them currently.**

10   Q.   So have they complained to you that Transport

11        Investments, Inc., is making their job tough?

12   A.   **Have the agents?**

13   Q.   Yeah.

14   A.   **Complained to me?**

15   Q.   Uh-huh.

16   A.   **They just know that the volumes have declined.**

17   Q.   Have they asked for more business?

18   A.   **Oh, I'm sure they have.**

19   Q.   You're sure?

20   A.   **I'm sure they have.**

21   Q.   Do you know who -- well, let's take down these names

22        because I might want to talk to them.  So who are the

23        agents?

24   A.   **Tony Denolla (phonetic).**

25   Q.   What's his company's name?



```
 1   A.   He's Lakewood.

 2   Q.   Where is he located at?

 3   A.   New Jersey.

 4   Q.   Who else?

 5   A.   Ron Pacer.

 6   Q.   What's his company?

 7   A.   He's with Lakewood as well.

 8   Q.   In New Jersey?

 9   A.   Yup.

10   Q.   Who else?

11   A.   That's the only two I have off the top of my head.

12   Q.   So it's really one agent, two persons at that agency,

13        right?

14   A.   Could be.  There could be more agents involved.

15   Q.   Does the Lakewood Agency have a contract with West

16        Marine?

17   A.   No, the agreement would be through us.

18   Q.   And you have an agreement with West Marine?

19   A.   We have a written agreement.  They have not -- we

20        signed it, they agreed to all the terms, we do not have

21        a countersigned copy of it.  They did not provide us

22        with one.

23   Q.   Is that an exclusive agreement?

24   A.   I don't have the verbiage in front of me.

25   Q.   Is it in your files?
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Mark Limback
12/07/2022                                    Page 58

1   A.   **It would be in somebody's, not mine.**

2   Q.   But it's within the company some place?

3   A.   **Yes.**

4   Q.   Okay.  But to your knowledge it's not an exclusive

5        agreement?

6   A.   **No.**

7   Q.   Has any employee of Universal Logistics -- well,

8        Universal Truckload contacted Ron Braunstein or anyone

9        else at West Marine for more business?

10  A.   **I don't know that off the top of my head, but there's**

11       **communication with him.**

12  Q.   Have you had -- meaning has anybody within your company

13       had conversations with Tony Denolla, Ron Pacer, or

14       anyone else about getting more business from West

15       Marine?

16  A.   **Yes, Brian Zimmerman actively speaks with them.**

17  Q.   Does Brian Zimmerman communicate to Tony Denolla by

18       email?

19  A.   **I don't know that for sure.**

20  Q.   What about Ron Pacer?

21  A.   **I don't know that for sure either.**

22  Q.   What about anyone else?

23  A.   **His business development individual would.**

24  Q.   Who is his development individual?

25  A.   **Steve Place.**



```
 1   Q.   P-L-A-C-E?

 2   A.   Yes.

 3   Q.   Is he an employee of Universal Truckload?

 4   A.   Yes.

 5   Q.   What's his title?

 6   A.   He is senior director of business development.

 7   Q.   Joe Bridge's replacement?

 8   A.   No, he was just an additional one and counterpart to

 9        Joe Bridge.

10   Q.   What do you know about Steve Place's communications

11        with West Marine?

12   A.   I don't know -- I don't know that he has or has not.

13   Q.   You don't know if Steve Place has made an outreach to

14        West Marine or an agent to get more West Marine

15        business?

16   A.   You asked me earlier if he communicated with Tony

17        Denolla, and that's what I -- that's the individual

18        that I gave you.

19   Q.   Oh, I see.  So he might have -- he -- I'm glad you said

20        it.  So the way I must have said the question or asked

21        the question was did he have communications with

22        Denolla -- Tony Denolla.  And what I meant to say, and

23        I'll ask it now, do you know if Steve Place had any

24        communications with Tony Denolla about getting more

25        business from West Marine?
```



Mark Limback
12/07/2022                                          Page 60

 1  A.   I don't know that firsthand.

 2  Q.   What about Ron Pacer?

 3  A.   I don't know that firsthand.

 4  Q.   But it's true that West Marine is still doing business

 5       with Universal Truckload or its successor?

 6  A.   Yeah, at a very decreased amount.

 7  Q.   Have you got any documentation of how much less?

 8  A.   Yes.

 9  Q.   When did you -- when did you make those calculations?

10  A.   Yesterday.

11  Q.   But not before then?

12  A.   No.

13  Q.   And I suppose you gave those calculations to your

14       attorney?

15  A.   Yes.

16  Q.   So we'll look at them later.  Before yesterday did you

17       make any calculations?

18  A.   I knew the revenue wasn't what it was originally and we

19       were monitoring it in comparison to what it was last

20       year.

21  Q.   Are you aware of anybody from your company discussing

22       business items, any kind of business items, with Robert

23       Braunstein from West Marine in the last -- well, since

24       Joe Bridge left?

25  A.   Yes, I am aware.



 1  Q.   Anything else?

 2  **A.   I can't think of at this time.**

 3  Q.   Has -- since May of 2021 has Universal Truckload

 4       acquired any new agents?

 5  **A.   Yes.**

 6  Q.   Since May of 2021 has Universal lost relationships with

 7       some of its agents?

 8  **A.   Yes.**

 9  Q.   And none of that had anything to do -- either the

10       addition or subtraction of agents for Universal

11       Truckload or its successor had anything to do with Joe

12       Bridge?

13  **A.   Oh, I believe we lost some agents that had to do with**

14       **Joe Bridge, yes.**

15  Q.   Who are they?

16  **A.   Jim McDonald.**

17  Q.   Who else?

18  **A.   David Clark.**

19  Q.   Who else?

20  **A.   That's it totally lost.**

21  Q.   So like Erick La Torre, are you looking for Joe Bridge

22       to pay for all the profits or revenue that Jim McDonald

23       didn't provide Universal?

24  **A.   Correct.**

25  Q.   What about David Clark, same thing?



**Mark Limback**
12/07/2022                                              Page 71

1  A.   He didn't generate much revenue, if any, with us so.

2  Q.   So you're not looking for any damages from David Clark?

3  A.   If there's a monetary way to figure it out we would.

4  Q.   Are you aware of any way to figure out monetary damages

5       with regard to David Clark?

6  A.   If he went to TII or Jones Motor and generated revenue

7       that could have came to us or would have came through

8       us then, yes, we could figure that out.

9  Q.   All right.  Who's Jim McDonald?

10 A.   He was an agent of ours that Joe Bridge brought on out

11      of Buckhannon, West Virginia.

12 Q.   And why did Jim McDonald leave Universal Truckload?

13 A.   His deal expired and he decided to leave, and based on

14      comments that I had heard in the past that he wanted to

15      follow Joe Bridge.

16 Q.   What comments were those?

17 A.   Well, it was basically Joe Bridge indicating that

18      people have called on Jim McDonald to go to work for

19      them but he wasn't going to leave -- other trucking

20      companies, and he wasn't going to leave us because

21      those other trucking companies didn't have a Joe

22      Bridge.

23 Q.   So this was while Joe Bridge was still working for

24      Universal Truckload?

25 A.   Correct.



**Mark Limback**
12/07/2022                                           Page 72

1  Q.   Anything else?

2  **A.   No.**

3  Q.   What about David Clark, when did he come to -- when did

4       he become an agent of Universal Truckload?

5  **A.   I don't know the exact date.  It was before Joe left.**

6  Q.   And David Clark left Universal Truckload?

7  **A.   Yes.**

8  Q.   Where did he go?

9  **A.   Jones Motor.**

10  Q.   And do you know when that happened?

11  **A.   No, I don't.**

12  Q.   Before or after Joe Bridge left Universal Truckload?

13  **A.   After.**

14  Q.   Do you know how Joe Bridge was involved in David

15       Clark's being associated with Jones Motor?

16  **A.   No, other than Joe was the guy that put David Clark on**

17       **as a Universal agent.**

18  Q.   Have you talked to David Clark?

19  **A.   No.**

20  Q.   Has anybody from Universal Truckload talked to David

21       Clark about his role at Jones Motor and why he left?

22  **A.   I'm not aware if anybody has.**

23  Q.   What about Jim McDonald, are you aware of anybody from

24       Universal Truckload who's talked to Jim McDonald about

25       why he's now associated with Jones Motor or another



**Mark Limback**
**12/07/2022**                                      **Page 73**

```
 1      company?

 2  A.  No, he left and didn't tell us where he was going.

 3  Q.  Since this lawsuit have you tried to get a statement

 4      from Jim McDonald to say that Joe Bridge did this or

 5      that with him?

 6  A.  No, we have not.

 7  Q.  Do you have any other evidence besides your belief

 8      about Jim McDonald's new relationship with TII or one

 9      of its companies?

10  A.  No, I don't.

11  Q.  What about David Clark?

12  A.  Other than an email with him saying he's a Jones Motor

13      agent.

14  Q.  Do you know if David Clark was a Jones Motor agent?

15  A.  He signed an email saying he was, and that's the extent

16      that I know.

17  Q.  Nothing else?

18  A.  No.

19  Q.  Are you aware of any other lawsuits that Universal

20      Truckload, Inc., has brought within the last five years

21      regarding a similar confidentiality and

22      non-solicitation agreement?

23  A.  With an employee?

24  Q.  With an employee?

25  A.  No, I'm not.
```


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

**Mark Limback**
12/07/2022                                    Page 74

1  Q.   What about beyond five years?

2  **A.   I'm not aware of any.**

3  Q.   Are you familiar with Celeritas Logistics?

4  **A.   That's the company that Erick La Torre owns.**

5  Q.   So when you speak of Erick La Torre -- does Universal

6       logistic -- strike all that.

7            Does Universal Truckload or its successors

8       have any relationship today with Celeritas Logistics?

9  **A.   No, but we feel that we had a potential and they were**

10      **going to come based on a proposal, but as of right now,**

11      **no, I'm not aware of one.**

12 Q.   Does Universal Logistics have any relationship with

13      David Clark today?

14 **A.   Not at this time.**

15 Q.   What about Craig Morris?

16 **A.   Yes.**

17 Q.   What's Universal Logistics' relationship with Craig

18      Morris today?

19 **A.   Craig is an agent for us.**

20 Q.   But not an exclusive agent, or is he?

21 **A.   Not based on the email that I saw that now he**

22      **represents Jones Motor.**

23 Q.   So was he supposed to be an exclusive agent?

24 **A.   He does not have an exclusive agent agreement with us,**

25      **no.**



1   Q.   So he was -- he was able to do business as an agent for

2        Universal Truckload or its successors and anyone else,

3        correct?

4   **A.   As long as they weren't associated with Joe Bridge.**

5   Q.   What in Craig Morris's relationship with Universal

6        Truckload says that he can't do business with Joe

7        Bridge?

8   **A.   Well, I believe it's -- well, I know it's because he**

9        **could do business with Joe Bridge when Joe Bridge was**

10       **an employee of Universal Truckload or UACL Logistics,**

11       **but if he went to Jones Motor, which we think he did**

12       **after Joe left, then that's -- that's a violation on**

13       **Joe's behalf based on his agreement.**

14  Q.   Well, I understand that's what you believe, but my

15       question to you is dealing with what evidence is there.

16       Is there a contract that says that Craig Morris cannot

17       do business with Joe Bridge?

18  **A.   From Craig Morris's perspective?**

19  Q.   Yes.

20  **A.   No, there isn't.**

21  Q.   And yet Universal Truckload still does business with

22       Craig Morris, right?

23  **A.   Yes.**

24  Q.   And Universal Truckload would like to do more business

25       with Craig Morris, right?



Mark Limback
12/07/2022                                    Page 76

```
 1   A.    Of course, yes.

 2   Q.    And what efforts has Universal Truckload done to

 3         increase its business with Craig Morris?

 4   A.    Just communicating with him about more revenue and

 5         trying to supply more opportunities that come through

 6         the door.

 7   Q.    But nobody at Universal Truckload to your knowledge has

 8         contacted Craig Morris to ask him why he's doing

 9         business with Joe Bridge?

10   A.    I wouldn't say nobody because I can't speak for

11         everybody.

12   Q.    Well, you can.  That's why you're here.

13   A.    Well, there may have or may not have.

14   Q.    You just don't know?

15   A.    I don't know.

16   Q.    But you could find out, right?

17   A.    Yes.

18   Q.    Who would you talk to to find out?

19   A.    Brian Zimmerman.

20   Q.    Anybody else?

21   A.    Rob Franey.

22   Q.    Who is Mr. Franey?

23   A.    He's the current director of business development

24         handling the southeast.

25   Q.    Anybody else?
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

**Mark Limback**
**12/07/2022**                                          **Page 95**

```
 1                    CERTIFICATE OF NOTARY

 2

 3  STATE OF MICHIGAN   )

 4                      )  SS

 5  COUNTY OF MACOMB    )

 6              I, Christina R. Raymond, Certified Shorthand

 7       Reporter, a Notary Public in and for the above county

 8       and state, do hereby certify that the above deposition

 9       was taken before me at the time and place hereinbefore

10       set forth; that the witness was by me first duly sworn

11       to testify to the truth, and nothing but the truth,

12       that the foregoing questions asked and answers made by

13       the witness were duly recorded by me stenographically

14       and reduced to computer transcription; that this is a

15       true, full and correct transcript of my stenographic

16       notes so taken; and that I am not related to, nor of

17       counsel to either party nor interested in the event of

18       this cause.

19

20

21       _____

22       Christina R. Raymond, CSR-7194

23       Notary Public,

24       Macomb County, Michigan

25    My Commission expires:  September 7, 2026
```

