# EXHIBIT E

```
                                                              Page 1

 1                UNITED STATES DISTRICT COURT

 2                         FOR THE

 3                EASTERN DISTRICT OF MICHIGAN

 4     _____

 5    UNIVERSAL TRUCKLOAD, INC.,

 6            Plaintiff,

 7       v.                                 Civil Action No.

 8    JOSEPH BRIDGE,                        2:22-CV-10988

 9            Defendant.

10    _____

11                VIDEOCONFERENCE DEPOSITION OF

12                        RON PAYSEUR

13    DATE:           Monday, February 20, 2023

14    TIME:           1:18 p.m.

15    LOCATION:       Remote Proceeding

16                    Cleveland, Ohio 44114

17    REPORTED BY:    Marianne Hissong, Notary Public

18    JOB NO.:        5756922

19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF UNIVERSAL TRUCKLOAD, INC., AND
 3   RON PAYSEUR:
 4        JOHN GILLIAM, ESQUIRE (by videoconference)
 5        Plunkett Cooney PC
 6        38505 Woodward Avenue, Suite 100, Lower Level
 7        Bloomfield Hills, Michigan 48304
 8        jgilliam@plunkettcooney.com
 9        (248) 594-6360
10
11   ON BEHALF OF DEFENDANT JOSEPH BRIDGE:
12        THOMAS D. JACKSON, ESQUIRE (by videoconference)
13        Benesch Law
14        200 Public Square, Suite 2300
15        Cleveland, Ohio 44114
16        tjackson@beneschlaw.com
17        (216) 363-4163
18
19   ALSO PRESENT:
20        Joseph Bridge, Defendant (by videoconference)
21
22
23
24
25
```

1                    I N D E X
2   EXAMINATION:                                           PAGE
3        By Mr. Jackson                                    5
4        By Mr. Gilliam                                    74
5
6                    E X H I B I T S
7   NO.              DESCRIPTION                           PAGE
8   Exhibit A        Instructions/Document Production      9
9   Exhibit B        Verified Amended Complaint for
10                   Injunctive and Other Relief           21
11           (Exhibits retained by counsel.)
12
13         D O C U M E N T S   R E Q U E S T E D
14  NO.         DESCRIPTION                                PAGE
15  1           Documents Responsive to Request
16              Number 4                                   19
17
18
19
20
21
22
23
24
25

Page 59

1     A    I would say between -- yeah -- 2021 into
2  2022.
3     Q    Okay.  Do you know what month in 2021 when
4  that started to tail off?
5     A    No.  I would be speculating.
6     Q    Okay.  In your view what could be the reason
7  for that decrease?  Do you know?
8     A    I -- I would be speculating.  I don't know.
9     Q    Is it usual for the load amount to be cut in
10 half, roughly, like that in your experience?
11    A    No.  In -- no.  It is not.
12    Q    So it's unusual, but you can't give me any
13 reasons that have been, you know -- what would cause
14 that?  Do you know?
15    A    I haven't had direct conversation with
16 anybody that would -- would relay the -- I just would
17 not know.
18    Q    Okay.  Did you ask West Marine why?
19    A    I did not.
20    Q    Okay.  Do you know, who would you have -- if
21 you had to ask, who would be the person that you would
22 ask at West Marine?  Do you know?
23    A    Yeah.  Mr. Braunstein.
24    Q    Okay.  And who is Mr. Braunstein?
25    A    He's their corporate transportation manager.

1    Q    Okay.  Do you know his first name?
2    A    Robert.
3    Q    Okay.  And have you had any communications
4  with him --
5    A    I -- I'm sorry.  I -- I cut you off.
6    Q    No.  You're fine.  Go ahead.
7    A    The only communication I've had with
8  Mr. Braunstein that I can think of were on two
9  occasions, and they were a weekend operational issue
10 over a trailer.
11   Q    Okay.  And when would that have been?
12   A    And that -- that would've gone back at least
13 a year and a half ago, so 2022'ish.
14   Q    Okay.  Do you know if that was an e-mail or
15 a phone call?  Do you know?
16   A    A phone call.
17   Q    Okay.  Okay.  So all you know is sometime in
18 2021, you say, you went -- West Marine -- the loads
19 for West Marine at Universal went from 11 to 12 down
20 to 6, right?
21   A    Yes.
22   Q    You have any reason to believe that that was
23 due to any actions by Mr. Bridge?
24   A    I would be speculating.
25   Q    Okay.  You just don't know?

Page 61

1    A    I don't know.  No.
2    Q    Okay.  You can't say "yes" or "no."  You do
3  not know either way?
4    A    I would say I do not know.
5    Q    Okay.  Do you know whether, you know, driver
6  issues or lack of drivers, anything like that,
7  contributed to that decrease?
8              MR. GILLIAM:  Object to form.
9              You can answer.
10             THE WITNESS:  Could you say the
11  question again, please?
12  BY MR. JACKSON:
13   Q    Yeah. Sure.  I can rephrase.  We're talking
14  about the decrease in loads from West Marine, right?
15   A    Okay.
16   Q    Do you think a lack of drivers or any driver
17  issues could have contributed to that decrease?
18   A    It did not.
19   Q    It did not?
20   A    It did not.
21   Q    Okay.  But you can't tell me any other
22  reasons that you believe would have contributed to the
23  decrease?
24   A    Correct.
25   Q    Okay.  I know you said in 2021, at some

Page 62

1  point, West Marine loads at Universal went down from
2  11 or 12 to 6 a week, and then -- and correct me if
3  I'm wrong -- you mentioned that there are roughly 3
4  loads a week today; is that right?  Or do I have that
5  wrong?
6        A    No.  You have that correct.
7        Q    Okay.  When do you recall a decrease from
8  six loads a week to three loads a week?
9        A    You know what?  I don't have that
10 information.
11       Q    Okay.  But how did you know it's decreased
12 from six loads a week to three loads a week, if those
13 are the numbers you're giving?
14       A    Well, that's -- because that's what we're
15 doing.
16       Q    Okay.  Again, you don't know why?
17       A    I do -- correct.  I do not know.
18       Q    Okay.  And you do not know if that is due to
19 any actions by Mr. Bridge?  You can't say "yea" or
20 "nay"?
21       A    Correct.  I can't say either way.
22       Q    Okay.  Approximately when did the business
23 transition from six loads a week to three loads a
24 week?
25       A    I didn't get a chance to research that, so I

Page 63

```
 1   -- I -- I couldn't tell you.
 2       Q    Is there a way you could find out?
 3       A    Possibly.  Yes.  If -- if I went back to
 4   their schedules, I could probably -- not that I saved
 5   every schedule, but I might have some seasonal ones.
 6       Q    Okay.  And you would have that, or does that
 7   belong to somebody else, like Universal or
 8   Mr. Dinallo?
 9       A    Well, we -- Mr. Place, Mr. Dinallo, and I
10   get those schedules.
11       Q    Okay.
12       A    We -- we would know how to plan.
13       Q    Okay.  So right now we're sitting at three
14   loads a week that you're usually running for West
15   Marine at Universal, correct?
16       A    Correct.
17       Q    Do you believe that you could handle more
18   loads for West Marine on Universal's behalf?
19       A    Yes.
20       Q    Okay.  I think you mentioned -- and again,
21   correct me if I'm wrong.  I don't want to
22   mischaracterize your testimony.  But when business was
23   at 11 or 12 loads a week, were you or Mr. Dinallo or
24   another agent seeking those loads from West Marine, or
25   was West Marine, you know, assigning those loads
```

Page 64

1  without you having to ask?
2      A   No.  What were -- those were load offerings
3  that would come to us.  And again, I -- it was based
4  on if you were at an accepted pricing range at the
5  time.  But those were the offerings that we got.
6      Q   So accepted pricing range.  What do you mean
7  by that?
8      A   In other words West Marine accepted our
9  price structure.
10     Q   At the time you were doing 11 to 12 loads,
11 they accepted -- prices?
12     A   Well, we were getting offered 11 to 12.  I
13 haven't had a chance to research what percentage of
14 those we covered on a regular basis.
15     Q   Okay.
16     A   But now we -- but now we have no access to
17 11 or 12.
18     Q   Okay.  I'm just trying to understand the
19 concept of accepted price range.  So do you know, is
20 it that West Marine was giving you 11 or 12 loads a
21 week based on this accepted price range?
22     A   I -- I don't know their strategy.  I -- I
23 don't know.
24     Q   West Marine's strategy, you mean.
25     A   Right.  West Marine strategy.

Page 65

1	Q	Okay. And what about when you went down to
2	six weeks? Again, was that West Marine offering loads
3	or offering six loads a week to you or you asking for,
4	you know, that amount or more?
5	A	That's all that we were assigned on the
6	schedules.
7	Q	Okay. Do you know if that was based on this
8	accepted price range?
9	A	I do not know.
10	Q	Okay. What about when we were down to three
11	loads a week?
12	A	The same thing. I -- I don't know. That's
13	what we were given on our schedule.
14	Q	Okay. Do you know if Universal is the
15	exclusive shipper for West Marine, where they conduct
16	business?
17	A	You know what? The last half of that broke
18	up. Could you repeat that, please?
19	Q	Yeah. Can you hear me now?
20	A	Oh, yeah. Yeah.
21	Q	Okay. I asked, do you know if Universal is
22	the exclusive shipper or trucker for West Marine in
23	the area that you run freights for West Marine?
24	A	We are not the exclusive.
25	Q	Okay. Do you know how many other carriers

Page 66

1   West Marine uses in that area?
2        A    I do not.  I do not.
3        Q    West Marine's a big company, fair to say,
4   right?
5        A    Yes.  They are.
6             MR. GILLIAM:  Object to form.
7   BY MR. JACKSON:
8        Q    Okay.  West Marine could use many carriers
9   to service their needs, correct?
10            MR. GILLIAM:  Object to form.
11            You can answer, Ron.
12            THE WITNESS:  I would say they could.
13  Yes.
14  BY MR. JACKSON:
15       Q    Okay.  Okay.  Do you, as your agency, or do
16  you know if Universal bids for work from West Marine?
17       A    I do.
18       Q    Do they?  You said you do?  Or --
19       A    I -- I do know that -- that we do -- we did.
20       Q    You did bids, correct?
21       A    You're asking about bid, correct?
22       Q    Yeah.  You did bid, or you do bid; is that
23  what you're saying?
24       A    We just did a bid.
25       Q    Okay.  How recently ago?

Page 67

1  A  I didn't get a chance to look that up, but
2  in -- within the last 30 days, I'm going to say.
3  Q  Okay. Could you explain that bidding
4  process for me? Do you know?
5  A  Yes. It came from a third party. I -- I
6  believe the third party is in the -- one of the West
7  Marine locations from the address if I -- but yeah.
8  It was an electronic bid. Came over in the form of a
9  spreadsheet.
10  Q  Okay. And did Universal win that bid?
11  A  We did not.
12  Q  Do you know why not?
13  A  We just got informed that we were not
14  awarded any of the lanes.
15  Q  For what period? For how long?
16  A  There was not a time frame in that, now that
17  you're asking. I don't remember seeing one.
18  Q  Okay. But do you know why Universal was not
19  awarded any of the lanes? Was there any explanation
20  given by West Marine?
21  A  No. I believe we just -- from memory,
22  again, short notice, I didn't get a chance to go back
23  and look at documents or look at those. But we just
24  got a notification that we were not accepted.
25  Q  Okay. Had happened before? Had Universal

Page 70

1  BY MR. JACKSON:
2      Q    Today are you or -- well, I won't ask you
3  about Mr. Dinallo.
4           Are you asking to run more loads for West
5  Marine?
6      A    Are -- are we asking?  Could you state that
7  again, please?
8      Q    Yeah.  You've noticed a pattern of it
9  steadily going down over the last few years, correct?
10     A    Yes.
11     Q    Are you, in your role, doing anything to ask
12 West Marine to run more loads weekly, today?
13     A    Well, that's not exactly an answerable.  We
14 do make offers to West Marine on a regular basis for
15 more loads.  If we think we can -- we know we can make
16 capacity for them, Mr. Dinallo will message
17 Mr. Braunstein and say, you know, we do have capacity
18 for whatever.  And he's been turning us down for that.
19     Q    Okay.  And you said regularly that would
20 happen, correct?
21     A    Yes.
22     Q    Okay.  Mr. Dinallo does that, not you?
23     A    Yes.
24     Q    Okay.  And you said West Marine has been
25 turning you down?

```
 1       A    Yes.
 2       Q    Do you know why?
 3       A    They just come back with a "no thanks" type
 4  answer.
 5       Q    But do you know why they say that?
 6       A    I do not know.
 7       Q    Okay.  Any reason to believe that them
 8  turning you down is due to any conduct by Mr. Bridge?
 9       A    I do not know.
10       Q    Okay.  So West Marine is still sending you
11  Universal loads, just not as many as in the past,
12  correct?
13       A    Correct.
14       Q    Okay.  So the business has not gone away,
15  right?
16            MR. GILLIAM:  Object to form.
17            You can answer.
18            THE WITNESS:  Well, if we -- at this
19  point it has not gone away.
20  BY MR. JACKSON:
21       Q    Okay.  And I think earlier you testified
22  that you, you know, you kind of have your own focus
23  and direction for your agency independent of
24  Universal, right?
25       A    [No audible response.]
```

Page 72

1     Q   I didn't hear you. I'm sorry.
2     A   -- a minute. I'm sorry. Say that again.
3 Something broke up.
4     Q   Oh. So I think earlier you testified that
5 you have your own focus and direction for your agency
6 independent of what Universal thinks; is that right?
7     A   Yes. Correct.
8     Q   Okay. Of that focus and direction, do you,
9 your agency, have a, you know, particular goal in mind
10 for the West Marine account, whether that be revenue
11 or whatever you earn on running West Marine loads?
12     A   I -- I would say revenue and volume because
13 our office, our agency's very good at what we do. We
14 developed a model way back when we started the
15 partnership, and it's worked very well. And we would
16 like to just continually keep filling that model,
17 which is primarily the East Coast.
18     Q   Okay. What would you say your goal, whether
19 that's a ballpark number, anything like that, for your
20 agency would be with West Marine on a yearly basis?
21     A   I wouldn't -- I wouldn't even know how to
22 speculate a goal like that. We always have a goal of
23 trying to grow each year, and this is, you know,
24 obviously we haven't done that with West Marine in the
25 last year and a half or so.

Page 73

1    Q    Okay.  And why is that?
2    A    The volume has not been there.
3    Q    Okay.  And have you done anything with
4  Mr. Braunstein to address the current volume?
5    A    I have not.
6              MR. GILLIAM:  Just object to -- asked
7  and answered.
8              But you can go ahead.
9              THE WITNESS:  Me directly, I have not.
10 BY MR. JACKSON:
11   Q    Okay.  Let's see.  Sitting here today do you
12 have any evidence that Mr. Bridge solicited business
13 from West Marine since he left Universal?
14   A    I would not have firsthand knowledge.  I do
15 not have knowledge.
16   Q    Okay.  Do you know what individuals would
17 know that type of thing?
18   A    I -- I would be speculating.
19   Q    Okay.
20   A    I -- I can't say.
21   Q    Would it be somebody at Universal?
22             MR. GILLIAM:  Object to foundation.
23             THE WITNESS:  I'm not --
24             MR. GILLIAM:  You can go ahead, Ron.
25             THE WITNESS:  I'm speculating that

Page 74

1  somebody, you know, in corporate may or may not.  I
2  mean, but me personally, I wouldn't know firsthand.
3              MR. JACKSON:  Okay.
4              John, I'll go through my notes, and
5  feel free if you have any questions for him.
6              MR. GILLIAM:  Sure.  I'll just wait if
7  you want to see if you have anything else.
8              MR. JACKSON:  Okay.  Yeah.  Give me a
9  few minutes.
10             MR. GILLIAM:  All right.
11             THE REPORTER:  We'll go off the record
12 at 3:02.
13             (Off the record.)
14             THE REPORTER:  Back on the record at
15 3:12.
16             MR. JACKSON:  Okay.  John, I don't have
17 any questions right now.  Feel free.
18             MR. GILLIAM:  Okay.  Thank you.
19                   EXAMINATION
20 BY MR. GILLIAM:
21     Q    Ron, just a few follow-up questions for you.
22 You said that before he left, Joe Bridge was in charge
23 of the relationship between Universal and West Marine;
24 is that right?
25     A    Yes.

Page 86

1          CERTIFICATE OF DEPOSITION OFFICER
2              I, MARIANNE HISSONG, the officer before whom
3    the foregoing proceedings were taken, do hereby
4    certify that any witness(es) in the foregoing
5    proceedings, prior to testifying, were duly sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a qualified
8    transcriptionist; that said digital audio recording of
9    said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action.                 *Marianne C Hissong*

17                                           MARIANNE HISSONG
18                                     Notary Public in and for the
19                                              State of Ohio
20
21
22
23
24
25

Page 87

1          CERTIFICATE OF TRANSCRIBER
2              I, ERICA MAKUCH, do hereby certify that this
3      transcript was prepared from the digital audio
4      recording of the foregoing proceeding, that said
5      transcript is a true and accurate record of the
6      proceedings to the best of my knowledge, skills, and
7      ability; that I am neither counsel for, related to,
8      nor employed by any of the parties to the action in
9      which this was taken; and, further, that I am not a
10     relative or employee of any counsel or attorney
11     employed by the parties hereto, nor financially or
12     otherwise interested in the outcome of this action.
13
14                                    *[signature: Erica Makuch]*
15                                          ERICA MAKUCH

Veritext Legal Solutions
www.veritext.com                                           888-391-3376