# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNIVERSAL TRUCKLOAD, INC., | ) | CASE NO.: 2:22-CV-10988 |
| | ) | |
| Plaintiff, | ) | JUDGE BERNARD A. FRIEDMAN |
| | ) | |
| v. | ) | **<u>NOTICE OF FILING DEPOSITION</u>** |
| | ) | **<u>TRANSCRIPT OF RON PAYSEUR</u>** |
| JOSEPH BRIDGE, | ) | |
| | ) | |
| Defendant. | ) | |

Notice is hereby given that Defendant Joseph Bridge is filing the transcript of the deposition of Ron Payseur, which was taken on Monday, February 20, 2023.

Respectfully submitted,

s/*Joseph N. Gross*
JOSEPH N. GROSS (Ohio Bar No. 0056241)
THOMAS D. JACKSON (Ohio Bar No. 0098911)
**BENESCH, FRIEDLANDER, COPLAN**
  **& ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio 44114
Telephone: 216-363-4500
Facsimile: 216-363-4588
Email: jgross@beneschlaw.com
    tjackson@beneschlaw.com

PAUL E. ROBINSON (P39327)
**SULLIVAN & LEAVITT, P.C.**
22375 Haggerty Road
Novi, Michigan 48375
Telephone: 248-349-3980
Facsimile: 248-349-2810
Email: per@sullivanleavitt.com

*Attorneys for Defendant Joseph Bridge*

## **CERTIFICATE OF SERVICE**

A copy of the foregoing was filed and served electronically on March 6, 2023,

via the Court's electronic filing system. Notice of this filing will be sent by operation

of the Court's system. Parties may access this filing through the Court's system.

s/*Joseph N. Gross*
JOSEPH N. GROSS
*One of the Attorneys for*
*Defendant Joseph Bridge*

21130827 v1

Page 1

1                  UNITED STATES DISTRICT COURT

2                            FOR THE

3                  EASTERN DISTRICT OF MICHIGAN

4      ————————————————————————————————

5      UNIVERSAL TRUCKLOAD, INC.,

6            Plaintiff,

7         v.                              Civil Action No.

8      JOSEPH BRIDGE,                     2:22-CV-10988

9            Defendant.

10     ————————————————————————————————

11              VIDEOCONFERENCE DEPOSITION OF

12                     RON PAYSEUR

13     DATE:          Monday, February 20, 2023

14     TIME:          1:18 p.m.

15     LOCATION:      Remote Proceeding

16                    Cleveland, Ohio 44114

17     REPORTED BY:   Marianne Hissong, Notary Public

18     JOB NO.:       5756922

19

20

21

22

23

24

25

Page 2

1            A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF UNIVERSAL TRUCKLOAD, INC., AND

3    RON PAYSEUR:

4        JOHN GILLIAM, ESQUIRE (by videoconference)

5        Plunkett Cooney PC

6        38505 Woodward Avenue, Suite 100, Lower Level

7        Bloomfield Hills, Michigan 48304

8        jgilliam@plunkettcooney.com

9        (248) 594-6360

10

11   ON BEHALF OF DEFENDANT JOSEPH BRIDGE:

12       THOMAS D. JACKSON, ESQUIRE (by videoconference)

13       Benesch Law

14       200 Public Square, Suite 2300

15       Cleveland, Ohio 44114

16       tjackson@beneschlaw.com

17       (216) 363-4163

18

19   ALSO PRESENT:

20       Joseph Bridge, Defendant (by videoconference)

21

22

23

24

25

Page 3

1                    I N D E X

2  EXAMINATION:                                    PAGE

3       By Mr. Jackson                             5

4       By Mr. Gilliam                             74

5

6                  E X H I B I T S

7  NO.              DESCRIPTION                    PAGE

8  Exhibit A      Instructions/Document Production  9

9  Exhibit B      Verified Amended Complaint for

10               Injunctive and Other Relief      21

11            (Exhibits retained by counsel.)

12

13        D O C U M E N T S   R E Q U E S T E D

14  NO.       DESCRIPTION                          PAGE

15  1         Documents Responsive to Request

16            Number 4                             19

17

18

19

20

21

22

23

24

25

Page 4

```
1                    P R O C E E D I N G S
2               THE REPORTER:  Good afternoon.  My name
3    is Marianne Hissong; I am the reporter assigned by
4    Veritext to take the record of this proceeding.  We
5    are now on the record at 1:18 p.m.
6               This is the deposition of
7    Ronald Payseur taken in the matter of Universal
8    Truckload, Inc. vs. Joseph Bridge on February 20,
9    2023, remote via Zoom.
10               I am a notary authorized to take
11   acknowledgments and administer oaths in Ohio.  Parties
12   agree that I will swear in the witness remotely.
13               Additionally, absent an objection on
14   the record before the witness is sworn, all parties
15   and the witness understand and agree that any
16   certified transcript produced from the recording of
17   this proceeding:
18                    - is intended for all uses permitted
19                    under applicable procedural and
20                    evidentiary rules and laws in the same
21                    manner as a deposition recorded by
22                    stenographic means; and
23                    - shall constitute written stipulation
24                    of such.
25                    At this time will everyone in
```

Page 5

1   attendance please identify yourself for the record,

2   beginning with the witness.

3                 MR. PAYSEUR:  Ronald Payseur.

4                 MR. GILLIAM:  John Gilliam on behalf of

5   Plaintiff and for Mr. Payseur for his deposition.

6                 MR. JACKSON:  Thomas Jackson on behalf

7   of Defendant.

8                 THE REPORTER:  Thank you.  Hearing --

9                 MR. BRIDGE:  Joseph Bridge.

10                THE REPORTER:  Hearing no objection I

11  will now swear in the witness.

12                Mr. Payseur, will you please raise your

13  right hand?

14  WHEREUPON,

15                      RON PAYSEUR,

16  called as a witness, and having been first duly sworn

17  to tell the truth, the whole truth, and nothing but

18  the truth, was examined and testified as follows:

19                THE REPORTER:  On the record.

20                MR. JACKSON:  Okay.  Thanks so much,

21  Marianne, for the introduction.

22                      EXAMINATION

23  BY MR. JACKSON:

24       Q    Mr. Payseur, how are you?

25       A    Good.  How about you?

Page 6

1      Q    I'm good.  As you probably just heard when I

2  said my name for the record, I'm Thomas Jackson.  I'm

3  one of the defendants in this case -- for Defendant

4  Joseph Bridge who's also on the call with us.  So we

5  are taking your deposition on the record today.  Have

6  you been deposed before?

7      A    Have -- please.

8      Q    Have you ever been deposed before?

9      A    One time.  Years ago.

10     Q    Okay.  So you kind of understand how this

11 works.  I ask questions.  You answer.  You're sworn to

12 tell the truth.  Is that correct?

13     A    Yes.

14     Q    Okay.  And as Marianne mentioned before we

15 went on the record, we are experiencing a bit of

16 technical difficulty with the connection, so she may

17 interrupt and have to stop the proceeding.  I just

18 want to put that on the record.  Okay?

19     A    Okay.

20     Q    She also explained to us that this is being

21 transcribed by her via Zoom, so over videoconference.

22 It's also being recorded as her audio backup, but it

23 is not being recorded via video.

24          Do you have counsel representing you during

25 this deposition, Mr. Payseur?

Page 7

1      A    Yes.  Mr. Gilliam.

2      Q    Okay.  And could you spell your name for the

3   record?

4      A    Sure.  Ronald.  And then P as in Peter, A-Y,

5   S as in Sam, E-U-R.

6      Q    Okay.  Thank you.  And as part of

7   Mr. Gilliam's representation of you, he may object at

8   any time, but you still need to answer my question.

9   Okay?

10     A    All right.

11     Q    That is unless he objects based on some sort

12  of privilege.  Okay?

13     A    Okay.

14     Q    Am I coming through clearly?  I just want to

15  make sure I'm coming through.

16     A    For the most part, but when you start and --

17  when you restart, that's where the breakup is.  The

18  same thing with the -- the court -- when she starts,

19  it takes a few words before it actually comes out.

20     Q    Okay.

21          MR. JACKSON:  Marianne, are you still

22  good, getting the record?  Okay.  Feel free to stop us

23  if not.

24  BY MR. JACKSON:

25     Q    Also another thing, Mr. Payseur, while we're

Page 8

1    conducting this -- I don't plan for this to go on very

2    long -- but you can take a break at any time.  If you

3    do need a break, you just let me know or let your

4    counsel, Mr. Gilliam, know, and we'll take a break.

5    Okay?

6         A    Sure.  Thank you.

7         Q    Okay.  Are there any reasons why you can't

8    testify fully and truthfully for us today?

9         A    No.

10        Q    I'm sorry.  I didn't catch that.

11        A    No.  There's not.

12        Q    Okay.  Are you taking any medications that

13   might affect your ability to testify truthfully and

14   fully today?

15        A    No.

16        Q    Okay.  You mentioned earlier that you have

17   been deposed once.  Was that in a litigation?  Was it

18   in another type of matter?  Could you explain that for

19   us?

20        A    It was in a litigation.

21        Q    Okay.  What type of litigation?  What was

22   the issue?

23        A    I'm not at liberty to discuss that.

24        Q    Okay.  That's fair.

25             THE REPORTER:  I'm sorry.  I did not

```
                                            Page 9
 1   catch that answer from Mr. Payseur.
 2               THE WITNESS:  No.  Just that I'm not at
 3   liberty to discuss that case.
 4               THE REPORTER:  Thank you.
 5               MR. JACKSON:  Okay.  Understood.
 6               Marianne, I'm going to go a little bit
 7   slower so I make sure I'm coming through.  Okay?
 8               I'm going to put up an exhibit that
 9   I'll mark Exhibit A.  Going to share my screen.
10               (Exhibit A was marked for
11               identification.)
12               Okay.  Can everybody see my screen?
13   BY MR. JACKSON:
14      Q    Mr. Payseur, can you see my screen?
15      A    -- virtual connectivity interruption --
16      Q    Okay.  Do you recognize this document,
17   Mr. Payseur?
18      A    Yes.  This is the one I received last week.
19      Q    Okay.  And have you reviewed this document?
20      A    Somewhat.  Yes.
21      Q    You say, "Somewhat."  What would you mean by
22   "somewhat"?
23      A    I mean I have read it.
24      Q    Okay.  And that first document -- I'll go
25   back up to the top because this is a PDF of multiple
```

Page 10

1    documents.  The first document right here is addressed
2    to you, correct?
3         A    Yes.  That is.
4         Q    Okay.  It says "Subpoena to Testify at a
5    Deposition in a Civil Action."  I'm going to scroll
6    down so you can read Exhibit A to the subpoena.  Did
7    you review this part of the subpoena, Mr. Payseur?
8         A    Let me take a look at the hard copy.
9         Q    Okay.  You have it with you?
10        A    Exhibit A.  Yes.  I am familiar with that.
11        Q    Okay.  And on Exhibit A, did you review --
12   I'm turning over to page 3 of that exhibit.  Did you
13   review the documents to be produced?
14        A    Yes.  I did.
15        Q    You say you guess you did.  Is that a
16   definitive --
17        A    No.  I said -- yes.  I did.
18        Q    Okay.  Sorry.  That came --
19        A    Yeah.
20        Q    That came through sounding like -- I
21   apologize.  Did not want to put words in your mouth,
22   so sorry.
23        A    No.  That's ...
24        Q    Okay.  Regarding this first request here, do
25   you see that?  Number 1.

Page 11

 1       A    I do.

 2       Q    Okay.  Any communications between you and

 3  Universal or any other persons regarding Universal's

 4  business relationship with West Marine from May 1,

 5  2020, to the present.  Do you understand what is

 6  referred to by Universal here?

 7       A    Yes.  I do.

 8       Q    Okay.  And who or what is Universal?

 9       A    Well, Universal is a division of Universal

10  Logistics Holdings, which was the truckload version or

11  division, if you will.

12       Q    Okay.  And do you recognize West Marine?  Do

13  you know what West Marine is here?

14       A    I do.

15       Q    Okay.  And what is West Marine?

16       A    It's a retail -- aquatic retailer that we

17  actually do some business with.

18       Q    Okay.  And you understand that you're

19  here -- this subpoena was served on you due to

20  Universal's -- well --

21                 THE WITNESS:  You know what?

22                 MR. JACKSON:  Oh.  Go ahead.

23                 THE WITNESS:  I'm --

24                 MR. JACKSON:  I'm sorry.

25                 THE WITNESS:  I -- I need to take a

Page 12

1    one-minute break because I'm expecting a -- a package

2    from Safety that I've got to sign for real quick.

3                    MR. JACKSON:  Okay.  We'll take a

4    break.

5                    THE WITNESS:  I'll be right back.

6                    THE REPORTER:  Off the record at 1:28.

7                    (Off the record.)

8                    THE REPORTER:  Back on the record at

9    1:28.

10                   MR. JACKSON:  Okay.  Yeah.  No problem,

11   Mr. Payseur.  We're --

12                   THE WITNESS:  Yes.

13                   MR. JACKSON:  We're allowed to do that

14   at any time, so we just had a very brief break for

15   your to check on that package.

16   BY MR. JACKSON:

17       Q    So going back, I was asking you about your

18   familiarity with what West Marine is here in this

19   first request for a document on your subpoena,

20   Exhibit A.

21       A    Correct.  Yeah.  Like we were discussing,

22   they're an aquatic retailer that we deliver to their

23   stores.

24       Q    Okay.

25       A    The product to their stores.

Page 13

1       Q    Got it.  And for the subpoena, you

2    understand, and it's referred to up here, up further

3    to the top of Exhibit A, that Mr. Mark Limback, who is

4    the president of UACL Logistics, LLC, he identified

5    you as an agent of Universal Truckload who is or was

6    involved with the business relationship between

7    Universal and West Marine, one of his customers.  Did

8    you see that?

9       A    I did not, I don't think.

10      Q    Okay.  It should be on page -- the first

11   page of that Exhibit A, paragraph 2.

12      A    Oh.  Yeah.  Yes.  I am familiar with that.

13   I'm sorry.  Yeah.

14      Q    Okay.  And would you agree that you were an

15   agent of Universal Truckload, Inc., that was involved

16   with the -- or is or was involved in the business

17   relationship between Universal and West Marine?

18      A    Yes.  Correct.

19      Q    Okay.  So back to this request on page 3 of

20   that exhibit, if you can get back there for me.

21      A    Okay.

22      Q    In response to that Number 1, did you have

23   any other communications requested by Request

24   Number 1?

25      A    No.

Page 14

1          Q     Okay.  Did you review any of your files to

2     see if you had any documents responsive to that

3     Request Number 1?

4          A     Yes.  I did.

5          Q     Okay.  And you determined that you did not,

6     correct?

7          A     That is correct.

8          Q     Okay.  What about Number 2 here?  And I will

9     read it.  Request Number 2 asks for any communications

10    between you and West Marine or any other persons

11    regarding Universal's business relationship with West

12    Marine from May 1, 2020, to the present.  Do you see

13    that?

14         A     Yes.  I see that.

15         Q     Okay.  And do you --

16         A     I have -- I beg your pardon.

17         Q     I'm sorry.  You go ahead.  Please go ahead.

18         A     Oh, no.  I have not had any communication.

19         Q     Okay.  Did you review any of your files for

20    any such communications requested by Request Number 2?

21         A     Yes.  Yes.  I did.

22         Q     Okay.  And you determined that you did not

23    have any?

24         A     Correct.

25         Q     Okay.  I'm going to go down to Number 3

Page 15

1    here, and I'll read the Request Number 3.  It asks for

2    any communications between you and West Marine or any

3    other persons regarding Bridge from January 1, 2021,

4    to the present.  Is that right?

5          A    That is correct.  No communication.

6          Q    Okay.  Do you know what "Bridge" means here?

7          A    Yes.  I do.

8          Q    Okay.  And what does that mean?  What is

9    that referring to?

10         A    At one point Joe was an agent -- Mr. Bridge

11   was an agent and then promoted to a -- a company

12   position within our company.

13         Q    Okay.  I'm just asking, but you understand

14   that to identify Mr. Joe Bridge who is with us today.

15   Correct?

16         A    Yes.  Correct.

17         Q    Okay.  And did you have any communications

18   requested by Request Number 3?

19         A    No.  No communication.

20         Q    Okay.  Did you review your files for any of

21   those requested communications?

22         A    Yes.

23         Q    And you determined that you do not have any?

24         A    Correct.

25         Q    Okay.  Going down to Request Number 4 here.

Page 16

1   Request Number 4 asks for all documents and records of

2   your agency relating to Universal's business

3   relationship with West Marine from May 1, 2020, to the

4   present.  Do you see that?

5       A    I do.

6       Q    This asks for your agency.  What is your

7   agency, Mr. Payseur?

8       A    You know what?  It tailed off at the end.

9   Could you repeat that, please?

10      Q    Sure.  You see here where it asks for all

11  documents and records of your agency?

12      A    Mm-hmm.

13      Q    Could you tell us what your agency is?

14      A    My -- well, my particular agency is 1978.

15      Q    Okay.  That's a number.  Is that

16  identification number?

17      A    It is.  Correct.

18      Q    Okay.  When you say, "agency," do you have a

19  business that you run as an agency?

20      A    It -- yes.

21      Q    And what is that business name?

22      A    The -- oh.  The business name is Lakewood

23  Fast Freight.

24      Q    Okay.

25                  MR. GILLIAM:  I didn't catch that.

Page 17

1    Could you repeat it, please?

2                    MR. JACKSON:  Sure, John.  I was asking

3    him what's the business name --

4                    MR. GILLIAM:  Oh.  No.  I heard that.

5    Just his answer cut out.

6                    MR. JACKSON:  Oh.  Sorry.

7                    THE WITNESS:  It was -- yeah.  I can

8    repeat that.  It's Lakewood Fast Freight.

9                    MR. GILLIAM:  Thank you.

10                   MR. JACKSON:  Got it.

11                   THE WITNESS:  No problem.

12   BY MR. JACKSON:

13       Q    And do you have any of the documents and

14   records requested by Request Number 4, Mr. Payseur?

15       A    The only thing that I can think of are

16   various items on spreadsheets over the -- a period of

17   time but no documents.

18       Q    You say, "spreadsheets."  Do you consider

19   those to be documents, like, tangible documents that

20   you could search for?

21       A    Not really because it's jumbled up.  We

22   don't keep any of the actual physical documents.  The

23   documents go directly from the driver to the corporate

24   office.

25       Q    Okay.  Could you describe to me what those

Page 18

```
 1   spreadsheets are?  Because I'm just going to go up to
 2   the second page here of exhibit.
 3        A    Yeah.  We -- it's kind of a -- it's a
 4   two-phase thing.  One is operational.  We keep track
 5   of who's working, where they are, what loads they're
 6   under.  And then there's a section where we break it
 7   apart for -- just so we can keep track of their
 8   productivity, so it's a line item of each driver and
 9   what they're doing on a particular day.
10        Q    Okay.  In this Exhibit A where it says -- do
11   you see on my screen -- this should be the second page
12   of Exhibit A, this paragraph, Number 9, here that says
13   "Documents."  Do you see that?
14        A    Okay.  It's a lengthy list, but I do see the
15   list.
16        Q    Okay.  Do the spreadsheets that you're
17   referring to, do they fall into any of the categories
18   listed here for documents?
19        A    No.  They do not.
20        Q    Okay.  And why is that not the case?
21        A    Because we don't itemize it or -- what's a
22   good word for it?  It's not in a format that you would
23   ever be able to pick out any of this -- any of the
24   information that would be normally in these documents.
25        Q    Okay.  If it's a spreadsheet -- I'm just
```

Page 19

```
 1   trying to understand what the spreadsheet is.  It's
 2   not, like, an Excel spreadsheet, or it's not something
 3   that you could print off or send via e-mail?
 4       A    It -- it's -- correct.  Well, it -- it's a
 5   shared spreadsheet that we do within the office, but
 6   it's really just for operational -- operation
 7   functions, I guess, if you will.
 8       Q    Okay.  Do you know, who does that
 9   spreadsheet belong to?  Who has custody of that
10   spreadsheet?
11       A    The three of us in the office.
12       Q    The three -- the three of you in your
13   agency's office or Universal's office?
14       A    In our office.  Universal does not -- it --
15   it doesn't pertain to them, so it's just the three of
16   us.  Tony Dinallo, who you -- you spoke to the other
17   day, he has an assistant, and then me.
18       Q    Okay.  I'm just going to put a request down
19   on the record for whatever that document is since you
20   indicated that it would be responsive to Number 4, but
21   we haven't seen it.  So we might need to have some of
22   our IT professionals see what document that is, and
23   we'll make a request for that on the record.
24                MR. JACKSON:  John, do you need me to
25   make a formal request in writing, or shall we
```

Page 20

1   acknowledge that on the record?

2              MR. GILLIAM:  Well, I think he said

3   that it doesn't pertain.

4              Right?

5              THE WITNESS:  It -- correct.  It's --

6   it's information about -- there's nothing about your

7   client that would be in that spreadsheet other than

8   the occasional line item.

9              MR. JACKSON:  Okay.

10             MR. GILLIAM:  Okay.  So we can --

11             MR. JACKSON:  That --

12             MR. GILLIAM:  We can take a look at it

13  and see.  We don't need a formal request.  We can just

14  address that this week.

15             MR. JACKSON:  Okay.  Yeah.

16  BY MR. JACKSON:

17     Q    And, Mr. Payseur, I wasn't -- I thought you

18  said when I asked about Number 4 -- I thought your

19  testimony, the only thing is -- would be that

20  spreadsheet.  I don't want to put words in your mouth

21  or anything.  That's the only reason I was asking

22  about it.  If it does not --

23     A    No.  I --

24     Q    Go ahead.

25     A    No.  I understand.

Page 21

1      Q     Okay.  Yeah.  If it flatly does not relate
2  to Number 4 in any way, then we don't need it.  But if
3  there's something about the request of Number 4 that
4  it would be responsive to, we would like to see it.
5  So I'll just make that known for the record.  But
6  okay.  Enough on that point.
7            I want to go down further in this subpoena.
8  Did you see Exhibit B to your subpoena, Mr. Payseur?
9                  (Exhibit B was marked for
10                  identification.)
11     A     I did.  Let me see.  Yes.
12     Q     Okay.  And can you tell us what that
13  Exhibit B is to that subpoena?
14     A     It looks like -- I'm not -- I don't know how
15  to describe it.  I -- I'm not sure exactly.  I mean,
16  it's naming some people, the plaintiff and the
17  defendant.
18     Q     Okay.  What does it say at the bottom?
19     A     And the case number.
20     Q     What does it --
21     A     I beg your pardon.
22     Q     What does it say at the bottom of that first
23  page there?
24     A     Sure.  "Verified Amended Complaint for
25  Injunctive and Other Relief."

Page 22

 1      Q    Okay.  Fair to say that that's the title of

 2   this document?

 3      A    Okay.

 4           MR. GILLIAM:  Object to foundation.

 5           You can answer, sir.

 6           THE WITNESS:  I'm not sure what -- if

 7   there was a question there.

 8   BY MR. JACKSON:

 9      Q    Would you agree that this -- what you just

10   read here, "Verified Amended Complaint for Injunctive

11   and Other Relief," that that's the title of this

12   document?

13      A    It appears to be, but I'm not qualified to

14   make that judgment.

15      Q    Okay.  Did you review this document,

16   Mr. Payseur?

17      A    Yes.  I did.

18      Q    Okay.  All the way through?  Its entirety?

19      A    I did review this.

20      Q    Okay.  And if you go down to further in that

21   document, Exhibit B, which is the verified amended

22   complaint, did you see a page that said "Index of

23   Exhibits" that I have up on my screen here?

24      A    Hold on one second.

25      Q    Yeah.  Take your time.

```
                                           Page 23

 1       A    Could you tell me what page that would be?
 2       Q    It does not have a page number on it.  It
 3   would be after page 14.
 4       A    Okay.  I see 13.  Oh, yes.  Okay.
 5       Q    You with me?
 6       A    I beg your pardon.
 7       Q    I said, are you with me?  You there?
 8       A    Yes.  Yes.  I'm on that page.
 9       Q    Okay.  There's a list of six exhibits right
10   here.  Did you review those exhibits in your review of
11   this Exhibit B?
12       A    Not really.
13       Q    Okay.  Did you or did you not review
14   Exhibit 1 entitled "Confidentiality and
15   Non-solicitation Agreement"?
16       A    I did not.
17       Q    Okay.  Did you review Exhibit 2 entitled
18   "March 11, 2016, Offer Letter"?
19       A    I did.
20       Q    Okay.  Did you review Exhibit 3 entitled
21   "November 5, 2021, Final Notice Legal Demand"?
22       A    Yes.  I did.
23       Q    Okay.  Did you review Exhibit 4 entitled
24   "March 14, 2022, Letter Regarding Violation of
25   Confidentiality and Non-solicitation Agreement"?
```

Page 24

1       A     I did not.

2       Q     Okay.  Did you review Exhibit 5 entitled

3    "Bridge Response Letter, March 18, 2022"?

4       A     I did not.

5       Q     Okay.  Did you review Exhibit 6 entitled

6    "Universal Truckload Response Letter, March 28, 2022"?

7       A     I did not.

8       Q     Okay.  Okay.  I was just scrolling down

9    further in the document that I have up as Exhibit A.

10   Give me just a second.

11            Mr. Payseur, do you see this document that's

12   on my screen right now?

13      A     Yes.  That's the -- yes.  I do.  I have it.

14      Q     Okay.  Can you tell me what this document

15   is?

16      A     "Subpoena to Testify at a Deposition in a

17   Civil Action."

18      Q     Okay.  And who is it directed to?

19      A     Me, I guess.  Is that what the next line is?

20      Q     What does the next line -- what does this

21   line say?

22      A     To Ronald Payseur.  Or Ron Payseur.

23      Q     Is there anything in front of Ron Payseur?

24   I just want to make sure you see what I see on my

25   screen.

Page 25

```
 1       A    Just -- no.  Just -- just the word "to,"
 2  T-O, and then a colon.  And Ron Payseur, 66 Lakewood
 3  Drive, Denville, New Jersey.
 4       Q    Can you see my screen, Mr. Payseur?
 5       A    Somewhat.  Yes.
 6       Q    I'm going to --
 7       A    I can -- I see it.  That's a little better,
 8  actually.  Okay.
 9       Q    Okay.  Can you see this better now?
10       A    Yes.
11       Q    Who is this subpoena directed to?
12       A    That's different than mine.
13       Q    Well, on my screen.  You can -- because if
14  you don't -- this one --
15       A    Yeah.  No.  That's -- that's to Lakewood
16  Fast Freight, which would be the entity that I
17  mentioned before.
18       Q    Okay.  Yeah.  That's all I wanted to
19  understand.  Do you have this hard --
20       A    Oh, okay.
21       Q    Do you have that hard copy with you or no?
22       A    I didn't see it, actually, but I didn't look
23  for it either.  I do not have that.
24       Q    Do you remember receiving this document?
25       A    I do not.  That's the first I've seen of
```

1    that.

2         Q    Okay.  Give me just a second.  I'm going to

3    pull up another document here.  Hold on.

4         A    Sure.

5         Q    Okay.  Thanks for your patience,

6    Mr. Payseur.  I'm not going to bring up another

7    document.  You did not receive what is on your screen,

8    is your testimony, correct?

9         A    Yes.  Correct.

10        Q    Okay.  Okay.  Aside from what we just went

11   through, the subpoena to you, did you review any other

12   documents in preparation for this deposition?

13        A    No.  I did not.

14        Q    Okay.  Did you speak with anyone in

15   preparation for this deposition?

16        A    Just Mr. Gilliam.

17        Q    Okay.  And when did you meet with

18   Mr. Gilliam?

19        A    This -- this morning.

20        Q    Okay.  All right.  Just got a few questions

21   to get to know about you a little bit.  Did you attend

22   college, Mr. Payseur?

23        A    Yes.

24        Q    And what college was that?

25        A    Central Piedmont.  It was a community

Page 27

1    college back in the 1970s.

2         Q    Okay.  Does it still exist?

3         A    I believe it does.

4         Q    Okay.  And did you graduate from Central

5    Piedmont?

6         A    I did not.

7         Q    Okay.  What years did you attend?

8         A    Probably 1977 through '78.

9         Q    Okay.  Just a brief time.  What did you

10   study during your time there?

11        A    Business and economics.

12        Q    Okay.  And you did not graduate, so you -- I

13   assume you left -- you just left Central Piedmont?

14        A    Correct.  Yes.

15        Q    Did you re-enroll in college elsewhere at

16   any time?

17        A    Yes.  I did.  Later in adulthood I took some

18   courses at Morris County Community College here in New

19   Jersey.

20        Q    Okay.  And you say you took some courses.

21   Did that culminate in a degree or certification?

22        A    It did not.

23        Q    Okay.  What years did you attend Morris

24   County?

25        A    You know, I would be speculating.  I -- I

Page 28

1    don't remember exactly.

2        Q    That's fine.  Do you remember what you

3    studied there?

4        A    The same thing.  Business.

5        Q    Got it.  Have you had any other professional

6    education of any sort?

7        A    Could you define that?

8        Q    Yeah.  Have you taken any other -- even

9    outside of college -- any other training courses?

10       A    Oh, yeah.

11       Q    Whether that be through military, through

12   your work, things like that.

13       A    Various jobs.  Yes.  Like, sales and

14   marketing, primarily.

15       Q    Okay.  Is it fair to say that those courses

16   just would've been, you know, courses you take with

17   your employment, wherever you were working?

18       A    Yes.

19       Q    Okay.  Did you attend any vocational or

20   trade school?

21       A    No.  I have not.

22       Q    Okay.  Do you hold any specific licenses,

23   degrees, or other type of professional certificates?

24       A    I am a licensed real estate agent in New

25   Jersey.

Page 29

1        Q     Okay.  And how long have you been licensed?

2        A     I'm going to say seven years.

3        Q     Okay.  Do you use that license today?

4        A     I do not.

5        Q     Okay.  When did you stop engaging in that

6    business?

7        A     Well, I really never engaged in it.  The

8    reason I got my license, my oldest daughter, when she

9    graduated college, she got her real estate license,

10   and I got mine just to help her with open houses and

11   for safety.  I didn't want her to be out and about in

12   -- in dangerous places.  And so I got my license just

13   so I could help her.

14       Q     Okay.  That's beautiful.  My dad would never

15   do that for me.  Just good riddance.  So he's like,

16   "I'm not going there."  Okay.  And are you currently

17   employed, Mr. Payseur?

18       A     Well, I'm an independent agent with

19   Universal, you know, through Lakewood Fast Freight and

20   Universal.

21       Q     Okay.  And who owns Lakewood Fast Freight?

22       A     I do.

23       Q     Okay.  But you don't employ yourself.

24       A     Correct.  It's a sole proprietor.

25       Q     Got it.  And you are the sole proprietor?

Page 30

1          A     I am.

2          Q     Okay.  So, like, is that contractor

3     relationship with Universal, is that -- I won't say

4     employment because it's not employment.  Is that the

5     only work you're doing right now, today?

6          A     Yes.  Correct.

7          Q     Okay.  And how long have you been in that

8     relationship with Universal?

9          A     I believe since February of 1998.

10         Q     That's a long time.  And you characterize

11    yourself as just an agent contractor for Universal?

12         A     Correct.

13         Q     Okay.  What did you do before you started

14    doing that in 1998?

15         A     I owned my own trucking company and

16    dissolved the operational part and became an agent.

17         Q     Okay.  And what was that company's name?

18         A     Payseur -- after my last name -- Motor

19    Express.

20         Q     Okay.  And what type of business was that?

21         A     That was local trucking.

22         Q     Okay.  By local, you mean --

23         A     In the New York Metro.  New York Metro.

24         Q     Okay.  Is that fair to say kind of the

25    tri-state area, New York, New Jersey, Connecticut?

Page 31

1       A     Yes.   That would be accurate.

2       Q     Okay.   And how long did you operate that

3  business?

4       A     Probably about five years.   Oh.   Actually I

5  told you the wrong date.   I became a Universal agent

6  in 2009.   I'm sorry.

7       Q     No.   That's fine.   We'll walk it back.

8       A     I knew something didn't sound ...

9       Q     That's perfectly fine.   We'll walk that back

10  a little bit.   So 2009 you started doing what you

11  continue to do today; is that correct?

12      A     Yes.   Correct.

13      Q     Okay.   Prior to that, prior to 2009, what

14  were you doing?

15      A     Prior to that I did have my own trucking

16  company from about -- right.   From about 2000 to 2008,

17  right up until I merged --

18      Q     Okay.   And was that same company you

19  identified, Payseur Motor?

20      A     Correct.   Yes.   It is.

21      Q     Okay.   Before 2000 what did you do?

22      A     I was a -- a company employee for other

23  trucking companies.

24      Q     Okay.   How many companies?

25      A     Two.   Just prior was one, and then before

Page 32

```
 1   that, another.
 2        Q    Do you remember their names?
 3        A    I do.  The -- the earliest was Heartland
 4   Express.
 5        Q    Okay.  And how long were you at -- did you
 6   say, "Hartley"?
 7        A    No.  Heartland.
 8        Q    Heartland.  Okay.  How long were you at
 9   Heartland?
10        A    That goes way back, but I'm going to say
11   five years.
12        Q    Okay.  And what was your job role there?
13        A    Regional sales manager.
14        Q    Okay.  And what type of business was
15   Heartland -- or is Heartland?
16        A    That is an over-the-road trucking company.
17        Q    What do you mean by "over the road"?
18        A    Well, I guess a better terminology -- a full
19   truckload carrier.  They did not do less than
20   truckload.  They did full truckloads.
21        Q    Okay.  So I'm understanding, does that mean
22   they would not carry, you know, a half trailer or an
23   empty trailer?  It has to be, you know, pretty filled
24   out?
25        A    Correct.  Correct.
```

Page 33

1      Q     Okay.  Okay.  And what did you do in that

2  job role at Heartland?

3      A     Business development, primarily in the

4  northeast.

5      Q     Okay.  And before Heartland -- so you say

6  five years you were at Heartland?  Is that taking us

7  back to 1995?  When you started.

8      A     Yes.  It would be.

9      Q     Okay.  Prior to that where were you at that

10 second company?

11     A     Well, the other company, Interstate

12 Distributor, was after Heartland and then up until I

13 started my own company.

14     Q     Oh, okay.  We have them flip-flopped.  So --

15     A     Yes.

16     Q     You worked at Interstate, is the company --

17     A     Interstate Distributor.

18     Q     Interstate Distributor.  So what type of

19 business is that?

20     A     That was over-the-road, full truckload

21 trucking.

22     Q     Got it.  Same as Heartland?

23     A     Correct.

24     Q     Okay.  And what was your job title there?

25     A     At that point I was a regional sales manager

Page 34

1    there as well.

2         Q    Okay.  And what did that entail?

3         A    Actually at one point I had -- when I left I

4    actually had the title of regional vice president of

5    sales.

6         Q    Okay.  So that --

7         A    And that was -- yeah.  It was -- within the

8    northeast.

9                   MR. GILLIAM:  I'm sorry.

10                  MR. JACKSON:  Okay.

11                  MR. GILLIAM:  It cut out on me.

12                  Ron, could you say your answer again,

13   please?

14                  THE WITNESS:  From -- from where?

15                  MR. GILLIAM:  Your last answer.

16                  THE WITNESS:  The -- the last answer, I

17   was with Interstate Distributor, a regional sales

18   manager, and at one point made it to regional sales

19   vice president.

20   BY MR. JACKSON:

21        Q    Got it. And did that job role, did that

22   involve, you know, business development similar to

23   Heartland?

24        A    It did.

25        Q    Okay.  Can you give me the dates when you

Page 35

```
 1   were at Interstate Distributors?  If you remember.
 2        A    I'm going to say 2000 to 2004.
 3        Q    Okay.  Was that contemporaneous with you
 4   owning your own company, Payseur?
 5        A    I'm sorry.  Was that what with owning?
 6        Q    Was that contemporaneous, at the same time,
 7   simultaneous with you operating your trucking company?
 8        A    No.  No.  No.  I left -- I left Interstate
 9   to start my trucking company.
10        Q    Okay.  Because I'm just trying to make sure
11   I have your -- and I don't want to get it wrong.
12        A    Yeah.  No.
13        Q    I have you --
14        A    That's -- that's --
15        Q    I have you running your trucking -- running
16   your own trucking company from about 2000 to 2008.  Is
17   that right?
18        A    No.  I -- I was with Interstate Distributor
19   from about 2000 to 2004 or so, I believe, and then my
20   own company for the next four years.
21        Q    Okay.  Got it.  That makes sense.  And what
22   were the dates at Heartland?
23        A    I'm going to say 1995 to 2000.
24        Q    Okay.  Any more trucking experience prior to
25   1995?
```

Page 36

1      A     Yes.  I briefly owned my -- a -- that same

2   trucking company -- it's a warehousing company,

3   actually, and then I sold that, and that's when I took

4   company jobs.

5      Q     Okay.  Do you remember -- and I know we're

6   getting a ways back.  Do you remember how long you

7   operated that, sort of, warehousing company?

8      A     That -- those dates get --

9      Q     Yeah.

10     A     Fuzzy.

11     Q     That's fine.  We won't go much further back.

12  Just wanted to get a little bit of your job history.

13  But today you're an agent, an agent contractor with

14  Universal.  What are your responsibilities in that

15  role?

16     A     Well, customer development and driver

17  development, operating -- you know, the -- in an

18  agent-based company, you are your own operation.  The

19  drivers and contractors, they do not run for the

20  corporate office.  They run the agents that they're --

21  recruited to.  So I participate in the operation,

22  sales to customers, that type of thing.

23     Q     Okay.  And you mentioned customer

24  development.  Can you tell me a little bit, you know,

25  what would you do if I'm "Z" customer and you're

Page 37

```
 1   trying to establish a relationship?  How do you
 2   develop customers in your role?
 3        A    It -- there's a couple of different ways.
 4   It's -- in -- today it's mostly electronic and not so
 5   much meeting face to face like years ago.  The first
 6   thing you do is fact sheets with each other to make
 7   sure that there's a -- a material fit, and then if
 8   that works out, then you to pricing and/or contract
 9   status.
10        Q    Okay.  Is that with every customer?
11        A    Yes.
12        Q    Okay.  And I think you --
13                  MR. GILLIAM:  What was that?  I didn't
14   hear that answer.  Is that a yes?
15                  THE WITNESS:  I'm sorry.  Say that
16   again.  Which question?
17                  MR. GILLIAM:  The last one.  Did you
18   say that's yes or no?  I didn't hear.
19                  THE WITNESS:  Oh.  With the -- yes.
20   Yes.
21                  MR. JACKSON:  Okay.  Got it.
22                  Marianne, we're still clear?  Is all
23   that coming through still?
24                  THE REPORTER:  Yes.
25                  MR. JACKSON:  Okay.  Got it.  Want to
```

Page 38

```
 1    make sure we're getting everything.
 2    BY MR. JACKSON:
 3         Q    So, Mr. Payseur, I think you -- that you
 4    said customer development, and then you said something
 5    else development.  Was that agent development?
 6         A    No.
 7         Q    What did you say?
 8         A    A driver.
 9         Q    Driver.  Okay.
10         A    I recruit most of our -- yes.  Correct.
11         Q    Okay.  Tell us a little bit about what
12    driver development entails.
13         A    Well, basically it runs a couple of
14    different -- primarily advertising.
15                   THE REPORTER:  I am unable to --
16                   THE WITNESS:  Advertising is what our
17    agency does.
18                   THE REPORTER:  -- catch Mr. Payseur's
19    answer.  It's too choppy.
20                   MR. JACKSON:  Okay.  We'll stop.  I can
21    ask again, and then we'll see if you're coming
22    through.  Okay?  Can you hear me still?
23                   THE WITNESS:  Can you hear me now?
24    Or ...
25                   THE REPORTER:  That's better.
```

Page 39

1                    MR. JACKSON:  That's better.

2                    THE WITNESS:  Okay.

3                    MR. JACKSON:  So I had asked

4    Mr. Payseur to tell us a little bit about what driver

5    development involves.

6    BY MR. JACKSON:

7         Q    Could you explain for us?

8         A    Sure.  Basically there's a couple of

9    different ways that it work -- three different ways, I

10   should say, that it works.  Primarily to get new

11   people into the organization, I run ads.  Also

12   corporate runs ads.  And then if there's a fit, then I

13   interview them over the phone, give them details about

14   what we do, and then supply them with the application

15   via the application link on the website.

16             The other way that we go about that are

17   referrals.  Universal has a referral bonus program.  I

18   encourage the -- when -- when I say drivers, I'm

19   actually interchanging that with contractors.  They're

20   not -- they're independent contractors themselves.

21   And so we encourage the contractors to make use of the

22   referral bonus and refer people that they know to us.

23             And then the -- the third venue is our --

24   the contractors that are in the system that don't have

25   a permanent fit with -- then I search the system for

Page 40

```
 1   people that are in our area, moving, that type of
 2   thing.  So that's really the three facets that go on.
 3         Q    Okay.  I appreciate that explanation.  You
 4   said you're an agent, so you don't report to anyone;
 5   is that fair?
 6         A    Correct.  That's fair to say.
 7         Q    Okay.  Is an agent, just being an agent, is
 8   that the only role that you've been engaged with
 9   Universal?
10         A    Yes.  Correct.
11         Q    Okay.  Have you been an agent for any other
12   carriers, Mr. Payseur?
13         A    No.
14         Q    Are you an exclusive agent for Universal?
15         A    In terms of -- I mean, I don't -- in terms
16   of contract, I guess it could go either way, but I am
17   exclusively Universal.
18         Q    And I only see, like, the crown of your
19   head.  If you could just put your camera down just a
20   little.  Tilt it down --
21         A    Oh, I'm sorry.  Oh, yeah.  You know what?  I
22   -- I apologize in advance.  I've got a condition that
23   if I sit too long, my legs bleed, so I have to get up
24   and stretch every now and then.  But yeah.  To answer
25   your question, I work exclusively with Universal.
```

Page 41

1      Q      Okay.  And before I ask another question,

2    are you okay?  Do you need a break?  Do you need to

3    walk around?  We don't want you sitting in --

4      A      No.  I'm fine.

5      Q      Okay.

6      A      I'm fine.  I'm fine.  Thanks for asking.

7      Q      No problem.  So there's no contract that

8    says you're an exclusive agent for Universal; is that

9    fair?

10     A      The fairest way to say it is it's been so

11   many years since I read it, but I just don't consider

12   any other company.  So ...

13     Q      Okay.  And just describe, I guess, in your

14   view, what does it mean to be an agent for Universal?

15   What does agency, that kind of ideal, mean to you?

16     A      That's a good question.  My -- well, in my

17   world or seeing it, we get to run our business the way

18   we want to run it -- obviously regulations, you know,

19   pertaining to safety and, you know, workplace rules

20   and all that.  But it's technically my own business,

21   and I can grow it or manipulate it however I need to

22   do it to get to my focus or what I think it should be.

23            So nobody says, "Well, you've got to do this

24   on a particular day" or whatever.  It's pretty much

25   how I envision it, and that's the direction I take it.

Page 42

1      Q    Okay.  So you mentioned your focus and
2   direction.  Universal has no say in that focus and
3   direction is what you're saying?
4      A    Yes.  Correct.
5      Q    Okay.  Okay.  Are you familiar with a
6   company called Transport Investments, Inc., which is
7   now Bridgeway Connects, Inc.?  Have you ever heard of
8   them?
9      A    I have.
10     Q    What do you know about that company?
11     A    I watched over the years.  I've seen press
12  releases, but I don't know in depth what they do.
13     Q    Okay.  So you do not know what business
14  Bridgeway conducts?
15     A    Yeah.  I do know that portion of the
16  business is truckload trucking.
17     Q    Okay.  Would you consider Bridgeway to be a
18  competitor to either your agency or Universal?
19     A    Yes.
20     Q    Okay.  And competitor in what way?
21             MR. GILLIAM:  Object to form.
22             You can answer.
23             THE WITNESS:  You know what?  Both of
24  you gentlemen broke up.  I'm not sure exactly where we
25  are.

Page 43

1    BY MR. JACKSON:

2        Q    Yeah.  I'll ask, because I think John

3    objected, but I'll ask the question again.  My

4    question was, a competitor in what way?

5                    MR. GILLIAM:  And just object to form.

6                    You can answer, Ron.

7                    THE WITNESS:  In that we do similar

8    types of business.  Truckload trucking.  Maybe their

9    model might be different -- I don't know -- because I

10   don't know how it works.  But the general business is

11   similar.

12   BY MR. JACKSON:

13       Q    Okay.  Would you say that Bridgeway competes

14   for the same customers that Universal and your agency

15   does?

16                   MR. GILLIAM:  Object to foundation.

17                   You can answer.

18                   THE WITNESS:  You know, I -- I don't

19   know what they do, exactly.  I mean, truckload

20   trucking, everybody competes with everybody -- I

21   think, but I don't know how to explain that.

22                   MR. GILLIAM:  I'm sorry.  That cut off

23   again.

24                   THE WITNESS:  You know what?  I need to

25   take a quick break.  Yeah.  Can -- you know what?  I

Page 44

1    just need to take a quick break about my leg.

2              MR. JACKSON:  Yeah.  Please.  We'll

3    take a break.

4              THE REPORTER:  Off the record.  Off the

5    record at 2:13.

6              (Off the record.)

7              THE REPORTER:  Back on the record at

8    2:20.

9    BY MR. JACKSON:

10        Q    Okay.  Mr. Payseur, we just took a short

11   break, think about five or six minutes.  I was asking

12   you about how Bridgeway is a competitor of either

13   Universal or your agency, and we were asking about

14   customers.  And I think my last question was, in what

15   way would Bridgeway be competing for customers, for

16   business?  Universal, Bridgeway, they all kind of

17   compete together, correct?

18        A    Yes.  The same business as truckload

19   trucking.  So yeah, they would, you know, be

20   competitors.

21        Q    Okay.  Fair to say that they -- that

22   everybody competes for drivers as well?

23        A    Yes.

24        Q    Okay.  What about equipment?  Like, trailers

25   or things like that.

Page 45

1      A     No.  I would not say that's -- no.

2      Q     Yeah.  Kind of on you to get your own

3  equipment together, right?

4      A     No.  Actually in the Universal model, the

5  independent contractors have the truck, and Universal

6  corporate supplies our trailers.

7      Q     Okay.  Let me rephrase what I was asking.

8  Sorry.  It's kind of on the, you know, respective

9  company, the respective competitors, to get their own

10  trucks, correct?  Or no?

11      A     Wait a minute.  Say that one more time,

12  please.

13      Q     Yes.  What I'm asking is, the type of -- say

14  Bridgeway is a competitor; Universal's a competitor.

15  It's on Universal or Bridgeway to get their own

16  equipment, right?  To get their trailers, purchase

17  what they need to fulfill, you know, the hauling

18  responsibility.

19              MR. GILLIAM:  Object to form.

20      A     Yes.  Correct.

21      Q     Okay.  Would you say that everyone competes

22  for, you know, similar lanes, similar routes,

23  depending on where they operate geographically?

24      A     Yes.

25      Q     Okay.  In what part of the country do you

Page 46

1   really run things for Universal?

2       A    Our primary lanes are eastern -- east -- the

3   East Coast.  The furthest west we go are Houston and

4   Oklahoma City.

5       Q    Okay --

6       A    But we do a little -- but we do regular runs

7   to Indiana, but that's ...

8       Q    That's about as far west as you go?

9       A    Yes.  Correct.

10      Q    Okay.  When you say, "East Coast," now, is

11  that the entire East Coast, you know, from Maine to

12  Florida, or is it more narrow?

13      A    No.  That -- we can do from Maine to

14  Florida.

15      Q    Okay.  Do you know Joe Bridge?

16      A    I do.

17      Q    How do you know him?

18      A    Through the agency meetings.

19      Q    Agency meetings, where?

20      A    Well -- well, every year it's a different

21  place, but Universal has what's called an annual agent

22  meeting, and at certain revenue levels, you get

23  invited to those meetings.  And I've met Joe at

24  several of those.

25      Q    Okay.  When would you say the first meeting

Page 47

1   that you met him was?

2        A    I'm sorry.  Say that again.

3        Q    When would you say the first agency meeting

4   was where you met him?

5        A    You know, I -- I would be speculating.  I

6   don't remember.

7        Q    Okay.  Did you work with him at all?

8        A    No.  No.  As an independent agent we

9   actually just work with ourselves or for ourselves.

10       Q    Okay.  Did you communicate with him at all

11  in fulfilling what you needed to fulfill with

12  Universal?

13       A    Over the course of time, occasionally, yes.

14       Q    Okay.  When was the last time you talked to

15  Mr. Bridge?

16       A    I would say before my heart surgery so at

17  least two and a half, three years, maybe.

18       Q    Okay.  So two to three years.  Is it fair to

19  say -- I mean, that's a while back -- last time you

20  spoke with him would've been 2020?

21       A    And that's speculating, but it's -- it's

22  speculating, but I would say -- because a lot of 2020

23  I was not in full capacity, but -- so I would go with

24  that.

25       Q    Okay.  Fair to say.  Do you know if

Page 48

1    Mr. Bridge is still at or employed with Universal?

2         A    I'm sorry.  Say that again, please.

3         Q    Do you know if Mr. Bridge is still employed

4    with Universal?

5         A    I would say no, he's not.

6         Q    What makes you think that?

7         A    This proceeding.

8         Q    Anything else?

9         A    What's that, please?

10        Q    Anything else?

11        A    Oh.  Oh.  Oh.  I see what your question.  I

12   did get notification in some way, shape, or form, that

13   I don't remember how, when Mr. Bridge left, but it

14   wasn't any -- if I recall right, it wasn't like a -- a

15   formal announcement or anything like that.

16        Q    Okay.  Around what time would you have

17   received that notification?

18        A    You know what?  With all that's gone on

19   healthwise and things, I -- I really don't know.

20        Q    Okay.

21        A    I would be speculating.

22        Q    Okay.  So you believe Mr. Bridge is no

23   longer there.  Do you have any inclination as to when

24   he left Universal?

25        A    Actually, I don't remember the date, but it

Page 49

1   just -- I just remembered how I found out.  I saw a

2   LinkedIn update pop up on my computer screen.

3       Q    Okay.  What type of LinkedIn update?  Who

4   was it from?

5       A    Well, just Mr. Bridge announcing his job, or

6   somehow it came up, and there was a post about it.

7       Q    Okay.  And again, you really don't remember

8   when that was?

9       A    No.  I do not.

10      Q    Okay.  In your mind, since whatever time

11  that was that you saw that he was no longer with

12  Universal, has Mr. Bridge reached out to solicit you

13  for any employment with wherever he went?

14      A    No.

15      Q    Okay.  And in fact, you got -- you have not

16  talked to him since, as you say, around 2020, correct?

17      A    Correct.

18      Q    Okay.  We touched on West Marine earlier.

19  Could you tell me again how you're familiar with that

20  company?

21      A    Well, yes.  I'm familiar with it with the

22  operation that we do there.

23      Q    And what's that operation?

24      A    We deliver the -- we deliver preloaded

25  trailers to their stores and --

Page 50

1      Q    Okay.  And what type of business is West
2  Marine?  What do they do?
3      A    An aquatic retailer.
4      Q    Okay.  And when you say, "preloaded
5  trailers," does that mean that West Marine loads their
6  own trailers and you pick them up or drivers pick them
7  up?
8      A    Correct.  Yes.
9      Q    Okay.  Do you know how long that operation,
10  as you said, has been going on between Universal and
11  West Marine?
12      A    No.  I would be speculating.
13      Q    Okay.  Do you know how that relationship
14  started between Universal and West Marine?
15      A    I do not.
16      Q    Okay.  Aside from yourself, who's involved
17  in maintaining that relationship between Universal and
18  West Marine?  And by maintaining -- I guess I'll take
19  that back, so scratch that last line.
20           What is your role in the relationship
21  between Universal and West Marine?
22      A    My role is that our agency, you know, you --
23  you spoke to Mr. Dinallo last week.  Our agencies, I
24  should say, because we have two separate agencies, are
25  in the business of operating functional duties --

Page 51

1   virtual connectivity interruption --

2        Q    I think you're breaking up, Mr. Payseur.

3             THE REPORTER:  Yes.  Mr. Payseur,

4   you're going to have to repeat that.  Mr. Payseur,

5   your answer cut out.  Would you mind repeating?

6             THE WITNESS:  We -- I don't know where

7   we left off.  I believe you were asking me about my

8   role.

9   BY MR. JACKSON:

10       Q    Correct.

11       A    Okay.  My role is, our two agencies,

12  Mr. Dinallo and mine, we perform the deliveries to the

13  stores for West Marine that come out of their

14  distribution center.

15       Q    Okay.  And you mentioned Mr. Dinallo.  We

16  did talk to him last week.  He has his own agency, or

17  do you guys work together with the same agency?

18       A    Well, we have two different agent numbers.

19  We work -- so that we -- we split costs, we split

20  commissions, that type of thing.  But we have two

21  separate agent numbers.

22       Q    Okay.  Does Mr. Dinallo work for or with

23  Lakewood Fast Freight?

24       A    No.

25       Q    Okay.  And how long have you and Mr. Dinallo

Page 52

```
1    have been working in tandem for that Universal/West

2    Marine relationship?

3        A    Well, I would say since 2009, maybe -- well,

4    we didn't do West Marine -- are you asking

5    specifically to West Marine or my relationship with

6    Mr. Dinallo?

7        Q    West Marine first, and then we'll get to how

8    long you've known him.

9        A    I -- I -- I'm going to say, on and off, six

10   years.  We --

11       Q    Okay.

12       A    We on and off worked with -- you know --

13   worked with West Marine.

14       Q    Okay.  And you have been kind of engaged

15   with Universal since 2009, right?

16       A    Yes.  Correct.

17       Q    Okay.  Six years will take us back to 2016,

18   2017.  So in your --

19       A    Yes.

20       Q    Oh.  Go ahead.  I'm sorry.

21       A    No.  No.  No.  I -- I would say that.

22       Q    Okay.  So between 2009 and I'll say 2016,

23   were you engaged with West Marine for Universal?

24       A    No.

25       Q    Okay.  Describe for me that working
```

Page 53

1    relationship with Mr. Dinallo.  How long have you

2    known each other?

3         A    Oh.  Probably -- I hate to say it -- 25

4    years.

5         Q    Okay.

6         A    A long time.

7         Q    That's almost as old as me so no shame in

8    that.

9         A    Yeah.  No.

10        Q    -- time to know people.  So where did you

11   guys meet?

12        A    My wife actually used to work for him in

13   another business.

14        Q    Okay.  What was that business?

15        A    Two things.  They did -- they sold and

16   serviced a product called Rainbow vacuums, and then

17   Mr. Dinallo was in the water softener business for a

18   while.

19        Q    Okay.  Got it.  Back to West Marine and

20   Universal, who at West Marine -- or scratch that.

21             Who at Universal was involved in kind of

22   managing the relationship between Universal and West

23   Marine?  Do you know?

24        A    Mr. Bridge.

25        Q    Okay.  Anybody else?

Page 54

1       A       No.   Not that I'm aware of.

2       Q       So since Mr. Bridge left Universal, who has

3  been managing that relationship at Universal with West

4  Marine?

5       A       Could you define the word "managing"?

6       Q       Yeah.   So you're the agent who makes the

7  runs or who sets up the runs for the freight --

8  correct? -- on Universal's behalf.

9       A       Yes.

10      Q       Is that a fair description?

11      A       Yes.

12      Q       Who at Universal oversees, manages,

13 supervises that relationship between West Marine and

14 Universal?

15      A       I -- I would say the greater part of that

16 would be Mr. Dinallo.

17      Q       Okay.   But Mr. Dinallo's not an employee of

18 Universal, correct?

19      A       Right.

20              MR. GILLIAM:   Object to form.

21 BY MR. JACKSON:

22      Q       Okay.   So do you know if anyone at Universal

23 is -- maybe supervising was not a best term -- but who

24 is the point of contact at Universal for West Marine?

25      A       Okay.   Okay.   I understand the question.

Page 55

1    Mr. Place.  Steve Place.

2        Q    Okay.  Do you know how long Mr. Place has

3    had that responsibility?

4        A    Since Mr. Bridge left.

5        Q    Okay.  Anyone else --

6        A    Oh.  I take that -- I take that back.  There

7    may have been somebody in between there.  We need to

8    strike that 'cause I'm not sure exactly how that

9    materialized.

10       Q    Okay.  So today it's Mr. Place.  And your

11   testimony is that it --

12       A    Yes.

13       Q    It could have been somebody else between the

14   time that Mr. Place took over and Mr. Bridge had left.

15       A    Yes.

16       Q    Okay.  But you don't know who?

17       A    I would be speculating.

18       Q    Okay.  That's fine.  So we'll kind of walk

19   through the business bargain between West Marine and

20   Universal since Mr. Bridge left.  Do you have any way

21   that you determine, you know, how many loads you're

22   hauling for West Marine on behalf of Universal?

23       A    Well, I didn't get a whole lot of

24   opportunity to research that with a short notice of

25   the -- of this proceeding, but I did notice something.

Page 56

1   Back up until April or May of 2020, the way we did our

2   business with them, all the lanes that we had priced

3   corporately, you know, Universal had priced in their

4   system, we had access to, and at one count I saw up to

5   11 or 12 a week.  Now we're relegated to being

6   assigned about three a week.

7       Q    Okay.  So 11 or 12 a week in 2020.  Is that

8   what you said?

9       A    From what our -- yes.  Up until that point.

10      Q    And so up until that point.  You mean up

11  until April/May 2020?

12      A    Well, April or May of '20.  Then it

13  switched.  Instead of us having availability of those

14  loads, we were relegated to very specific scheduled

15  loads, so it was probably about six for the next year,

16  and now we're down to three.

17      Q    Okay.  So just so I understand it, in April

18  and May 2020, you recall you or Mr. Dinallo, whoever

19  was running the loads, you would get 11 to 12 weeks --

20  11 to 12 loads a week from West Marine, correct?

21      A    We would get that.  Yes.  We would get the

22  offers.  There were a couple regions that we only get

23  as a backup for them, like the Midwest, but yeah.  And

24  then it flipped to where we were just getting assigned

25  loads, and that number has dropped.

Page 57

1        Q     Okay.  You mentioned the Midwest region

2   being a backup region for Universal as to West Marine.

3   What do you mean by that?

4        A     Well, we focus primarily on the East Coast.

5        Q     Okay.

6        A     But if they needed help to, like, Ohio,

7   Michigan -- Wisconsin was one of the ones.  If we had

8   the capacity or could help them out, we would do that.

9        Q     Okay.  What other regions were,

10  quote/unquote, "backup regions" that you guys handle?

11       A     The Mid-Atlantic, a couple of runs there,

12  like the -- the Maryland/Delaware area.  And that's

13  pretty much it.  Yeah.

14       Q     Okay.

15       A     Last -- a year ago we did some into Florida,

16  but we don't see those offerings anymore.

17       Q     A year ago, you say, would've been 2022,

18  correct?

19       A     Yes.  Correct.

20       Q     Okay.  At the time -- you mentioned this

21  April/May 2020, 11 or 12 a week, kind of, capacity --

22  well, not capacity.  Scratch that.

23             Eleven or twenty -- eleven or twelve load a

24  week jobs that you were doing.  How many of those do

25  you think would've been in Florida at that time?

Page 58

1        A     At -- at that particular time, we did not --

2   in that -- going that far back, we didn't see the

3   Florida ones.  We only saw the Florida ones one

4   season, which was twenty -- if they'd serve -- late

5   '21 into '22.

6        Q     Okay.  So let me go back to -- we're still

7   in April/May 2020 with 11 or 12 West Marine loads a

8   week.  You said eventually that started decreasing,

9   right?

10       A     Correct.

11       Q     When did we go from 11 or 12 a week to 6, I

12  think is the number that you mentioned -- is that

13  correct?  Six a week.

14       A     You know what?  I haven't had a chance to

15  look into that.

16       Q     Do you know about when?

17       A     I would be speculating.

18       Q     Okay.  Would it have been before Mr. Bridge

19  left Universal?

20       A     That would be speculating.  Again, I haven't

21  had a -- a chance to research that, and I would not

22  have total records for that anyway.

23       Q     Right.  Right.  Okay.  So you cannot tell me

24  when -- what year the loads decreased from 11 or 12 a

25  week to 6 a week.  You can't tell me that?

Page 59

1      A     I would say between -- yeah -- 2021 into

2    2022.

3      Q     Okay.  Do you know what month in 2021 when

4    that started to tail off?

5      A     No.  I would be speculating.

6      Q     Okay.  In your view what could be the reason

7    for that decrease?  Do you know?

8      A     I -- I would be speculating.  I don't know.

9      Q     Is it usual for the load amount to be cut in

10   half, roughly, like that in your experience?

11     A     No.  In -- no.  It is not.

12     Q     So it's unusual, but you can't give me any

13   reasons that have been, you know -- what would cause

14   that?  Do you know?

15     A     I haven't had direct conversation with

16   anybody that would -- would relay the -- I just would

17   not know.

18     Q     Okay.  Did you ask West Marine why?

19     A     I did not.

20     Q     Okay.  Do you know, who would you have -- if

21   you had to ask, who would be the person that you would

22   ask at West Marine?  Do you know?

23     A     Yeah.  Mr. Braunstein.

24     Q     Okay.  And who is Mr. Braunstein?

25     A     He's their corporate transportation manager.

Page 60

1    Q    Okay.  Do you know his first name?

2    A    Robert.

3    Q    Okay.  And have you had any communications

4    with him --

5    A    I -- I'm sorry.  I -- I cut you off.

6    Q    No.  You're fine.  Go ahead.

7    A    The only communication I've had with

8    Mr. Braunstein that I can think of were on two

9    occasions, and they were a weekend operational issue

10   over a trailer.

11   Q    Okay.  And when would that have been?

12   A    And that -- that would've gone back at least

13   a year and a half ago, so 2022'ish.

14   Q    Okay.  Do you know if that was an e-mail or

15   a phone call?  Do you know?

16   A    A phone call.

17   Q    Okay.  Okay.  So all you know is sometime in

18   2021, you say, you went -- West Marine -- the loads

19   for West Marine at Universal went from 11 to 12 down

20   to 6, right?

21   A    Yes.

22   Q    You have any reason to believe that that was

23   due to any actions by Mr. Bridge?

24   A    I would be speculating.

25   Q    Okay.  You just don't know?

Page 61

1          A      I don't know.  No.

2          Q      Okay.  You can't say "yes" or "no."  You do

3     not know either way?

4          A      I would say I do not know.

5          Q      Okay.  Do you know whether, you know, driver

6     issues or lack of drivers, anything like that,

7     contributed to that decrease?

8                         MR. GILLIAM:  Object to form.

9                         You can answer.

10                        THE WITNESS:  Could you say the

11    question again, please?

12    BY MR. JACKSON:

13         Q      Yeah.  Sure.  I can rephrase.  We're talking

14    about the decrease in loads from West Marine, right?

15         A      Okay.

16         Q      Do you think a lack of drivers or any driver

17    issues could have contributed to that decrease?

18         A      It did not.

19         Q      It did not?

20         A      It did not.

21         Q      Okay.  But you can't tell me any other

22    reasons that you believe would have contributed to the

23    decrease?

24         A      Correct.

25         Q      Okay.  I know you said in 2021, at some

Page 62

1    point, West Marine loads at Universal went down from

2    11 or 12 to 6 a week, and then -- and correct me if

3    I'm wrong -- you mentioned that there are roughly 3

4    loads a week today; is that right?  Or do I have that

5    wrong?

6        A    No.  You have that correct.

7        Q    Okay.  When do you recall a decrease from

8    six loads a week to three loads a week?

9        A    You know what?  I don't have that

10   information.

11       Q    Okay.  But how did you know it's decreased

12   from six loads a week to three loads a week, if those

13   are the numbers you're giving?

14       A    Well, that's -- because that's what we're

15   doing.

16       Q    Okay.  Again, you don't know why?

17       A    I do -- correct.  I do not know.

18       Q    Okay.  And you do not know if that is due to

19   any actions by Mr. Bridge?  You can't say "yea" or

20   "nay"?

21       A    Correct.  I can't say either way.

22       Q    Okay.  Approximately when did the business

23   transition from six loads a week to three loads a

24   week?

25       A    I didn't get a chance to research that, so I

Page 63

1    -- I -- I couldn't tell you.

2         Q    Is there a way you could find out?

3         A    Possibly.  Yes.  If -- if I went back to

4    their schedules, I could probably -- not that I saved

5    every schedule, but I might have some seasonal ones.

6         Q    Okay.  And you would have that, or does that

7    belong to somebody else, like Universal or

8    Mr. Dinallo?

9         A    Well, we -- Mr. Place, Mr. Dinallo, and I

10   get those schedules.

11        Q    Okay.

12        A    We -- we would know how to plan.

13        Q    Okay.  So right now we're sitting at three

14   loads a week that you're usually running for West

15   Marine at Universal, correct?

16        A    Correct.

17        Q    Do you believe that you could handle more

18   loads for West Marine on Universal's behalf?

19        A    Yes.

20        Q    Okay.  I think you mentioned -- and again,

21   correct me if I'm wrong.  I don't want to

22   mischaracterize your testimony.  But when business was

23   at 11 or 12 loads a week, were you or Mr. Dinallo or

24   another agent seeking those loads from West Marine, or

25   was West Marine, you know, assigning those loads

Page 64

1   without you having to ask?

2       A    No.  What were -- those were load offerings

3   that would come to us.  And again, I -- it was based

4   on if you were at an accepted pricing range at the

5   time.  But those were the offerings that we got.

6       Q    So accepted pricing range.  What do you mean

7   by that?

8       A    In other words West Marine accepted our

9   price structure.

10      Q    At the time you were doing 11 to 12 loads,

11  they accepted -- prices?

12      A    Well, we were getting offered 11 to 12.  I

13  haven't had a chance to research what percentage of

14  those we covered on a regular basis.

15      Q    Okay.

16      A    But now we -- but now we have no access to

17  11 or 12.

18      Q    Okay.  I'm just trying to understand the

19  concept of accepted price range.  So do you know, is

20  it that West Marine was giving you 11 or 12 loads a

21  week based on this accepted price range?

22      A    I -- I don't know their strategy.  I -- I

23  don't know.

24      Q    West Marine's strategy, you mean.

25      A    Right.  West Marine strategy.

Page 65

```
 1      Q    Okay.  And what about when you went down to
 2  six weeks?  Again, was that West Marine offering loads
 3  or offering six loads a week to you or you asking for,
 4  you know, that amount or more?
 5      A    That's all that we were assigned on the
 6  schedules.
 7      Q    Okay.  Do you know if that was based on this
 8  accepted price range?
 9      A    I do not know.
10      Q    Okay.  What about when we were down to three
11  loads a week?
12      A    The same thing.  I -- I don't know.  That's
13  what we were given on our schedule.
14      Q    Okay.  Do you know if Universal is the
15  exclusive shipper for West Marine, where they conduct
16  business?
17      A    You know what?  The last half of that broke
18  up.  Could you repeat that, please?
19      Q    Yeah.  Can you hear me now?
20      A    Oh, yeah.  Yeah.
21      Q    Okay.  I asked, do you know if Universal is
22  the exclusive shipper or trucker for West Marine in
23  the area that you run freights for West Marine?
24      A    We are not the exclusive.
25      Q    Okay.  Do you know how many other carriers
```

Page 66

1   West Marine uses in that area?

2        A    I do not.  I do not.

3        Q    West Marine's a big company, fair to say,

4   right?

5        A    Yes.  They are.

6                 MR. GILLIAM:  Object to form.

7   BY MR. JACKSON:

8        Q    Okay.  West Marine could use many carriers

9   to service their needs, correct?

10                MR. GILLIAM:  Object to form.

11                You can answer, Ron.

12                THE WITNESS:  I would say they could.

13   Yes.

14   BY MR. JACKSON:

15       Q    Okay.  Okay.  Do you, as your agency, or do

16   you know if Universal bids for work from West Marine?

17       A    I do.

18       Q    Do they?  You said you do?  Or --

19       A    I -- I do know that -- that we do -- we did.

20       Q    You did bids, correct?

21       A    You're asking about bid, correct?

22       Q    Yeah.  You did bid, or you do bid; is that

23   what you're saying?

24       A    We just did a bid.

25       Q    Okay.  How recently ago?

Page 67

1      A    I didn't get a chance to look that up, but
2    in -- within the last 30 days, I'm going to say.
3      Q    Okay.  Could you explain that bidding
4    process for me?  Do you know?
5      A    Yes.  It came from a third party.  I -- I
6    believe the third party is in the -- one of the West
7    Marine locations from the address if I -- but yeah.
8    It was an electronic bid.  Came over in the form of a
9    spreadsheet.
10      Q    Okay.  And did Universal win that bid?
11      A    We did not.
12      Q    Do you know why not?
13      A    We just got informed that we were not
14    awarded any of the lanes.
15      Q    For what period?  For how long?
16      A    There was not a time frame in that, now that
17    you're asking.  I don't remember seeing one.
18      Q    Okay.  But do you know why Universal was not
19    awarded any of the lanes?  Was there any explanation
20    given by West Marine?
21      A    No.  I believe we just -- from memory,
22    again, short notice, I didn't get a chance to go back
23    and look at documents or look at those.  But we just
24    got a notification that we were not accepted.
25      Q    Okay.  Had happened before?  Had Universal

Page 68

1    bid on work with West Marine and not won it, to your

2    knowledge?

3        A    To my knowledge that had not happened.

4        Q    Okay.  Had Universal bid on work with West

5    Marine and won the work in the past, to your

6    knowledge?

7        A    Could you say that again, please?

8        Q    Yeah.  So I asked, essentially, are there

9    any other instances where Universal bid on work and

10   did not win it?  Now I'm asking, are there instances

11   that you're aware of where Universal bid on work and

12   did win the work with West Marine?

13       A    I'm still not following.  I'm sorry.  Say --

14   say that one more time.

15       Q    Yes.

16            MR. GILLIAM:  He's asking if there were

17   any successful bids.

18            MR. JACKSON:  Correct.

19            THE WITNESS:  I'm not privileged to

20   those.  They're corporate bids that are out there

21   that, you know, I wouldn't know the answer to that

22   totally because I don't see all of those.

23   BY MR. JACKSON:

24       Q    Okay.  What is your role in the bidding

25   process for West Marine, specifically, or for other

Page 69

1    customers that you --

2         A    Okay.  My role is to bid in the lanes that

3    we're comfortable in servicing.

4         Q    And again, that would you be Northeast -- or

5    the East Coast.

6         A    Or -- yes.  Correct.

7         Q    Okay.  If there's some California/Arizona

8    work out there, you and Universal are not going to bid

9    on that?

10        A    I -- well, I can't speak for Universal.  I

11   can only speak for my operation.

12        Q    But you are not going to bid on that.

13        A    Yes.  That is correct.

14        Q    Okay.  Okay.  Do you know if Universal

15   received any complaints from West Marine regarding

16   Universal's services?

17                  MR. GILLIAM:  Object to form.

18        A    I am not aware of any.

19        Q    Okay.

20        A    I'm sorry.

21        Q    Are you aware of any concerns West Marine

22   raised regarding Universal services?

23                  MR. GILLIAM:  Object to form.

24                  You can answer.

25                  THE WITNESS:  I am not aware of any.

Page 70

1    BY MR. JACKSON:

2        Q    Today are you or -- well, I won't ask you

3    about Mr. Dinallo.

4            Are you asking to run more loads for West

5    Marine?

6        A    Are -- are we asking?  Could you state that

7    again, please?

8        Q    Yeah.  You've noticed a pattern of it

9    steadily going down over the last few years, correct?

10       A    Yes.

11       Q    Are you, in your role, doing anything to ask

12   West Marine to run more loads weekly, today?

13       A    Well, that's not exactly an answerable.  We

14   do make offers to West Marine on a regular basis for

15   more loads.  If we think we can -- we know we can make

16   capacity for them, Mr. Dinallo will message

17   Mr. Braunstein and say, you know, we do have capacity

18   for whatever.  And he's been turning us down for that.

19       Q    Okay.  And you said regularly that would

20   happen, correct?

21       A    Yes.

22       Q    Okay.  Mr. Dinallo does that, not you?

23       A    Yes.

24       Q    Okay.  And you said West Marine has been

25   turning you down?

Page 71

1    A    Yes.

2    Q    Do you know why?

3    A    They just come back with a "no thanks" type

4    answer.

5    Q    But do you know why they say that?

6    A    I do not know.

7    Q    Okay.  Any reason to believe that them

8    turning you down is due to any conduct by Mr. Bridge?

9    A    I do not know.

10    Q    Okay.  So West Marine is still sending you

11    Universal loads, just not as many as in the past,

12    correct?

13    A    Correct.

14    Q    Okay.  So the business has not gone away,

15    right?

16              MR. GILLIAM:  Object to form.

17              You can answer.

18              THE WITNESS:  Well, if we -- at this

19    point it has not gone away.

20    BY MR. JACKSON:

21    Q    Okay.  And I think earlier you testified

22    that you, you know, you kind of have your own focus

23    and direction for your agency independent of

24    Universal, right?

25    A    [No audible response.]

Page 72

1      Q     I didn't hear you.  I'm sorry.

2      A     -- a minute.  I'm sorry.  Say that again.

3   Something broke up.

4      Q     Oh.  So I think earlier you testified that

5   you have your own focus and direction for your agency

6   independent of what Universal thinks; is that right?

7      A     Yes.  Correct.

8      Q     Okay.  Of that focus and direction, do you,

9   your agency, have a, you know, particular goal in mind

10   for the West Marine account, whether that be revenue

11   or whatever you earn on running West Marine loads?

12      A     I -- I would say revenue and volume because

13   our office, our agency's very good at what we do.  We

14   developed a model way back when we started the

15   partnership, and it's worked very well.  And we would

16   like to just continually keep filling that model,

17   which is primarily the East Coast.

18      Q     Okay.  What would you say your goal, whether

19   that's a ballpark number, anything like that, for your

20   agency would be with West Marine on a yearly basis?

21      A     I wouldn't -- I wouldn't even know how to

22   speculate a goal like that.  We always have a goal of

23   trying to grow each year, and this is, you know,

24   obviously we haven't done that with West Marine in the

25   last year and a half or so.

Page 73

1        Q    Okay.  And why is that?

2        A    The volume has not been there.

3        Q    Okay.  And have you done anything with

4    Mr. Braunstein to address the current volume?

5        A    I have not.

6             MR. GILLIAM:  Just object to -- asked

7    and answered.

8             But you can go ahead.

9             THE WITNESS:  Me directly, I have not.

10   BY MR. JACKSON:

11       Q    Okay.  Let's see.  Sitting here today do you

12   have any evidence that Mr. Bridge solicited business

13   from West Marine since he left Universal?

14       A    I would not have firsthand knowledge.  I do

15   not have knowledge.

16       Q    Okay.  Do you know what individuals would

17   know that type of thing?

18       A    I -- I would be speculating.

19       Q    Okay.

20       A    I -- I can't say.

21       Q    Would it be somebody at Universal?

22            MR. GILLIAM:  Object to foundation.

23            THE WITNESS:  I'm not --

24            MR. GILLIAM:  You can go ahead, Ron.

25            THE WITNESS:  I'm speculating that

Page 74

1    somebody, you know, in corporate may or may not.  I

2    mean, but me personally, I wouldn't know firsthand.

3                    MR. JACKSON:  Okay.

4                    John, I'll go through my notes, and

5    feel free if you have any questions for him.

6                    MR. GILLIAM:  Sure.  I'll just wait if

7    you want to see if you have anything else.

8                    MR. JACKSON:  Okay.  Yeah.  Give me a

9    few minutes.

10                   MR. GILLIAM:  All right.

11                   THE REPORTER:  We'll go off the record

12   at 3:02.

13                   (Off the record.)

14                   THE REPORTER:  Back on the record at

15   3:12.

16                   MR. JACKSON:  Okay.  John, I don't have

17   any questions right now.  Feel free.

18                   MR. GILLIAM:  Okay.  Thank you.

19                        EXAMINATION

20   BY MR. GILLIAM:

21        Q    Ron, just a few follow-up questions for you.

22   You said that before he left, Joe Bridge was in charge

23   of the relationship between Universal and West Marine;

24   is that right?

25        A    Yes.

Page 75

1      Q     Did Mr. Bridge have any involvement in

2  setting prices?

3      A     He did.

4      Q     Would he have known what Universal was

5  charging to West Marine?

6      A     Yes.

7      Q     And would he have known what lanes Universal

8  was servicing for West Marine?

9      A     Yes.

10     Q     And how do you know that?

11     A     Correspondence, and he got copied in just as

12  Steve Place does on the schedules now.

13     Q     Okay.  When you said that West Marine was

14  offering 11 to 12 loads per week back in 2020/2021,

15  where were those load or where were those lanes for

16  those loads?

17     A     I -- I understand.

18     Q     Does that make sense?  I'm sorry.

19     A     They -- it -- it does.  It does.  It was

20  mostly -- examples were, like, New Hampshire, Maine,

21  three to four different variations in New Jersey,

22  Connecticut.  And then there were a few odd or -- odd

23  -- not -- they're odd to them, but -- was to us -- to

24  Ohio, Wisconsin, and Minnesota.

25     Q     Okay.  So generally on the eastern part of

Page 76

1    the United States but primarily the East Coast?

2         A    Yes.   Correct.

3         Q    Okay.   Thank you.   And in the servicing of

4    the West Marine account on behalf of Universal,

5    between you and Ron, would one of you be the primary

6    contact with West Marine?

7         A    I'm --

8                   MR. JACKSON:   You mean Tony?

9                   THE WITNESS:   I'm sorry.   Could you

10   rephrase that, 'cause you broke up --

11   BY MR. GILLIAM:

12        Q    Yeah.   In servicing the West Marine account

13   for Universal, did you or Ron primarily have the

14   responsibility of being the point of contact with West

15   Marine?

16                  MR. JACKSON:   You mean Tony, John?

17                  THE WITNESS:   Do you mean Tony?

18                  MR. GILLIAM:   Oh, yeah.   Who did I say?

19                  MR. JACKSON:   Ron.

20                  MR. GILLIAM:   Oh.   I'm sorry.   Yeah.

21   BY MR. GILLIAM:

22        Q    So, Ron, did -- between you and --

23        A    That's okay.

24        Q    Between you and Tony, were you primarily the

25   person who would talk with West Marine, or was it

Page 77

1    Tony, or was that a shared responsibility?

2         A    It was Tony.

3         Q    Okay.  When you were asked earlier about if

4    you had any contact with Mr. Braunstein about why the

5    business was down, was that something that normally

6    would have been your responsibility, or was that more

7    what Tony would do?

8         A    That's more with what Tony would do.

9         Q    Okay.  Did you ever talk to Tony about

10   whether he communicated with West Marine about the

11   decline in volume of loads that your agencies were

12   facilitating for Universal?

13        A    Yes.  A --

14        Q    When did --

15        A    A couple -- on a couple of occasions.

16        Q    Okay.  And did Tony have any information

17   from West Marine, you know, why the volume was down?

18        A    He was pricing.

19        Q    Okay.  Meaning the pricing was not

20   competitive enough for Universal to get those loads?

21        A    Well, they -- we were up until -- up to some

22   point, but then I guess it's -- thought they could get

23   it done less, but I did not have a conversation

24   specifically.  I just was told -- they -- they said he

25   was just told for price.

Page 78

1              MR. GILLIAM:  Okay.  I'm sorry.

2              Marianne, did you catch any of that?  I

3    caught, like, half of it.

4              THE REPORTER:  I did as well.

5              MR. GILLIAM:  Okay.

6    BY MR. GILLIAM:

7         Q    Ron, could you restate your answer, please?

8         A    Sure.  The -- the response that Tony was

9    getting from West Marine was -- was about price, but

10   there weren't specifics about that.

11        Q    Okay.  And before Mr. Bridge left Universal,

12   do you recall Tony ever mentioning that West Marine

13   was not offering as many loads because of price?

14        A    No.  I -- I don't think that ever came up.

15        Q    Okay.  And did Tony, in these conversations

16   that you had with him about the decline in West Marine

17   business, did Tony ever mention that quality of

18   service was an issue for West Marine?

19        A    It never came up, and I am copied -- on that

20   stuff, and so I would've seen -- I would've known if

21   we were having service issues.

22        Q    Okay.  So you have no reason to believe that

23   Universal is getting less business from West Marine

24   due to the services and quality of service that

25   Universal provided to West Marine?

Page 79

1        A    Correct.

2        Q    And no one at West Marine has indicated that

3   to you or to Tony, to your knowledge, correct?

4        A    That is correct.

5        Q    Okay.  Do you have any reason to believe

6   that the volume of work -- I'm sorry -- the volume of

7   loads from West Marine had to do with a decline in the

8   volume of loads that West Marine had to ship?

9        A    I would not have access to that.  Nobody has

10  stated that to be the issue.  So.

11       Q    Okay.  And so, in other words, Tony didn't

12  tell you that West Marine indicated their having a

13  decline in their business, and they don't have as many

14  loads that they need shipped?

15       A    Correct.  And that -- with any of our

16  customers, that would be a normal conversation, and

17  that has not occurred.

18       Q    Okay.  So there's no reason that that would

19  not have come up if that was the reason, as far as you

20  know?

21       A    Right.

22       Q    Okay.  And would it make sense, then, to

23  you, if it was not related to service issues or

24  related to a downturn in West Marine's business that

25  the explanation for volume decrease with Universal is

Page 80

```
 1   that West Marine was sending their loads to other
 2   carriers?
 3        A    Correct.  That's reasonable.
 4        Q    Okay.  And when you said you weren't sure
 5   exactly when the volume started to decrease for
 6   Universal, down from 11 to 6 loads per week, and then
 7   from 6 to 3 loads per week, would that decrease in
 8   volume correspond with a decrease in revenue?
 9        A    Oh, yeah.  Definitely.
10        Q    Okay.  And so we --
11        A    Because -- definitely it would.
12        Q    Okay.  And would we be able to track that by
13   looking at revenue to see when that volume decreased?
14        A    Yeah.  Our corporate does keep those
15   records.
16        Q    Okay.  You were asked some questions about
17   your goals for your agency and for Mr. Dinallo and his
18   agency, and, in general, you said that the goal is to
19   continue to grow revenue and volume; is that right?
20        A    Well, to grow in volume but not necessarily
21   to have a volume number.  There's a lot of factors
22   that go into achieving that number.  If I was just a
23   pure salesperson, I'd say I want to do -- million a
24   year, but taking it into consideration, operations and
25   everything else, so that's why I gave the answer of
```

Page 81

1    growth.

2        Q    Okay.

3        A    Continued growth.

4        Q    So generally continued growth but no

5    specific quantitative targets.  Is that fair to say?

6        A    Yes.  That's fair to say.

7        Q    Okay.  And have you experienced any

8    substantial or noticeable decline in volume from other

9    customers of Universal other than West Marine?

10       A    No, actually.

11       Q    What was that?

12       A    No.  I have not.

13       Q    Okay.  So the only noticeable difference in

14   the volume of work that your agency and Mr. Dinallo's

15   agency is facilitating for Universal has been with

16   West Marine as the customer?

17       A    Correct.  Yes.

18       Q    Okay.  And you mentioned that Mr. Dinallo

19   would reach out to Mr. Braunstein to offer to ship

20   more freight for West Marine; is that correct?

21       A    Yes.

22       Q    And --

23       A    -- we knew that we could provide them more

24   capacity, we did offer.

25       Q    Okay.  So if you felt like there were times

Page 82

1    that you had capacity, Tony would reach out and tell

2    Mr. Braunstein, you know, "If you need anything this

3    week, we can cover you"?

4         A    Exactly.  We would converse internally to

5    make sure that we had a valid, you know, capacity

6    before we offered it, and then Tony would say, you

7    know, we have this, this, and this, you know, that we

8    can do.

9         Q    Okay.  And other than those efforts, what

10   else has your agency done to make up for the loss of

11   revenue from the decline in volume of West Marine

12   loads?

13        A    Well, I -- we've had to refocus.  West

14   Marine is a very tricky account, if I should say.  You

15   need to be in specific places at specific times.  And

16   so we've had to reposition some of the lanes and the

17   customer development that we've gone after to make up

18   for what West Marine revenue does.

19        Q    Okay.  Have you taken on any new customers

20   in the last 18 months to replace some of that lost

21   revenue?

22        A    I got to think about that.  I wouldn't

23   say -- nothing jumps out at me except the -- customers

24   we've grown with.  The -- the existing customers.

25        Q    Okay.  So there has been some mitigation

Page 83

1    through other customers but not necessarily new

2    customers?

3         A    I -- I would say yeah.

4         Q    Okay.

5         A    I would say that.

6         Q    In your business are you aware of if it's a,

7    I guess, customary for agents or business development

8    personnel to receive substantial signing bonuses when

9    they move to a different trucking company?

10        A    I would say -- I haven't had experience of

11   that myself, so I would say it could be, but I haven't

12   experienced that.

13        Q    Okay.  When you came over to Universal -- or

14   to start your agency, were you offered a sizable

15   signing bonus?

16        A    No.  I was not.

17        Q    Okay.  And you would agree that even though

18   you don't have specific evidence of Mr. Bridge's

19   involvement in the loss of West Marine business that

20   his departure does coincide with when the volume

21   started to decrease for Universal.  Would you agree

22   with that?

23        A    I would agree with that.

24             MR. GILLIAM:  Okay.  Thank you,

25   Mr. Payseur.  I don't have anything further.

Page 84

1          MR. JACKSON:  Neither do I.  Thank you

2     so much, Mr. Payseur, for your time.  We really

3     appreciate it.

4          THE WITNESS:  No -- no problem.

5          Okay.  Thank you, gentlemen.

6          THE REPORTER:  And, Mr. Jackson, would

7     you like a copy of this transcript?

8          MR. JACKSON:  Yes.  Can we get it the

9     same -- expedited that Joe requested last week?

10          THE REPORTER:  Yes.  The 24th?

11          MR. JACKSON:  That is Friday, right?

12     Yeah.

13          THE REPORTER:  Okay.

14          MR. JACKSON:  Or if you need until

15     Monday, that's fine too.

16          THE REPORTER:  I will put it in for

17     this Friday.

18          And, Mr. Gilliam, would you like a

19     copy?

20          MR. GILLIAM:  Yes, please.

21          THE REPORTER:  Okay.

22          MR. GILLIAM:  Ron, you're all set to

23     go.

24          MR. JACKSON:  He's already gone.

25          THE REPORTER:  Off the record at 3:28.

Page 85

1                    (Signature not requested.)
2                    (Whereupon, at 3:28 p.m., the
3                    proceeding was concluded.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

1          CERTIFICATE OF DEPOSITION OFFICER

2          I, MARIANNE HISSONG, the officer before whom

3  the foregoing proceedings were taken, do hereby

4  certify that any witness(es) in the foregoing

5  proceedings, prior to testifying, were duly sworn;

6  that the proceedings were recorded by me and

7  thereafter reduced to typewriting by a qualified

8  transcriptionist; that said digital audio recording of

9  said proceedings are a true and accurate record to the

10 best of my knowledge, skills, and ability; that I am

11 neither counsel for, related to, nor employed by any

12 of the parties to the action in which this was taken;

13 and, further, that I am not a relative or employee of

14 any counsel or attorney employed by the parties

15 hereto, nor financially or otherwise interested in the

16 outcome of this action.

17                              MARIANNE HISSONG

18                         Notary Public in and for the

19                                  State of Ohio

20

21

22

23

24

25

Page 87

1        CERTIFICATE OF TRANSCRIBER

2            I, ERICA MAKUCH, do hereby certify that this

3    transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                                ERICA MAKUCH

16

17

18

19

20

21

22

23

24

25

**[1 - action]**

| 1 | 2 |
|---|---|
| **1** 3:15 10:25 11:4 13:22,24 14:3,12 15:3 16:3 23:14 | **2** 13:11 14:8,9 14:20 23:17 |
| **100** 2:6 | **20** 1:13 4:8 56:12 |
| **10988** 1:8 | **200** 2:14 |
| **11** 23:18 56:5,7 56:19,20 57:21 58:7,11,24 60:19 62:2 63:23 64:10,12 64:17,20 75:14 80:6 | **2000** 31:16,21 35:2,16,19,23 |
| | **2004** 35:2,19 |
| | **2008** 31:16 35:16 |
| | **2009** 31:6,10,13 52:3,15,22 |
| | **2016** 23:18 52:17,22 |
| **12** 56:5,7,19,20 57:21 58:7,11 58:24 60:19 62:2 63:23 64:10,12,17,20 75:14 | **2017** 52:18 |
| | **2020** 11:5 14:12 16:3 47:20,22 49:16 56:1,7,11,18 57:21 58:7 |
| **13** 23:4 | **2020/2021** 75:14 |
| **14** 23:3,24 | **2021** 15:3 23:21 59:1,3 60:18 61:25 |
| **18** 24:3 82:20 | |
| **19** 3:16 | **2022** 23:24 24:3,6 57:17 59:2 |
| **1970s** 27:1 | |
| **1977** 27:8 | **2022'ish** 60:13 |
| **1978** 16:14 | **2023** 1:13 4:9 |
| **1995** 33:7 35:23,25 | **21** 3:10 58:5 |
| **1998** 30:9,14 | **216** 2:17 |
| **1:18** 1:14 4:5 | **22** 58:5 |
| **1:28** 12:6,9 | |

| 2300 | 2:14 |
|---|---|
| **248** | 2:9 |
| **24th** | 84:10 |
| **25** | 53:3 |
| **26317** | 87:14 |
| **28** | 24:6 |
| **28061** | 86:16 |
| **2:13** | 44:5 |
| **2:20** | 44:8 |
| **2:22** | 1:8 |

| 3 |
|---|
| **3** 10:12 13:19 14:25 15:1,18 23:20 62:3 80:7 |
| **30** 67:2 |
| **363-4163** 2:17 |
| **38505** 2:6 |
| **3:02** 74:12 |
| **3:12** 74:15 |
| **3:28** 84:25 85:2 |

| 4 |
|---|
| **4** 3:16 15:25 16:1 17:14 19:20 20:18 21:2,3 23:23 |
| **44114** 1:16 2:15 |
| **48304** 2:7 |

| 5 |
|---|
| **5** 3:3 23:21 24:2 |
| **5756922** 1:18 |

| 594-6360 | 2:9 |
|---|---|

| 6 |
|---|
| **6** 24:5 58:11,25 60:20 62:2 80:6,7 |
| **66** 25:2 |

| 7 |
|---|
| **74** 3:4 |
| **78** 27:8 |

| 9 |
|---|
| **9** 3:8 18:12 |

| a |
|---|
| **ability** 8:13 86:10 87:7 |
| **able** 18:23 80:12 |
| **absent** 4:13 |
| **accepted** 64:4,6 64:8,11,19,21 65:8 67:24 |
| **access** 56:4 64:16 79:9 |
| **account** 72:10 76:4,12 82:14 |
| **accurate** 31:1 86:9 87:5 |
| **achieving** 80:22 |
| **acknowledge** 20:1 |
| **acknowledg...** 4:11 |
| **action** 1:7 10:5 24:17 86:12,16 |

**[action - attend]**

87:8,12

**actions** 60:23
62:19

**actual** 17:22

**actually** 7:19
11:17 25:8,22
31:4 34:3,4
36:3 39:19
45:4 47:9
48:25 53:12
81:10

**additionally**
4:13

**address** 20:14
67:7 73:4

**addressed** 10:1

**administer**
4:11

**ads** 39:11,12

**adulthood**
27:17

**advance** 40:22

**advertising**
38:14,16

**affect** 8:13

**afternoon** 4:2

**agencies** 50:23
50:24 51:11
77:11

**agency** 16:2,6,7
16:11,13,14,18
16:19 38:17
41:15 42:18
43:14 44:13
46:18,19 47:3

50:22 51:16,17
66:15 71:23
72:5,9,20
80:17,18 81:14
81:15 82:10
83:14

**agency's** 19:13
72:13

**agent** 13:5,15
15:10,11 28:24
29:18 30:11,16
31:5 36:13,13
36:18 38:5
40:4,7,7,11,14
41:8,14 46:21
47:8 51:18,21
54:6 63:24

**agents** 36:20
83:7

**ago** 6:9 37:5
57:15,17 60:13
66:25

**agree** 4:12,15
13:14 22:9
83:17,21,23

**agreement**
23:15,25

**ahead** 11:22
14:17,17 20:24
52:20 60:6
73:8,24

**allowed** 12:13

**amended** 3:9
21:24 22:10,21

**amount** 59:9
65:4

**announcement**
48:15

**announcing**
49:5

**annual** 46:21

**answer** 6:11
7:8 9:1 17:5
22:5 34:12,15
34:16 37:14
38:19 40:24
42:22 43:6,17
51:5 61:9
66:11 68:21
69:24 71:4,17
78:7 80:25

**answerable**
70:13

**answered** 73:7

**anybody** 53:25
59:16

**anymore** 57:16

**anyway** 58:22

**apart** 18:7

**apologize** 10:21
40:22

**appears** 22:13

**applicable** 4:19

**application**
39:14,15

**appreciate** 40:3
84:3

**approximately**
62:22

**april** 56:1,11
56:12,17 57:21
58:7

**aquatic** 11:16
12:22 50:3

**area** 30:25 40:1
57:12 65:23
66:1

**arizona** 69:7

**aside** 26:10
50:16

**asked** 20:18
39:3 65:21
68:8 73:6 77:3
80:16

**asking** 12:17
15:13 17:2
20:21 41:6
44:11,13 45:7
45:13 51:7
52:4 65:3
66:21 67:17
68:10,16 70:4
70:6

**asks** 14:9 15:1
16:1,6,10

**assigned** 4:3
56:6,24 65:5

**assigning** 63:25

**assistant** 19:17

**assume** 27:13

**atlantic** 57:11

**attend** 26:21
27:7,23 28:19

| | | | |
|---|---|---|---|
| **attendance** 5:1 | **ballpark** 72:19 | **bid** 66:21,22,22 | 46:15 47:15 |
| **attorney** 86:14 | **bargain** 55:19 | 66:24 67:8,10 | 48:1,3,13,22 |
| 87:10 | **based** 7:11 | 68:1,4,9,11 | 49:5,12 53:24 |
| **audible** 71:25 | 36:18 64:3,21 | 69:2,8,12 | 54:2 55:4,14 |
| **audio** 6:22 86:8 | 65:7 | **bidding** 67:3 | 55:20 58:18 |
| 87:3 | **basically** 38:13 | 68:24 | 60:23 62:19 |
| **authorized** | 39:8 | **bids** 66:16,20 | 71:8 73:12 |
| 4:10 | **basis** 64:14 | 68:17,20 | 74:22 75:1 |
| **availability** | 70:14 72:20 | **big** 66:3 | 78:11 |
| 56:13 | **beautiful** 29:14 | **bit** 6:15 9:6 | **bridge's** 83:18 |
| **avenue** 2:6 | **beg** 14:16 | 26:21 31:10 | **bridgeway** 42:7 |
| **awarded** 67:14 | 21:21 23:6 | 36:12,24 38:11 | 42:14,17 43:13 |
| 67:19 | **beginning** 5:2 | 39:4 | 44:12,15,16 |
| **aware** 54:1 | **behalf** 2:2,11 | **bleed** 40:23 | 45:14,15 |
| 68:11 69:18,21 | 5:4,6 54:8 | **bloomfield** 2:7 | **brief** 12:14 |
| 69:25 83:6 | 55:22 63:18 | **bonus** 39:17,22 | 27:9 |
| | 76:4 | 83:15 | **briefly** 36:1 |
| **b** | **believe** 27:3 | **bonuses** 83:8 | **bring** 26:6 |
| **b** 3:6,9 21:8,9 | 30:9 35:19 | **bottom** 21:18 | **broke** 42:24 |
| 21:13 22:21 | 48:22 51:7 | 21:22 | 65:17 72:3 |
| 23:11 | 60:22 61:22 | **braunstein** | 76:10 |
| **back** 9:25 12:5 | 63:17 67:6,21 | 59:23,24 60:8 | **business** 11:4 |
| 12:8,17 13:19 | 71:7 78:22 | 70:17 73:4 | 11:17 13:6,16 |
| 13:20 27:1 | 79:5 | 77:4 81:19 | 14:11 16:2,19 |
| 31:7,9 32:10 | **belong** 19:9 | 82:2 | 16:21,22 17:3 |
| 33:7 36:6,11 | 63:7 | **break** 8:2,3,4 | 27:11 28:4 |
| 44:7 47:19 | **benesch** 2:13 | 12:1,4,14 18:6 | 29:6 30:20 |
| 50:19 52:17 | **beneschlaw.c...** | 41:2 43:25 | 31:3 32:14 |
| 53:19 55:6 | 2:16 | 44:1,3,11 | 33:3,19 34:22 |
| 56:1 58:2,6 | **best** 54:23 | **breaking** 51:2 | 41:17,20 42:13 |
| 60:12 63:3 | 86:10 87:6 | **breakup** 7:17 | 42:16 43:8,10 |
| 67:22 71:3 | **better** 25:7,9 | **bridge** 1:8 2:11 | 44:16,18 50:1 |
| 72:14 74:14 | 32:18 38:25 | 2:20 4:8 5:9,9 | 50:25 53:13,14 |
| 75:14 | 39:1 | 6:4 15:3,6,10 | 53:17 55:19 |
| **backup** 6:22 | | 15:14 24:3 | 56:2 62:22 |
| 56:23 57:2,10 | | | |

[business - connecticut]                                    Page 4

63:22 65:16
71:14 73:12
77:5 78:17,23
79:13,24 83:6
83:7,19

**c**

**c**  2:1 3:13 4:1
**california**  69:7
**call**  6:4 60:15
  60:16
**called**  5:16 42:6
  46:21 53:16
**camera**  40:19
**capacity**  47:23
  57:8,21,22
  70:16,17 81:24
  82:1,5
**carrier**  32:19
**carriers**  40:12
  65:25 66:8
  80:2
**carry**  32:22
**case**  6:3 9:3
  18:20 21:19
**catch**  8:10 9:1
  16:25 38:18
  78:2
**categories**
  18:17
**caught**  78:3
**cause**  55:8
  59:13 76:10
**center**  51:14
**central**  26:25
  27:4,13

**certain**  46:22
**certificate**  86:1
  87:1
**certificates**
  28:23
**certification**
  27:21
**certified**  4:16
**certify**  86:4
  87:2
**chance**  58:14
  58:21 62:25
  64:13 67:1,22
**characterize**
  30:10
**charge**  74:22
**charging**  75:5
**check**  12:15
**choppy**  38:19
**city**  46:4
**civil**  1:7 10:5
  24:17
**clear**  37:22
**clearly**  7:14
**cleveland**  1:16
  2:15
**client**  20:7
**coast**  46:3,10
  46:11 57:4
  69:5 72:17
  76:1
**coincide**  83:20
**college**  26:22
  26:24 27:1,15
  27:18 28:9

29:9
**colon**  25:2
**come**  51:13
  64:3 71:3
  79:19
**comes**  7:19
**comfortable**
  69:3
**coming**  7:14,15
  9:7 37:23
  38:21
**commissions**
  51:20
**communicate**
  47:10
**communicated**
  77:10
**communication**
  14:18 15:5,19
  60:7
**communicati...**
  11:2 13:23
  14:9,20 15:2
  15:17,21 60:3
**community**
  26:25 27:18
**companies**
  31:23,24
**company**  15:11
  15:12 30:15
  31:16,18,22
  32:16 33:10,11
  33:13,16 35:4
  35:7,9,16,20
  36:2,2,4,7,18

41:12 42:6,10
  45:9 49:20
  66:3 83:9
**company's**
  30:17
**compete**  44:17
**competes**  43:13
  43:20 44:22
  45:21
**competing**
  44:15
**competitive**
  77:20
**competitor**
  42:18,20 43:4
  44:12 45:14,14
**competitors**
  44:20 45:9
**complaint**  3:9
  21:24 22:10,22
**complaints**
  69:15
**computer**  49:2
**concept**  64:19
**concerns**  69:21
**concluded**  85:3
**condition**  40:22
**conduct**  65:15
  71:8
**conducting**  8:1
**conducts**  42:14
**confidentiality**
  23:14,25
**connecticut**
  30:25 75:22

connection
  6:16
connectivity
  9:15 51:1
connects  42:7
consider  17:18
  41:11 42:17
consideration
  80:24
constitute  4:23
contact  54:24
  76:6,14 77:4
contemporan...
  35:3,6
continually
  72:16
continue  31:11
  80:19
continued  81:3
  81:4
contract  37:8
  40:16 41:7
contractor  30:2
  30:11 36:13
contractors
  36:19 39:19,20
  39:21,24 45:5
contributed
  61:7,17,22
conversation
  59:15 77:23
  79:16
conversations
  78:15

converse  82:4
cooney  2:5
copied  75:11
  78:19
copy  10:8
  25:21 84:7,19
corporate
  17:23 36:20
  39:12 45:6
  59:25 68:20
  74:1 80:14
corporately
  56:3
correct  6:12
  10:2 12:21
  13:18 14:6,7
  14:24 15:5,15
  15:16,24 16:17
  19:4 20:5 26:8
  26:9 27:14
  29:24 30:6,12
  31:11,12,20
  32:25,25 33:23
  38:10 40:6,10
  42:4 44:17
  45:10,20 46:9
  49:16,17 50:8
  51:10 52:16
  54:8,18 56:20
  57:18,19 58:10
  58:13 61:24
  62:2,6,17,21
  63:15,16,21
  66:9,20,21
  68:18 69:6,13

70:9,20 71:12
  71:13 72:7
  76:2 79:1,3,4
  79:15 80:3
  81:17,20
correspond
  80:8
corresponden...
  75:11
costs  51:19
counsel  3:11
  6:24 8:4 86:11
  86:14 87:7,10
count  56:4
country  45:25
county  27:18
  27:24
couple  37:3
  38:13 39:8
  56:22 57:11
  77:15,15
course  47:13
courses  27:18
  27:20 28:9,15
  28:16
court  1:1 7:18
cover  82:3
covered  64:14
crown  40:18
culminate
  27:21
current  73:4
currently  29:16
custody  19:9

customary  83:7
customer  36:16
  36:23,25 37:10
  38:4 81:16
  82:17
customers  13:7
  36:22 37:2
  43:14 44:14,15
  69:1 79:16
  81:9 82:19,23
  82:24 83:1,2
cut  17:5 34:11
  43:22 51:5
  59:9 60:5
cv  1:8

              d

d  2:12 3:1,13
  3:13 4:1
dad  29:14
dangerous
  29:12
date  1:13 31:5
  48:25
dates  34:25
  35:22 36:8
daughter  29:8
day  18:9 19:17
  41:24
days  67:2
decline  77:11
  78:16 79:7,13
  81:8 82:11
decrease  59:7
  61:7,14,17,23
  62:7 79:25

80:5,7,8 83:21
**decreased**
58:24 62:11
80:13
**decreasing**
58:8
**defendant** 1:9
2:11,20 5:7 6:3
21:17
**defendants** 6:3
**define** 28:7
54:5
**definitely** 80:9
80:11
**definitive** 10:16
**degree** 27:21
**degrees** 28:23
**delaware** 57:12
**deliver** 12:22
49:24,24
**deliveries**
51:12
**demand** 23:21
**denville** 25:3
**departure**
83:20
**depending**
45:23
**deposed** 6:6,8
8:17
**deposition** 1:11
4:6,21 5:5 6:5
6:25 10:5
24:16 26:12,15
86:1

**depth** 42:12
**describe** 17:25
21:15 41:13
52:25
**description** 3:7
3:14 54:10
**details** 39:13
**determine**
55:21
**determined**
14:5,22 15:23
**develop** 37:2
**developed**
72:14
**development**
33:3 34:22
36:16,17,24
38:4,5,5,12
39:5 82:17
83:7
**difference**
81:13
**different** 25:12
37:3 38:14
39:9,9 43:9
46:20 51:18
75:21 83:9
**difficulty** 6:16
**digital** 86:8
87:3
**dinallo** 19:16
50:23 51:12,15
51:22,25 52:6
53:1,17 54:16
56:18 63:8,9

63:23 70:3,16
70:22 80:17
81:18
**dinallo's** 54:17
81:14
**direct** 59:15
**directed** 24:18
25:11
**direction** 41:25
42:2,3 71:23
72:5,8
**directly** 17:23
73:9
**discuss** 8:23
9:3
**discussing**
12:21
**dissolved** 30:16
**distribution**
51:14
**distributor**
33:12,17,18
34:17 35:18
**distributors**
35:1
**district** 1:1,3
**division** 11:9
11:11
**document** 3:8
9:16,19,24
10:1 12:19
19:19,22 22:2
22:12,15,21
24:9,11,14
25:24 26:3,7

**documents**
3:15 10:1,13
14:2 16:1,11
17:13,17,19,19
17:22,23 18:13
18:18,24 26:12
67:23
**doing** 18:9 30:5
30:14 31:10,14
57:24 62:15
64:10 70:11
**downturn**
79:24
**drive** 25:3
**driver** 17:23
18:8 36:16
38:8,9,12 39:4
61:5,16
**drivers** 36:19
39:18 44:22
50:6 61:6,16
**dropped** 56:25
**due** 11:19
60:23 62:18
71:8 78:24
**duly** 5:16 86:5
**duties** 50:25

**e**

**e** 2:1,1 3:1,6,13
3:13,13,13 4:1
4:1 7:5 19:3
60:14
**earlier** 8:16
49:18 71:21
72:4 77:3

earliest 32:3
earn 72:11
east 46:2,3,10
   46:11 57:4
   69:5 72:17
   76:1
eastern 1:3
   46:2 75:25
economics
   27:11
education 28:6
efforts 82:9
either 25:23
   40:16 42:18
   44:12 61:3
   62:21
electronic 37:4
   67:8
eleven 57:23,23
employ 29:23
employed
   29:17 48:1,3
   86:11,14 87:8
   87:11
employee 31:22
   54:17 86:13
   87:10
employment
   28:17 30:4,4
   49:13
empty 32:23
encourage
   39:18,21
engaged 29:7
   40:8 52:14,23

engaging 29:5
enroll 27:15
entail 34:2
entails 38:12
entire 46:11
entirety 22:18
entitled 23:14
   23:17,20,23
   24:2,5
entity 25:16
envision 41:25
equipment
   44:24 45:3,16
erica 87:2,15
es 86:4
esquire 2:4,12
essentially 68:8
establish 37:1
estate 28:24
   29:9
eventually 58:8
everybody 9:12
   43:20,20 44:22
evidence 73:12
   83:18
evidentiary
   4:20
exactly 21:15
   28:1 42:24
   43:19 55:8
   70:13 80:5
   82:4
examination
   3:2 5:22 74:19

examined 5:18
examples 75:20
excel 19:2
except 82:23
exclusive 40:14
   41:8 65:15,22
   65:24
exclusively
   40:17,25
exhibit 3:8,9
   9:8,9,10 10:6
   10:10,11,12
   12:20 13:3,11
   13:20 18:2,10
   18:12 21:8,9
   21:13 22:21
   23:11,14,17,20
   23:23 24:2,5,9
exhibits 3:11
   22:23 23:9,10
exist 27:2
existing 82:24
expecting 12:1
expedited 84:9
experience
   35:24 59:10
   83:10
experienced
   81:7 83:12
experiencing
   6:15
explain 8:18
   39:7 43:21
   67:3

explained 6:20
explanation
   40:3 67:19
   79:25
express 30:19
   32:4

**f**

face 37:5,5
facets 40:2
facilitating
   77:12 81:15
fact 37:6 49:15
factors 80:21
fair 8:24 22:1
   28:15 30:24
   40:5,6 41:9
   44:21 47:18,25
   54:10 66:3
   81:5,6
fairest 41:10
fall 18:17
familiar 10:10
   13:12 42:5
   49:19,21
familiarity
   12:18
far 46:8 58:2
   79:19
fast 16:23 17:8
   25:16 29:19,21
   51:23
february 1:13
   4:8 30:9
feel 7:22 74:5
   74:17

felt 81:25
files 14:1,19
  15:20
filled 32:23
filling 72:16
final 23:21
financially
  86:15 87:11
find 63:2
fine 28:2 31:7,9
  36:11 41:4,6,6
  55:18 60:6
  84:15
first 5:16 9:24
  10:1,24 12:19
  13:10 21:22
  25:25 37:5
  46:25 47:3
  52:7 60:1
firsthand 73:14
  74:2
fit 37:7 39:12
  39:25
five 31:4 32:11
  33:6 44:11
flatly 21:1
flip 33:14
flipped 56:24
flopped 33:14
florida 46:12
  46:14 57:15,25
  58:3,3
focus 41:22
  42:1,2 57:4
  71:22 72:5,8

follow 74:21
following 68:13
follows 5:18
foregoing 86:3
  86:4 87:4
form 42:21
  43:5 45:19
  48:12 54:20
  61:8 66:6,10
  67:8 69:17,23
  71:16
formal 19:25
  20:13 48:15
format 18:22
found 49:1
foundation
  22:4 43:16
  73:22
four 35:20
  75:21
frame 67:16
free 7:22 74:5
  74:17
freight 16:23
  17:8 25:16
  29:19,21 51:23
  54:7 81:20
freights 65:23
friday 84:11,17
front 24:23
fulfill 45:17
  47:11
fulfilling 47:11
full 32:18,20
  33:20 47:23

fully 8:8,14
functional
  50:25
functions 19:7
further 13:2
  21:7 22:20
  24:9 36:11
  83:25 86:13
  87:9
furthest 46:3
fuzzy 36:10

g

g 4:1
general 43:10
  80:18
generally 75:25
  81:4
gentlemen
  42:24 84:5
geographically
  45:23
getting 7:22
  36:6 38:1
  56:24 64:12
  78:9,23
gilliam 2:4 3:4
  5:4,4 7:1 8:4
  16:25 17:4,9
  20:2,10,12
  22:4 26:16,18
  34:9,11,15
  37:13,17 42:21
  43:5,16,22
  45:19 54:20
  61:8 66:6,10

68:16 69:17,23
71:16 73:6,22
73:24 74:6,10
74:18,20 76:11
76:18,20,21
78:1,5,6 83:24
84:18,20,22
gilliam's 7:7
give 24:10 26:2
  34:25 39:13
  59:12 74:8
given 65:13
  67:20
giving 62:13
  64:20
go 8:1 9:6,24
  11:22 14:17,17
  14:25 17:23
  18:1 20:24
  21:7 22:20
  36:11 39:16
  40:2,16 46:3,8
  47:23 52:20
  58:6,11 60:6
  67:22 73:8,24
  74:4,11 80:22
  84:23
goal 72:9,18,22
  72:22 80:18
goals 80:17
goes 32:10
going 9:6,8,9
  10:5 12:17
  14:25 15:25
  18:1 19:18

**[going - itemize]** Page 9

25:6 26:2,6
29:2,16 32:10
35:2,23 50:10
51:4 52:9 58:2
67:2 69:8,12
70:9
**good** 4:2 5:25
6:1 7:22 18:22
29:15 41:16
72:13
**graduate** 27:4
27:12
**graduated** 29:9
**greater** 54:15
**grow** 41:21
72:23 80:19,20
**grown** 82:24
**growth** 81:1,3
81:4
**guess** 10:15
19:7 24:19
32:18 40:16
41:13 50:18
77:22 83:7
**guys** 51:17
53:11 57:10

**h**

**h** 3:6
**half** 32:22
47:17 59:10
60:13 65:17
72:25 78:3
**hampshire**
75:20

**hand** 5:13
**handle** 57:10
63:17
**happen** 70:20
**happened**
67:25 68:3
**hard** 10:8
25:19,21
**hartley** 32:6
**hate** 53:3
**hauling** 45:17
55:22
**head** 40:19
**healthwise**
48:19
**hear** 37:14,18
38:22,23 65:19
72:1
**heard** 6:1 17:4
42:7
**hearing** 5:8,10
**heart** 47:16
**heartland** 32:3
32:7,8,9,15,15
33:2,5,6,12,22
34:23 35:22
**help** 29:10,13
57:6,8
**hereto** 86:15
87:11
**hills** 2:7
**hissong** 1:17
4:3 86:2,17
**history** 36:12

**hmm** 16:12
**hold** 22:24 26:3
28:22
**holdings** 11:10
**houses** 29:10
**houston** 46:3

**i**

**ideal** 41:15
**identification**
9:11 16:16
21:10
**identified** 13:4
31:19
**identify** 5:1
15:14
**inclination**
48:23
**independent**
29:18 39:20
45:5 47:8
71:23 72:6
**index** 22:22
**indiana** 46:7
**indicated** 19:20
79:2,12
**individuals**
73:16
**information**
18:24 20:6
62:10 77:16
**informed** 67:13
**injunctive** 3:10
21:25 22:10
**instances** 68:9
68:10

**instructions**
3:8
**intended** 4:18
**interchanging**
39:19
**interested**
86:15 87:12
**internally** 82:4
**interrupt** 6:17
**interruption**
9:15 51:1
**interstate**
33:11,16,17,18
34:17 35:1,8
35:18
**interview** 39:13
**introduction**
5:21
**investments**
42:6
**invited** 46:23
**involve** 34:22
**involved** 13:6
13:15,16 50:16
53:21
**involvement**
75:1 83:19
**involves** 39:5
**issue** 8:22 60:9
78:18 79:10
**issues** 61:6,17
78:21 79:23
**item** 18:8 20:8
**itemize** 18:21

| items 17:16 | john 2:4 5:4 | 43:25 44:19 | 75:7 78:20 |
|---|---|---|---|
| **j** | 17:2 19:24 | 45:8,17,22 | **l** |
| jackson 2:12 | 43:2 74:4,16 | 46:11,15,17 | lack 61:6,16 |
| 3:3 5:6,6,20,23 | 76:16 | 47:5,25 48:3 | lakewood |
| 6:2 7:21,24 9:5 | joseph 1:8 2:11 | 48:18,19 50:9 | 16:22 17:8 |
| 9:13 11:22,24 | 2:20 4:8 5:9 | 50:13,22 51:6 | 25:2,15 29:19 |
| 12:3,10,13,16 | 6:4 | 52:12 53:10,23 | 29:21 51:23 |
| 17:2,6,10,12 | judgment | 54:22 55:2,16 | lanes 45:22 |
| 19:24 20:9,11 | 22:14 | 55:21 56:3 | 46:2 56:2 |
| 20:15,16 22:8 | jumbled 17:21 | 58:14,16 59:3 | 67:14,19 69:2 |
| 34:10,20 37:21 | jumps 82:23 | 59:7,8,13,14,17 | 75:7,15 82:16 |
| 37:25 38:2,20 | **k** | 59:20,22 60:1 | late 58:4 |
| 39:1,3,6 43:1 | keep 17:22 18:4 | 60:14,15,17,25 | law 2:13 |
| 43:12 44:2,9 | 18:7 72:16 | 61:1,3,4,5,5,25 | laws 4:20 |
| 51:9 54:21 | 80:14 | 62:9,11,16,17 | left 27:13,13 |
| 61:12 66:7,14 | kind 6:10 18:3 | 62:18 63:12,25 | 34:3 35:8,8 |
| 68:18,23 70:1 | 30:24 41:15 | 64:19,22,23 | 48:13,24 51:7 |
| 71:20 73:10 | 44:16 45:2,8 | 65:4,7,9,12,14 | 54:2 55:4,14 |
| 74:3,8,16 76:8 | 52:14 53:21 | 65:17,21,25 | 55:20 58:19 |
| 76:16,19 84:1 | 55:18 57:21 | 66:16,19 67:4 | 73:13 74:22 |
| 84:6,8,11,14,24 | 71:22 | 67:12,18 68:21 | 78:11 |
| january 15:3 | knew 31:8 | 68:21 69:14 | leg 44:1 |
| jersey 25:3 | 81:23 | 70:15,17 71:2 | legal 23:21 |
| 27:19 28:25 | know 8:3,4 | 71:5,6,9,22 | legs 40:23 |
| 30:25 75:21 | 11:13,21 15:6 | 72:9,21,23 | lengthy 18:14 |
| jgilliam 2:8 | 16:8 19:8 | 73:16,17 74:1 | letter 23:18,24 |
| job 1:18 32:12 | 21:14 26:21 | 74:2 75:10 | 24:3,6 |
| 33:2,24 34:21 | 27:25 28:16 | 77:17 79:20 | level 2:6 |
| 36:12 49:5 | 29:19 32:22,23 | 82:2,5,7,7 | levels 46:22 |
| jobs 28:13 36:4 | 34:22 36:5,17 | **knowledge** | liberty 8:23 9:3 |
| 57:24 | 36:24 39:22 | 68:2,3,6 73:14 | license 29:3,8,9 |
| joe 15:10,14 | 40:21 41:18,19 | 73:15 79:3 | 29:12 |
| 46:15,23 74:22 | 42:10,12,13,15 | 86:10 87:6 | licensed 28:24 |
| 84:9 | 42:23 43:9,10 | known 21:5 | 29:1 |
|  | 43:18,19,21,24 | 52:8 53:2 75:4 |  |

**licenses** 28:22
**limback** 13:3
**line** 18:8 20:8
  24:19,20,21
  50:19
**link** 39:15
**linkedin** 49:2,3
**list** 18:14,15
  23:9
**listed** 18:18
**litigation** 8:17
  8:20,21
**little** 9:6 25:7
  26:21 31:10
  36:12,24 38:11
  39:4 40:20
  46:6
**llc** 13:4
**load** 57:23 59:9
  64:2 75:15
**loads** 18:5 50:5
  55:21 56:14,15
  56:19,20,25
  58:7,24 60:18
  61:14 62:1,4,8
  62:8,12,12,23
  62:23 63:14,18
  63:23,24,25
  64:10,20 65:2
  65:3,11 70:4
  70:12,15 71:11
  72:11 75:14,16
  77:11,20 78:13
  79:7,8,14 80:1
  80:6,7 82:12

**local** 30:21,22
**location** 1:15
**locations** 67:7
**logistics** 11:10
  13:4
**long** 8:2 29:1
  30:7,10 31:2
  32:5,8 36:6
  40:23 50:9
  51:25 52:8
  53:1,6 55:2
  67:15
**longer** 48:23
  49:11
**look** 10:8 20:12
  25:22 58:15
  67:1,23,23
**looking** 80:13
**looks** 21:14
**loss** 82:10
  83:19
**lost** 82:20
**lot** 47:22 55:23
  80:21
**lower** 2:6

**m**

**m** 3:13
**made** 34:18
**mail** 19:3 60:14
**maine** 46:11,13
  75:20
**maintaining**
  50:17,18
**make** 7:15 9:7
  19:23,25 21:5

22:14 24:24
35:10 37:6
38:1 39:21
70:14,15 75:18
79:22 82:5,10
82:17
**makes** 35:21
  48:6 54:6
**makuch** 87:2
  87:15
**manager** 32:13
  33:25 34:18
  59:25
**manages** 54:12
**managing**
  53:22 54:3,5
**manipulate**
  41:21
**manner** 4:21
**march** 23:18,24
  24:3,6
**marianne** 1:17
  4:3 5:21 6:14
  7:21 9:6 37:22
  78:2 86:2,17
**marine** 11:4,12
  11:13,15 12:18
  13:7,17 14:10
  14:12 15:2
  16:3 49:18
  50:2,5,11,14,18
  50:21 51:13
  52:2,4,5,7,13
  52:23 53:19,20
  53:23 54:4,13

54:24 55:19,22
56:20 57:2
58:7 59:18,22
60:18,19 61:14
62:1 63:15,18
63:24,25 64:8
64:20,25 65:2
65:15,22,23
66:1,8,16 67:7
67:20 68:1,5
68:12,25 69:15
69:21 70:5,12
70:14,24 71:10
72:10,11,20,24
73:13 74:23
75:5,8,13 76:4
76:6,12,15,25
77:10,17 78:9
78:12,16,18,23
78:25 79:2,7,8
79:12 80:1
81:9,16,20
82:11,14,18
83:19
**marine's** 64:24
  66:3 79:24
**mark** 9:9 13:3
**marked** 9:10
  21:9
**marketing**
  28:14
**maryland**
  57:12
**material** 37:7

**[materialized - numbers]**                                     Page 12

**materialized**
   55:9
**matter**   4:7 8:18
**mean**   9:21,23
   15:8 21:15
   30:22 32:17,21
   40:15 41:14,15
   43:19 47:19
   50:5 56:10
   57:3 64:6,24
   74:2 76:8,16
   76:17
**meaning**   77:19
**means**   4:22
   15:6
**medications**
   8:12
**meet**   26:17
   53:11
**meeting**   37:5
   46:22,25 47:3
**meetings**   46:18
   46:19,23
**memory**   67:21
**mention**   78:17
**mentioned**   6:14
   8:16 25:17
   36:23 42:1
   51:15 57:1,20
   58:12 62:3
   63:20 81:18
**mentioning**
   78:12
**merged**   31:17

**message**   70:16
**met**   46:23 47:1
   47:4
**metro**   30:23,23
**michigan**   1:3
   2:7 57:7
**mid**   57:11
**midwest**   56:23
   57:1
**military**   28:11
**million**   80:23
**mind**   49:10
   51:5 72:9
**mine**   25:12
   29:10 51:12
**minnesota**
   75:24
**minute**   12:1
   45:11 72:2
**minutes**   44:11
   74:9
**mischaracteri...**
   63:22
**mitigation**
   82:25
**mm**   16:12
**model**   43:9
   45:4 72:14,16
**monday**   1:13
   84:15
**month**   59:3
**months**   82:20
**morning**   26:19
**morris**   27:18
   27:23

**motor**   30:18
   31:19
**mouth**   10:21
   20:20
**move**   83:9
**moving**   40:1
**multiple**   9:25

**n**

**n**   2:1 3:1,13 4:1
**name**   4:2 6:2
   7:2 16:21,22
   17:3 30:17,18
   60:1
**names**   32:2
**naming**   21:16
**narrow**   46:12
**nay**   62:20
**necessarily**
   80:20 83:1
**need**   7:8 8:3
   11:25 19:21,24
   20:13 21:2
   41:2,2,21
   43:24 44:1
   45:17 55:7
   79:14 82:2,15
   84:14
**needed**   47:11
   57:6
**needs**   66:9
**neither**   84:1
   86:11 87:7
**never**   29:7,14
   78:19

**new**   25:3 27:18
   28:24 30:23,23
   30:25,25 39:10
   75:20,21 82:19
   83:1
**non**   23:15,25
**normal**   79:16
**normally**   18:24
   77:5
**northeast**   33:4
   34:8 69:4
**notary**   1:17
   4:10 86:18
**notes**   74:4
**notice**   23:21
   55:24,25 67:22
**noticeable**   81:8
   81:13
**noticed**   70:8
**notification**
   48:12,17 67:24
**november**
   23:21
**number**   3:16
   10:25 13:22,24
   14:3,8,9,20,25
   15:1,18,25
   16:1,15,16
   17:14 18:12
   19:20 20:18
   21:2,3,19 23:2
   56:25 58:12
   72:19 80:21,22
**numbers**   51:18
   51:21 62:13

**[o - okay]**

| o | | | |
|---|---|---|---|
| **o** 3:13 4:1 25:2 | 19:14 36:20 | 21:1,6,12,18 | 51:11,15,22,25 |
| **oaths** 4:11 | 72:13 | 22:1,3,15,18,20 | 52:11,14,17,22 |
| **object** 7:7 22:4 | **officer** 86:1,2 | 23:4,4,9,13,17 | 52:25 53:5,14 |
| 42:21 43:5,16 | **oh** 11:22 13:12 | 23:20,23 24:2 | 53:19,25 54:17 |
| 45:19 54:20 | 14:18 16:22 | 24:5,8,8,14,18 | 54:22,25,25 |
| 61:8 66:6,10 | 17:4,6 23:4 | 25:8,9,18,20 | 55:2,5,10,16,18 |
| 69:17,23 71:16 | 25:20 28:10 | 26:2,5,10,10,14 | 56:7,17 57:1,5 |
| 73:6,22 | 31:4 33:14 | 26:17,20 27:2 | 57:9,14,20 |
| **objected** 43:3 | 37:19 40:21,21 | 27:4,7,9,12,20 | 58:6,18,23 |
| **objection** 4:13 | 48:11,11,11 | 27:23 28:15,19 | 59:3,6,18,20,24 |
| 5:10 | 52:20 53:3 | 28:22 29:1,3,5 | 60:1,3,11,14,17 |
| **objects** 7:11 | 55:6 65:20 | 29:14,16,21,23 | 60:17,25 61:2 |
| **obviously** | 72:4 76:18,20 | 30:2,7,13,17,20 | 61:5,15,21,25 |
| 41:18 72:24 | 80:9 | 30:22,24 31:2 | 62:7,11,16,18 |
| **occasional** 20:8 | **ohio** 1:16 2:15 | 31:13,18,21,24 | 62:22 63:6,11 |
| **occasionally** | 4:11 57:6 | 32:5,8,12,14,21 | 63:13,20 64:15 |
| 47:13 | 75:24 86:19 | 33:1,1,5,9,14 | 64:18 65:1,7 |
| **occasions** 60:9 | **okay** 5:20 6:10 | 33:24 34:2,6 | 65:10,14,21,25 |
| 77:15 | 6:14,18,19 7:2 | 34:10,25 35:3 | 66:8,15,15,25 |
| **occurred** 79:17 | 7:6,9,12,13,20 | 35:10,21,24 | 67:3,10,18,25 |
| **odd** 75:22,22 | 7:22 8:5,7,12 | 36:5,23 37:10 | 68:4,24 69:2,7 |
| 75:23 | 8:16,21,24 9:5 | 37:12,21,25 | 69:14,14,19 |
| **offer** 23:18 | 9:7,12,16,19,24 | 38:9,11,20,22 | 70:19,22,24 |
| 81:19,24 | 10:4,9,11,18,24 | 39:2 40:3,7,11 | 71:7,10,14,21 |
| **offered** 64:12 | 11:2,8,12,15,18 | 41:1,2,5,13 | 72:8,18 73:1,3 |
| 82:6 83:14 | 12:3,10,24 | 42:1,5,5,13,17 | 73:11,16,19 |
| **offering** 65:2,3 | 13:10,14,19,21 | 42:20 43:13 | 74:3,8,16,18 |
| 75:14 78:13 | 14:1,5,8,15,19 | 44:10,21,24 | 75:13,25 76:3 |
| **offerings** 57:16 | 14:22,25 15:6 | 45:7,21,25 | 76:23 77:3,9 |
| 64:2,5 | 15:8,13,17,20 | 46:5,10,15,25 | 77:16,19 78:1 |
| **offers** 56:22 | 15:25 16:15,18 | 47:7,10,14,18 | 78:5,11,15,22 |
| 70:14 | 16:24 17:25 | 47:25 48:16,20 | 79:5,11,18,22 |
| **office** 17:24 | 18:10,14,16,20 | 48:22 49:3,7 | 80:4,10,12,16 |
| 19:5,11,13,13 | 18:25 19:8,18 | 49:10,15,18 | 81:2,7,13,18,25 |
| | 20:9,10,15 | 50:1,4,9,13,16 | 82:9,19,25 |

83:4,13,17,24
84:5,13,21
**oklahoma** 46:4
**old** 53:7
**oldest** 29:8
**once** 8:17
**ones** 57:7 58:3
58:3 63:5
**open** 29:10
**operate** 31:2
45:23
**operated** 36:7
**operating** 35:7
36:17 50:25
**operation** 19:6
36:18,21 49:22
49:23 50:9
69:11
**operational**
18:4 19:6
30:16 60:9
**operations**
80:24
**opportunity**
55:24
**organization**
39:11
**outcome** 86:16
87:12
**outside** 28:9
**oversees** 54:12
**own** 30:15
31:15 33:13
35:4,16,20
36:18 41:20

45:2,9,15 50:6
51:16 71:22
72:5
**owned** 30:15
36:1
**owning** 35:4,5
**owns** 29:21

**p**

**p** 2:1,1 4:1 7:4
**p.m.** 1:14 4:5
85:2
**package** 12:1
12:15
**page** 3:2,7,14
10:12 13:10,11
13:19 18:2,11
21:23 22:22
23:1,2,3,8
**paragraph**
13:11 18:12
**pardon** 14:16
21:21 23:6
**part** 7:6,16
10:7 30:16
45:25 54:15
75:25
**participate**
36:21
**particular**
16:14 18:9
41:24 58:1
72:9
**parties** 4:11,14
86:12,14 87:8
87:11

**partnership**
72:15
**party** 67:5,6
**past** 68:5 71:11
**patience** 26:5
**pattern** 70:8
**payseur** 1:12
2:3 4:7 5:3,3,5
5:12,15,24
6:25 7:25 9:1
9:14,17 10:7
12:11 16:7
17:14 20:17
21:8 22:16
24:11,22,22,23
25:2,4 26:6,22
29:17 30:18
31:19 35:4
38:3 39:4
40:12 44:10
51:2,3,4 83:25
84:2
**payseur's**
38:18
**pc** 2:5
**pdf** 9:25
**people** 21:16
39:11,22 40:1
53:10
**percentage**
64:13
**perfectly** 31:9
**perform** 51:12
**period** 17:16
67:15

**permanent**
39:25
**permitted** 4:18
**person** 59:21
76:25
**personally** 74:2
**personnel** 83:8
**persons** 11:3
14:10 15:3
**pertain** 19:15
20:3
**pertaining**
41:19
**peter** 7:4
**phase** 18:4
**phone** 39:13
60:15,16
**physical** 17:22
**pick** 18:23 50:6
50:6
**piedmont**
26:25 27:5,13
**place** 46:21
55:1,1,2,10,14
63:9 75:12
**places** 29:12
82:15
**plaintiff** 1:6 2:2
5:5 21:16
**plan** 8:1 63:12
**please** 5:1,12
6:7 14:17 16:9
17:1 34:13
44:2 45:12
48:2,9 61:11

65:18 68:7
70:7 78:7
84:20
**plunkett** 2:5
**plunkettcoon...**
2:8
**point** 15:10
21:6 33:25
34:3,18 54:24
56:9,10 62:1
71:19 76:14
77:22
**pop** 49:2
**portion** 42:15
**position** 15:12
**possibly** 63:3
**post** 49:6
**preloaded**
49:24 50:4
**preparation**
26:12,15
**prepared** 87:3
**present** 2:19
11:5 14:12
15:4 16:4
**president** 13:4
34:4,19
**press** 42:11
**pretty** 32:23
41:24 57:13
**price** 64:9,19
64:21 65:8
77:25 78:9,13
**priced** 56:2,3

**prices** 64:11
75:2
**pricing** 37:8
64:4,6 77:18
77:19
**primarily**
28:14 33:3
38:14 39:10
57:4 72:17
76:1,13,24
**primary** 46:2
76:5
**print** 19:3
**prior** 31:13,13
31:15,25 33:9
35:24 86:5
**privilege** 7:12
**privileged**
68:19
**probably** 6:1
27:8 31:4 53:3
56:15 63:4
**problem** 12:10
17:11 41:7
84:4
**procedural**
4:19
**proceeding**
1:15 4:4,17
6:17 48:7
55:25 85:3
87:4
**proceedings**
86:3,5,6,9 87:6

**process** 67:4
68:25
**produced** 4:16
10:13
**product** 12:25
53:16
**production** 3:8
**productivity**
18:8
**professional**
28:5,23
**professionals**
19:22
**program** 39:17
**promoted**
15:11
**proprietor**
29:24,25
**provide** 81:23
**provided** 78:25
**public** 1:17
2:14 86:18
**pull** 26:3
**purchase** 45:16
**pure** 80:23
**put** 6:18 9:8
10:21 19:18
20:20 40:19
84:16

**q**

**qualified** 22:13
86:7
**quality** 78:17
78:24

**quantitative**
81:5
**question** 7:8
22:7 37:16
40:25 41:1,16
43:3,4 44:14
48:11 54:25
61:11
**questions** 6:11
26:20 74:5,17
74:21 80:16
**quick** 12:2
43:25 44:1
**quote** 57:10

**r**

**r** 2:1 3:13 4:1
7:5
**rainbow** 53:16
**raise** 5:12
**raised** 69:22
**range** 64:4,6,19
64:21 65:8
**reach** 81:19
82:1
**reached** 49:12
**read** 9:23 10:6
14:9 15:1
22:10 41:11
**real** 12:2 28:24
29:9
**really** 17:21
19:6 23:12
29:7 40:2 46:1
48:19 49:7
84:2

**reason** 20:21
  29:8 59:6
  60:22 71:7
  78:22 79:5,18
  79:19
**reasonable**
  80:3
**reasons** 8:7
  59:13 61:22
**recall** 48:14
  56:18 62:7
  78:12
**receive** 26:7
  83:8
**received** 9:18
  48:17 69:15
**receiving** 25:24
**recently** 66:25
**recognize** 9:16
  11:12
**record** 4:4,5,14
  5:1,19 6:2,5,15
  6:18 7:3,22
  12:6,7,8 19:19
  19:23 20:1
  21:5 44:4,5,6,7
  74:11,13,14
  84:25 86:9
  87:5
**recorded** 4:21
  6:22,23 86:6
**recording** 4:16
  86:8 87:4
**records** 16:1,11
  17:14 58:22

80:15
**recruit** 38:10
**recruited** 36:21
**reduced** 86:7
**refer** 39:22
**referral** 39:17
  39:22
**referrals** 39:17
**referred** 11:6
  13:2
**referring** 15:9
  18:17
**refocus** 82:13
**regarding**
  10:24 11:3
  14:11 15:3
  23:24 69:15,22
**region** 57:1,2
**regional** 32:13
  33:25 34:4,17
  34:18
**regions** 56:22
  57:9,10
**regular** 46:6
  64:14 70:14
**regularly** 70:19
**regulations**
  41:18
**relate** 21:1
**related** 79:23
  79:24 86:11
  87:7
**relating** 16:2
**relationship**
  11:4 13:6,17

14:11 16:3
  30:3,8 37:1
  50:13,17,20
  52:2,5 53:1,22
  54:3,13 74:23
**relative** 86:13
  87:10
**relay** 59:16
**releases** 42:12
**relegated** 56:5
  56:14
**relief** 3:10
  21:25 22:11
**remember**
  25:24 28:1,2
  32:2 35:1 36:5
  36:6 47:6
  48:13,25 49:7
  67:17
**remembered**
  49:1
**remote** 1:15 4:9
**remotely** 4:12
**repeat** 16:9
  17:1,8 51:4
  65:18
**repeating** 51:5
**rephrase** 45:7
  61:13 76:10
**replace** 82:20
**report** 40:4
**reported** 1:17
**reporter** 4:2,3
  5:8,10,19 8:25
  9:4 12:6,8

37:24 38:15,18
  38:25 44:4,7
  51:3 74:11,14
  78:4 84:6,10
  84:13,16,21,25
**reposition**
  82:16
**representation**
  7:7
**representing**
  6:24
**request** 3:15
  10:24 12:19
  13:19,23 14:3
  14:9,20 15:1
  15:18,25 16:1
  17:14 19:18,23
  19:25 20:13
  21:3
**requested**
  13:23 14:20
  15:18,21 17:14
  84:9 85:1
**research** 55:24
  58:21 62:25
  64:13
**respective** 45:8
  45:9
**response** 13:22
  24:3,6 71:25
  78:8
**responsibilities**
  36:14
**responsibility**
  45:18 55:3

76:14 77:1,6
**responsive** 3:15
14:2 19:20
21:4
**restart** 7:17
**restate** 78:7
**retail** 11:16
**retailer** 11:16
12:22 50:3
**retained** 3:11
**revenue** 46:22
72:10,12 80:8
80:13,19 82:11
82:18,21
**review** 10:7,11
10:13 14:1,19
15:20 22:15,19
23:10,10,13,17
23:20,23 24:2
24:5 26:11
**reviewed** 9:19
**riddance** 29:15
**right** 5:13 7:10
10:1 12:5 15:4
20:4 23:9
24:12 26:20
30:5 31:16,17
35:17 45:3,16
48:14 52:15
54:19 58:9,23
58:23 60:20
61:14 62:4
63:13 64:25
66:4 71:15,24
72:6 74:10,17

74:24 79:21
80:19 84:11
**road** 32:16,17
33:20
**robert** 60:2
**role** 32:12 33:2
34:21 36:15
37:2 40:8
50:20,22 51:8
51:11 68:24
69:2 70:11
**ron** 1:12 2:3
5:15 24:22,23
25:2 34:12
43:6 66:11
73:24 74:21
76:5,13,19,22
78:7 84:22
**ronald** 4:7 5:3
7:4 24:22
**roughly** 59:10
62:3
**routes** 45:22
**rules** 4:20
41:19
**run** 16:19
36:19,20 39:11
41:17,18 46:1
65:23 70:4,12
**running** 35:15
35:15 56:19
63:14 72:11
**runs** 38:13
39:12 46:6
54:7,7 57:11

**s**

**s** 2:1 3:6,13,13
4:1 7:5
**safety** 12:2
29:11 41:19
**sales** 28:13
32:13 33:25
34:5,17,18
36:22
**salesperson**
80:23
**sam** 7:5
**saved** 63:4
**saw** 49:1,11
56:4 58:3
**saying** 42:3
66:23
**says** 10:4 18:10
18:12 41:8,23
**schedule** 63:5
65:13
**scheduled**
56:14
**schedules** 63:4
63:10 65:6
75:12
**school** 28:20
**scratch** 50:19
53:20 57:22
**screen** 9:9,12
9:14 18:11
22:23 24:12,25
25:4,13 26:7
49:2

**scroll** 10:5
**scrolling** 24:8
**search** 17:20
39:25
**season** 58:4
**seasonal** 63:5
**second** 18:2,11
22:24 24:10
26:2 33:10
**section** 18:6
**see** 9:12,14
10:25 13:8
14:2,12,14
16:4,10 18:11
18:13,14 19:22
20:13 21:4,8
21:11 22:22
23:4 24:11,24
24:24 25:4,7,9
25:22 38:21
40:18 48:11
57:16 58:2
68:22 73:11
74:7 80:13
**seeing** 41:17
67:17
**seeking** 63:24
**seen** 19:21
25:25 42:11
78:20
**send** 19:3
**sending** 71:10
80:1
**sense** 35:21
75:18 79:22

**separate** 50:24 51:21
**serve** 58:4
**served** 11:19
**service** 66:9 78:18,21,24 79:23
**serviced** 53:16
**services** 69:16 69:22 78:24
**servicing** 69:3 75:8 76:3,12
**set** 84:22
**sets** 54:7
**setting** 75:2
**seven** 29:2
**several** 46:24
**shame** 53:7
**shape** 48:12
**share** 9:9
**shared** 19:5 77:1
**sheets** 37:6
**ship** 79:8 81:19
**shipped** 79:14
**shipper** 65:15 65:22
**short** 44:10 55:24 67:22
**sign** 12:2
**signature** 85:1 86:16 87:14
**signing** 83:8,15
**similar** 34:22 43:7,11 45:22

45:22
**simultaneous** 35:7
**sir** 22:5
**sit** 40:23
**sitting** 41:3 63:13 73:11
**six** 23:9 44:11 52:9,17 56:15 58:13 62:8,12 62:23 65:2,3
**sizable** 83:14
**skills** 86:10 87:6
**slower** 9:7
**softener** 53:17
**sold** 36:3 53:15
**sole** 29:24,25
**solicit** 49:12
**solicitation** 23:15,25
**solicited** 73:12
**somebody** 55:7 55:13 63:7 73:21 74:1
**somewhat** 9:20 9:21,22 25:5
**sorry** 8:10,25 10:18,22 11:24 13:13 14:17 17:6 31:6 34:9 35:5 37:15 40:21 43:22 45:8 47:2 48:2 52:20 60:5

68:13 69:20 72:1,2 75:18 76:9,20 78:1 79:6
**sort** 7:11 28:6 36:7
**sound** 31:8
**sounding** 10:20
**speak** 26:14 69:10,11
**specific** 28:22 56:14 81:5 82:15,15 83:18
**specifically** 52:5 68:25 77:24
**specifics** 78:10
**speculate** 72:22
**speculating** 27:25 47:5,21 47:22 48:21 50:12 55:17 58:17,20 59:5 59:8 60:24 73:18,25
**spell** 7:2
**split** 51:19,19
**spoke** 19:16 47:20 50:23
**spreadsheet** 18:25 19:1,2,5 19:9,10 20:7 20:20 67:9
**spreadsheets** 17:16,18 18:1

18:16
**square** 2:14
**start** 7:16 35:9 83:14
**started** 30:13 31:10 33:7,13 50:14 58:8 59:4 72:14 80:5 83:21
**starts** 7:18
**state** 30:25 70:6 86:19
**stated** 79:10
**states** 1:1 76:1
**status** 37:9
**steadily** 70:9
**stenographic** 4:22
**steve** 55:1 75:12
**stipulation** 4:23
**stop** 6:17 7:22 29:5 38:20
**stores** 12:23,25 49:25 51:13
**strategy** 64:22 64:24,25
**stretch** 40:24
**strike** 55:8
**structure** 64:9
**studied** 28:3
**study** 27:10
**stuff** 78:20

| subpoena 10:4 | t | term 54:23 | 70:15 71:21 |
|---|---|---|---|
| 10:6,7 11:19 | | terminology | 72:4 78:14 |
| 12:19 13:1 | t 3:6,13,13 25:2 | 32:18 | 82:22 |
| 21:7,8,13 | tail 59:4 | terms 40:15,15 | thinks 72:6 |
| 24:16 25:11 | tailed 16:8 | testified 5:18 | third 39:23 |
| 26:11 | take 4:4,10 8:2 | 71:21 72:4 | 67:5,6 |
| substantial | 8:4 10:8 11:25 | testify 8:8,13 | thomas 2:12 |
| 81:8 83:8 | 12:3 20:12 | 10:4 24:16 | 5:6 6:2 |
| successful | 22:25 28:16 | testifying 86:5 | thought 20:17 |
| 68:17 | 41:25 43:25 | testimony | 20:18 77:22 |
| suite 2:6,14 | 44:1,3 50:18 | 20:19 26:8 | three 19:11,12 |
| supervises | 52:17 55:6,6 | 55:11 63:22 | 19:12,15 39:9 |
| 54:13 | taken 4:7 28:8 | thank 5:8 7:6 | 40:2 47:17,18 |
| supervising | 82:19 86:3,12 | 8:6 9:4 17:9 | 56:6,16 62:8 |
| 54:23 | 87:9 | 74:18 76:3 | 62:12,23 63:13 |
| supplies 45:6 | takes 7:19 | 83:24 84:1,5 | 65:10 75:21 |
| supply 39:14 | talk 51:16 | thanks 5:20 | tilt 40:20 |
| sure 7:4,15 8:6 | 76:25 77:9 | 26:5 41:6 71:3 | time 1:14 4:25 |
| 9:7 16:10 17:2 | talked 47:14 | thing 7:18,25 | 6:9 7:8 8:2 |
| 21:15,24 22:6 | 49:16 | 17:15 18:4 | 12:14 17:17 |
| 24:24 26:4 | talking 61:13 | 20:19 28:4 | 22:25 27:9,10 |
| 35:10 37:7 | tandem 52:1 | 36:22 37:6 | 27:16 30:10 |
| 38:1 39:8 | tangible 17:19 | 40:2 51:20 | 35:6 45:11 |
| 42:24 55:8 | targets 81:5 | 65:12 73:17 | 47:13,14,19 |
| 61:13 74:6 | technical 6:16 | things 28:12 | 48:16 49:10 |
| 78:8 80:4 82:5 | technically | 44:25 46:1 | 53:6,10 55:14 |
| surgery 47:16 | 41:20 | 48:19 53:15 | 57:20,25 58:1 |
| swear 4:12 | tell 5:17 6:12 | think 13:9 | 64:5,10 67:16 |
| 5:11 | 16:13 21:12 | 17:15 20:2 | 68:14 84:2 |
| switched 56:13 | 23:1 24:14 | 37:12 38:3 | times 81:25 |
| sworn 4:14 | 36:24 38:11 | 41:22 43:2,21 | 82:15 |
| 5:16 6:11 86:5 | 39:4 49:19 | 44:11,14 48:6 | title 22:1,11 |
| system 39:24 | 58:23,25 61:21 | 51:2 57:25 | 33:24 34:4 |
| 39:25 56:4 | 63:1 79:12 | 58:12 60:8 | tjackson 2:16 |
| | 82:1 | 61:16 63:20 | |

**today** 6:5 8:8
8:14 15:14
29:3 30:5
31:11 36:13
37:4 55:10
62:4 70:2,12
73:11
**together** 44:17
45:3 51:17
**told** 31:5 77:24
77:25
**tony** 19:16 76:8
76:16,17,24
77:1,2,7,8,9,16
78:8,12,15,17
79:3,11 82:1,6
**took** 27:17,20
36:3 44:10
55:14
**top** 9:25 13:3
**total** 58:22
**totally** 68:22
**touched** 49:18
**track** 18:4,7
80:12
**trade** 28:20
**trailer** 32:22,23
60:10
**trailers** 44:24
45:6,16 49:25
50:5,6
**training** 28:9
**transcribed**
6:21

**transcriber**
87:1
**transcript** 4:16
84:7 87:3,5
**transcriptionist**
86:8
**transition**
62:23
**transport** 42:6
**transportation**
59:25
**tri** 30:25
**tricky** 82:14
**truck** 45:5
**trucker** 65:22
**trucking** 30:15
30:21 31:15,23
32:16 33:21
35:7,9,15,16,24
36:2 42:16
43:8,20 44:19
83:9
**truckload** 1:5
2:2 4:8 11:10
13:5,15 24:6
32:19,20 33:20
42:16 43:8,19
44:18
**truckloads**
32:20
**trucks** 45:10
**true** 86:9 87:5
**truth** 5:17,17
5:18 6:12

**truthfully** 8:8
8:13
**trying** 19:1
35:10 37:1
64:18 72:23
**turning** 10:12
70:18,25 71:8
**twelve** 57:23
**twenty** 57:23
58:4
**two** 18:4 31:25
47:17,18 50:24
51:11,18,20
53:15 60:8
**type** 8:18,21
28:23 30:20
32:14 33:18
36:22 40:1
45:13 49:3
50:1 51:20
71:3 73:17
**types** 43:8
**typewriting**
86:7

**u**

**u** 3:13,13 7:5
**uacl** 13:4
**unable** 38:15
**under** 4:19
18:6
**understand**
4:15 6:10 11:5
11:18 13:2
15:13 19:1
20:25 25:19

54:25 56:17
64:18 75:17
**understanding**
32:21
**understood** 9:5
**united** 1:1 76:1
**universal** 1:5
2:2 4:7 11:3,6
11:8,9,9 13:5,7
13:15,17 19:14
24:6 29:19,20
30:3,8,11 31:5
36:14 39:17
40:9,14,17,25
41:8,14 42:2
42:18 43:14
44:13,16 45:4
45:5,15 46:1
46:21 47:12
48:1,4,24
49:12 50:10,14
50:17,21 52:1
52:15,23 53:20
53:21,22 54:2
54:3,12,14,18
54:22,24 55:20
55:22 56:3
57:2 58:19
60:19 62:1
63:7,15 65:14
65:21 66:16
67:10,18,25
68:4,9,11 69:8
69:10,14,22
71:11,24 72:6

73:13,21 74:23
75:4,7 76:4,13
77:12,20 78:11
78:23,25 79:25
80:6 81:9,15
83:13,21
**universal's**
11:3,20 14:11
16:2 19:13
45:14 54:8
63:18 69:16
**unquote**  57:10
**unusual**  59:12
**update**  49:2,3
**use**  29:3 39:21
66:8
**used**  53:12
**uses**  4:18 66:1
**usual**  59:9
**usually**  63:14

**v**

**v**  1:7
**vacuums**  53:16
**valid**  82:5
**variations**
75:21
**various**  17:16
28:13
**venue**  39:23
**verified**  3:9
21:24 22:10,21
**veritext**  4:4
**version**  11:10
**vice**  34:4,19

**video**  6:23
**videoconfere...**
1:11 2:4,12,20
6:21
**view**  41:14 59:6
**violation**  23:24
**virtual**  9:15
51:1
**vocational**
28:19
**volume**  72:12
73:2,4 77:11
77:17 79:6,6,8
79:25 80:5,8
80:13,19,20,21
81:8,14 82:11
83:20
**vs**  4:8

**w**

**wait**  45:11 74:6
**walk**  31:7,9
41:3 55:18
**want**  6:18 7:14
10:21 20:20
21:7 24:24
29:11 35:11
37:25 41:3,18
63:21 74:7
80:23
**wanted**  25:18
36:12
**warehousing**
36:2,7
**watched**  42:11

**water**  53:17
**way**  21:2 22:18
32:10 39:16
40:16 41:10,17
42:20 43:4
44:15 48:12
55:20 56:1
61:3 62:21
63:2 72:14
**ways**  36:6 37:3
39:9,9
**we've**  82:13,16
82:17,24
**website**  39:15
**week**  9:18
20:14 50:23
51:16 56:5,6,7
56:20 57:21,24
58:8,11,13,25
58:25 62:2,4,8
62:8,12,12,23
62:24 63:14,23
64:21 65:3,11
75:14 80:6,7
82:3 84:9
**weekend**  60:9
**weekly**  70:12
**weeks**  56:19
65:2
**went**  6:15
26:10 49:13
60:18,19 62:1
63:3 65:1
**west**  11:4,12,13
11:15 12:18

13:7,17 14:10
14:11 15:2
16:3 46:3,8
49:18 50:1,5
50:11,14,18,21
51:13 52:1,4,5
52:7,13,23
53:19,20,22
54:3,13,24
55:19,22 56:20
57:2 58:7
59:18,22 60:18
60:19 61:14
62:1 63:14,18
63:24,25 64:8
64:20,24,25
65:2,15,22,23
66:1,3,8,16
67:6,20 68:1,4
68:12,25 69:15
69:21 70:4,12
70:14,24 71:10
72:10,11,20,24
73:13 74:23
75:5,8,13 76:4
76:6,12,14,25
77:10,17 78:9
78:12,16,18,23
78:25 79:2,7,8
79:12,24 80:1
81:9,16,20
82:11,13,18
83:19
**wife**  53:12

**[win - zoom]**                                        Page 22

**win**  67:10
  68:10,12
**wisconsin**  57:7
  75:24
**witness**  4:12,14
  4:15 5:2,11,16
  9:2 11:21,23
  11:25 12:5,12
  17:7,11 20:5
  22:6 34:14,16
  37:15,19 38:16
  38:23 39:2
  42:23 43:7,18
  43:24 51:6
  61:10 66:12
  68:19 69:25
  71:18 73:9,23
  73:25 76:9,17
  84:4 86:4
**won**  68:1,5
**woodward**  2:6
**word**  18:22
  25:1 54:5
**words**  7:19
  10:21 20:20
  64:8 79:11
**work**  28:12
  30:5 39:9
  40:25 47:7,9
  51:17,19,22
  53:12 66:16
  68:1,4,5,9,11
  68:12 69:8
  79:6 81:14

**worked**  33:16
  52:12,13 72:15
**working**  18:5
  28:17 52:1,25
**workplace**
  41:19
**works**  6:11
  37:8 39:10
  43:10
**world**  41:17
**would've**  28:16
  47:20 57:17,25
  60:12 78:20,20
**writing**  19:25
**written**  4:23
**wrong**  31:5
  35:11 62:3,5
  63:21

|      x      |
| --- |

**x**  3:1,6

|      y      |
| --- |

**y**  7:4
**yea**  62:19
**yeah**  10:19
  12:10,21 13:12
  13:13 17:7
  18:3 20:15
  21:1 22:25
  25:15,18 28:8
  28:10 34:7
  35:12 36:9
  40:21,24 42:15
  43:2,25 44:2
  44:19 45:2

  53:9 54:6
  56:23 57:13
  59:1,23 61:13
  65:19,20,20
  66:22 67:7
  68:8 70:8 74:8
  76:12,18,20
  80:9,14 83:3
  84:12
**year**  46:20
  56:15 57:15,17
  58:24 60:13
  72:23,25 80:24
**yearly**  72:20
**years**  6:9 27:7
  27:23 29:2
  31:4 32:11
  33:6 35:20
  37:5 41:11
  42:11 47:17,18
  52:10,17 53:4
  70:9
**york**  30:23,23
  30:25

|      z      |
| --- |

**z**  36:25
**zoom**  4:9 6:21

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.